UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------X
Shawn A. Jackson,
(Petitioner).

          -against-

James T. Conway, Superintendent,
Attica Correctional Facility
(Respondent).
------------------------------------X

05 CV 0571

ADDENDUM ON PETITION FOR A WRIT
OF HABEAS CORPUS PURSUANT TO
28 U.S.C. §2254

1. Shawn A. Jackson, Petitioner pro se, is presently incarcerated at the Attica Correctional Facility, P.O. Box 149, Attica, New York, 14011-0149 under D.I.N. # 01-B-1494.

2. Respondent, James T. Conway, is the Superintendent of the Attica Correctional Facility, and exercises immediate control of petitioner during this confinement.

3. Petitioner brings the instant application seeking issuance of a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, and the instant papers are in compliance with the applicable rules governing such petitions.

4. The facts and circumstances of the judgment at issue are more fully set forth on the attendant application form, and this Addendum is being included to present a more concise recounting of the constitutional errors which served to undermine the judgment.

5. Petitioner relies on the briefs submitted by counsel and pro se, in support of his arguments addressed on this petition. (and)

6. As entered on the attendant form, Petitioner addresses each claimed constitutional issue in the order they are entered thereon:

(Page 2)

GROUND ONE

PROSECUTORIAL MISCONDUCT WAS SO PERVASIVE AS TO DEPRIVE PETITIONER OF RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED THROUGH OPERATION OF THE SIXTH & FOURTEENTH AMENDMENTS, (U.S. Const. Amends. VI & XIV).

Prosecutorial Misconduct has become a heated issue in New York Prosecutions. Among the matters of contention are serious Brady and disclosure violations; improper tactics of introducing prior uncharged crimes and bad acts; improper bolstering witnesses testimonies; improperly introducing evidence that had already been ruled inadmissible by the Trial Court; and inappropriate comments during summations.

In the instant case, an overreaching prosecutor denied petitioner his constitutional rights to Due Process and a Fair Trial under the United States Constitution. The prosecution's ongoing campaign to prejudice the jury against petitioner began with Abuse of the Charging Function; the Bill of Particulars did nothing to cure the Non-Specificity of the Multiplicitous, Duplicitous and Identical Counts; a Strategically Timed Conflict of Interest to Disqualify Defense Counsel Two Weeks before the scheduled start of the Trial, Non-Disclosure of Monroe County Public Safety Laboratory Case Number 2907-00 Report #2; continuing through voir dire; opening statement; informed defense in writing that No Expert Testimony would be offered, then she put an Expert on the Stand; and continued unabated through its closing summation.

Abuse of the Charging Function

I was arrested and charged with Two Rape in the First, Two Sodomy in the First and One Count of Incest. All allegedly committed by me against my 14 year old daughter, (C.L.J.). Due to the lack of physical evidence to support the original 5 charges, A.D.A. Briggs mounted a bait and switch Shock and Awe Campaign by bootstrapping the original five charges, adding Two more alleged victims, my ex-wife (K.L.J.) and my wife (R.J.J.) for a total of 26 Felony Rape and Sodomy charges that allegedly took place in a

(Page 3)

90 minute period. All of which stand in diametric opposition to the scrutiny of physical, medical and forensic science. A.D.A. Briggs further abused the charging function by burying these 26 Charges behind 22 more charges of Multiplicitous, Duplicitous and Identical Counts all covered in an egregious shroud of non-specificity so as to be indefensible. Thus creating an Accusatory Instrument of 48 heinous crimes with one intent, to blind the Truthful Intentions of the Jury.

The Request for a Bill of Particulars and Demand for Discovery filed by A.P.D. Matthew Clark on March 12, 2001 pages 1-25 specifically requests clarity of the indictment. The Bill of Particulars did nothing to cure the problem. Moreover, on page 27 item L. specifically requests:
   1. Copies of all medical reports, etc. regarding this incident, and pertaining to the complainant, not previously supplied. This information is necessary both for trial preparation, and for use by potential defense experts. If none so state;
(Moreover, m)
   m. Copies of any and all scientific reports per CPL §240.20(1)(c), pertaining to this case, to include a list of any items submitted to the Monroe County Public Safety Laboratory. If none so state.

Assistant District Attorney Cara Briggs only supplied defense counsel with Monroe County Public Safety Laboratory case number 2907-00 Reports 1 & 3. Why didn't she supply defense with Report Two. What was tested, What was it tested for and what was the results of the testing ? Considering the items tested were collected following an alleged 90 minute assault alleging 26 Felony Rape and Sodomy charges the forensic analysis of any cross-contamination between a 34 Year old man, a 14 year old menstruating female who's flow saturated 3 layers of clothing, a 33 year old woman and 30 year old woman. Surely a 90 minute Rape and Sodomy Attack between three Grown Adults and a menstruating teenager yielded at least a pubic hair. The results of this test were relevant to the charges at hand and defense counsel was more then entitled to them. How is a strategically sound defense going to be established without All of the Facts of the case ?

(Page 4)

Pretrial Misconduct

By waiting from December, 2000 until mid-April, 2001 to announce that she intended to call Tony Arnold, a jailhouse informant in her case against petitioner, an informant who was represented by the Public Defender, Madam Assistant District Attorney Cara Briggs, effectively hamstrung petitioner's defense. During this time, Assistant Public Defender Matthew Clark had been preparing for trial, investigating the medical and forensic evidence and readying a defense for petitioner. Now, approximately two weeks before the scheduled start of trial, the prosecution used information it could have divulged up to Four Months Previously to Force a substitution of Counsel on the eve of trial.

Mr. Arnold's testimony regarded an alleged conversation with petitioner while incarcerated together at the Monroe County Jail, during which petitioner supposedly attempted to solicit Mr. Arnold to kill his wife and ex-wife (T.T.pp.549-550). Given Mr. Arnold's status as a convicted felon and regular appearances for the Monroe County District Attorney's Office for such purposes, (A 4 Time Convicted Felon that has never done 1 day Up-State Time), as well as the limited probative value of his testimony, it seems strange that the prosecution would wait four months to decide to use him.

The reason for this becomes even more transparent when one considers that this decision was made approximately one week after the March 28, 2001 Report from the Monroe County Public Safety Laboratory, wherein C.L.J. was Excluded by DNA testing as the source for bloodstains found on petitioner's and petitioner's wife's (R.J.J.) bed linen supporting petitioner's contention that No crime was committed. Moreover, this was the very last opportunity for the prosecution to substantiate their case through the scrutiny of Physical, Medical and Forensic Science. All of which was applied following an alleged 90 minute attack.

This use of a witness who really contributed very little to the prosecution's case was designed not to further the prosecution's case, but

rather as a strategic move to virtually ensure that petitioner would be forced to go to trial with underprepared or unprepared counsel, which was the only way left for them to win a case which was unsupported by ANY physical, medical or forensic evidence, which was, as later arguments will bear out, precisely what took place.

## Voir Dire and Opening Statement

The jury was further prejudiced against petitioner by numerous inflammatory remarks made by the prosecutor, Cara Briggs, as well as by other prosecutorial misconduct before and during the trial. Even before the trial began, during Voir Dire, the prosecution was admonished by the Court for improper use of hypotheticals which would apply to petitioner's case and predispose prospective jurors against him (Trial,p.45). The Court informed prospective jurors that the "voir dire process is supposed to be an educational one to the extent that we are trying to find out if you can be a fair and impartial juror. We are not here to brainwash you" (Trial,p.45). Despite this, the Court had to admonish the prosecution again during voir dire for using a similar hypothetical when questioning members of the panel (Trial,p.117).

At the outset of trial, Ms. Briggs began her opening statement with extremely prejudicial and inflammatory remarks about petitioner (Trial, pp. 221-222). She told the jury over defense objection that "at the end of the trial you will have an entirely different picture of [Mr. Jackson] than the superficial presentation that you have of him now" (Trial, pp. 221-222). Immediately afterward, Ms. Briggs told the jury, again over defense objection, that Mr. Jackson would be "exposed as a twisted, sadistic man who delighted in controlling the members of his very own family to the point that he abused them constantly" (Trial,p.222). At the conclusion of the prosecution's inflammatory opening statement, the defense moved for a mistrial; the Court denied the objection (Trial,p.236). The substantial prejudice against petitioner from the prosecution's improper comments was exacerbated when the trial court overruled defense objections to this

(Page 6)

illegitimate argument. Moreover, by overruling the defense objections, the court essentially told the jury that there was no impropriety.

The purpose of an opening statement is to give the prosecution an opportunity to set forth the nature of the charges and to briefly state the facts it expects to prove with evidence which will be introduced at trial to support them. The opening statement is not argument; and it is most assuredly not an opportunity to begin irreversibly tainting the jury against the defendant as the prosecution did in the case at bar.

### The Improper Testimony of Dr. Ann Lenane

The prosecutions improper tactics to prejudice the jury against petitioner is also demonstrated by Ms. Briggs' decision to elicit Expert Testimony in diametric opposition to her letter to Defense Counsel two days before trial specifically stating that the prosecution would **NOT** be offering Expert Testimony.

Here, Dr. Lenane delivered some devastating testimony when she opined, from her review of the alleged victim's medical records, (T.p.528, Lines 24-25), "The other finding that they noted was old blood in the vulva, **which means he was inside the vagina.**"

Now there is an Expert on the stand who just testified to Penetration of the Vagina, which is an element required to be proven in Rape in the First. This is just wrong on so many levels. First and Foremost, the Expert is **NOT** even suppose to be on the stand. Second, expert testimony in this regard should have been, it is consistent with penetration. Thirdly, how can she responsibly say that when she knew C.L.J. was in the early morning of the Third Day of her Current Menses. Dr. Lenane further prejudiced my jury by saying the abrasion on C.L.J.'s Vagina was consistent with penetration. This too was an irresponsible statement considering that the Irritation/Abrasion at the noted location is exactly where Sloppy Sanitary Napkins have been in contact for Two Days, in addition to the travel path

(Page 7)

of Menses Flow and Toilet Paper Wiping, (again for Two Days). Madam Assistant District Attorney Cara Briggs **LIED** in Writing saying No Expert Testimony, then she went out and **PAID** Dr. Ann Lenane to come and testify.

Why didn't Ms. Briggs just reply that she was going to offer Expert Testimony ? Could it be that knowing Expert Testimony was going to be offered might stimulate Mr. Damelio, (Defense Counsel) to look at the Monroe County Laboratory Reports, realizing he had #1 and #3 and **NOT** Report #2, moreover if Defense Counsel went out and got an Expert, that Expert would illuminate the Testimony of the Alleged Victims as Manifestly Untrue. Ms. Briggs was afraid of Head to Head Expert Testimony. So She Lied.

By the time my attorney was able to effectively communicate to Judge Peter Corning that the witness was not a treating physician of any of the Alleged Victims, therefore testifying as an Expert it was too late my jury was irreversibly tainted. No curative instruction could undue the overwhelming prejudice from this Outrageous Display of Prosecutorial Misconduct. This is Bad Faith Prosecution exercising Misrepresentation and Fraud.

This Warrants Reversal due to the prejudice against petitioner lies in the Nature of Expert Testimony and its Influence on the Jury's function. Moreover, Expert Testimony is powerful because it is used in partial substitution for the Jury's otherwise Exclusive Province, which is to draw conclusions from the facts.

### Closing Summation

The prosecution made numerous improper comments in its closing summation. Several times during her closing argument, Ms. Briggs told the jury that Mr. Jackson was in Fact Guilty of the Crimes Charged (Trial,pp.625,639,641-643,649). She told the jury that these "Heinous Horrific Acts" really happened and that Mr. Jackson committed them (Trial,p.625). Ms. Briggs told the jury that Mr. Jackson is not innocent, because innocent men do not "admit

there is a possibility they did something wrong, when what we are talking about is sex with his own daughter" (Trial,p.639).

Over defense objection, Ms. Briggs told the jury, "That man, sitting there, looking like he is pondering every word that is being said, is GUILTY" (Trial,p.643)(Emphasis supplied). The prosecutor informed the jury that the only explanation for the testimony against Mr. Jackson is that he is in fact GUILTY (Trial,p.643). Finally, in her concluding remarks, Ms. Briggs told the jury that "[Mr. Jackson] is guilty of everything" charged in the indictment and that he "has consistently abused his family for years, basically beat them into submission" (Trial,p.649).

The prosecution also improperly bolstered witness testimony, argued facts not in evidence and elicited sympathy for the Alleged Victims in the summation. Ms. Briggs told the jury that it should believe the witnesses for the People because, "even the best actor or actress could probably not tremble with fear as continuously as some of these witnesses did" (Trial,p.627). She told the jury that it was obvious that the witnesses were afraid of Mr. Jackson (Trial,p.628), and that since each witness testified consistently with the next, then the testimony was not part of a "Diabolical plan to frame Shawn Jackson", but must be true (Trial,pp.628-630).

The People also improperly bolstered the medical records of K.L.J. and C.L.J. by arguing facts that were not in evidence. Ms. Briggs argued throughout her closing summation that Mr. Jackson was unable to get an erection, and that this was the only reason there "is not semen in this case, it is because [Mr. Jackson] was physically unable to leave any" (Trial,p.630). She then told the jury that K.L.J.'s medical records show there was redness in her anal folds, which is consistent with her testimony about the incident on November 29 with Mr. Jackson (Trial,p.634). She informed the jury that the person who performed C.L.J.'s gynecological exam noted an abrasion on her vagina (Trial,pp.634-635), and argued that C.L.J.'s gynecological records and the diagram contained therein of her vagina are "the most reliable...part of the record" (Trial,p.635).

(Page 9)

Madam Assistant District Attorney Cara M. Briggs abused the Power of the Office that she holds at every turn of the proceedings against petitioner. The "Official Lawlessness" was so pervasive that it deprived petitioner of his Right to a Fair Trial and Due Process of Law as Guaranteed through operation of the Sixth and Fourteenth Amendments. The cumulative effect of her calculated and premeditated Misconduct entirely undermines the integrity of the outcome and Warrants Reversal of my Conviction.

### GROUND TWO

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL SO AS TO DEPRIVE PETITIONER OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED THROUGH OPERATION OF THE SIXTH AND FOURTEENTH AMENDMENTS, (U.S. Const. Amends. VI & XIV).

Please refer to Habeas Corpus Petition section (22) [b] POINTS 1 - 4.

### GROUND THREE

PETITIONERS 48 COUNT INDICTMENT WAS INFLAMMATORY & PREJUDICIAL DUE TO IT'S DUPLICITOUS, MULTIPLICITOUS AND IDENTICAL COUNTS COVERED IN A SHROUD OF NON-SPECIFICITY SO AS TO BE INDEFENSIBLE. IT WAS SO PERVASIVE AS TO DEPRIVE PETITIONER OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED THROUGH OPERATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS, (U.S. Const. Amends. V, VI & XIV).

Petitioner was charged in the Indictment with **Forty-EIGHT COUNTS:** Sodomy in the First Degree (15x), Rape in the First Degree (6x), Incest (5x), Sex Abuse in the First Degree (5x), Rape in the Third Degree (3x), Sodomy in the Third Degree (2x), Assault in the Third Degree (6x), EWOC (3x) Attempted Sodomy in the First Degree (2x), Coercion (1x).

This indictment was defective, and the Court should have granted Mr. Clark's motion to dismiss it.

(Page 10)

## Multiplicitous Counts

The primary problem with the indictment is the sheer multiplicity of charges it contains. Mr. Clark's motion papers listed 13 sets of counts in the indictment alleging the same crime, on the same date, to the same complainant, by the act, and in the same words:

a. Charges 6 and 7, Charging Attempted Sodomy, 1st Degree.
b. Charges 10, 11 and 12, Charging Rape, 1st. Degree.
c. Charges 13 and 14, Charging Sodomy, 1st. Degree.
d. Charges 15, 16 and 17 Charging Sodomy, 1st. Degree.
e. Charges 18 and 19, Charging Sodomy, 1st. Degree.
f. Charges 21, 22 and 23, Charging Sodomy, 1st. Degree.
g. Charges 29 and 30, Charging Sexual Abuse, 1st. Degree.
h. Charges 31 and 32, Charging Sexual Abuse, 1st. Degree.
i. Charges 33, 35 and 37, Charging Rape, 1st. Degree.
j. Charges 34, 36 and 38, Charging Rape, 3rd. Degree.
k. Charges 39 and 41, Charging Sodomy, 1st. Degree.
l. Charges 40 and 42, Charging Sodomy, 3rd. Degree.
m. Charges 43, 44, 45, 46 and 47, Charging Incest.

Multiple counts of an indictment cannot charge a person with the same offense. This is the very definition of multiplicitous counts. This creates a danger of multiple sentences for the same offense. Another danger is that a defendant may be seen to have committed more crimes than are actually charged. A third danger, not argued in the motion but raised in my appeal is that the sheer number of charges in an indictment such as this are unduly prejudicial, and create an impression in the minds of potential jurors that anyone charged with so many crimes must have done something. The sheer volume of the charges is in itself incriminating.

Mr. Clark had requested that counts 6 and 7, 10 through 19, 21 through 23, and 29 through 47 be dismissed as multiplicitous. He argued in support of this that nothing in the Bill of Particulars showed these to be separate

acts on the same day, other than a naked assertion of those facts. Nor was any such evidence adduced at trial. The counts were multiplicitous and should have been dismissed.

## Duplicitous Counts

Although CPL §200.10 allows an indictment to accuse a defendant of as many offenses as may be joined together, each count must allege only a single offense. Any count which does not follow this procedure is considered "Duplicitous". Such was the case with the indictment in the case at bar.

Mr. Clark also asked that counts 27 and 48 be dismissed, as they charged more than one crime. These counts charged Endangering the Welfare of a Child regarding G.J.J. (Count 27), and C.L.J. (Count 48).

Counts 24 through 26 charge petitioner with Assault in the Third Degree for injuries allegedly done to G.J.J. during the period of January 19, 1999 through November 30, 2000, also alleged in Count 27. And Counts 1 through 8 charge petitioner with crimes against G.J.J.'s mother, during this same time period (threats of harm to the mother are a part of the Endangering charge).

Count 28 charges petitioner with Endangering for alleged sexual offenses against C.L.J. during November 29-30, 2000, time period. Counts 29 through 47 also charge petitioner with multiple sex crimes involving C.L.J. for the same time period. Mr. Clark correctly argued that petitioner could have been convicted of any of these counts, any of which would form a basis for the charge of Endangering the Welfare of a Child. This prevented petitioner of being apprized of these counts on the basis of a different offense. This is the very test for duplicitous counts.

Mr. Clark then correctly points out that petitioner could have been convicted of any one of counts 10-26, acquitted of the rest, and that any one of them alone would form a basis for a conviction for Endangering the

(Page 12)

Welfare of a Child as to Count 27. Likewise, he could have been convicted of any one of counts 29-47, acquitted of the rest, which would then form a basis for a conviction of Endangering as to Count 28; and yet all of these are separate charges.

Mr. Clark correctly argued that duplicitous counts make it impossible to tell whether a jury found a defendant guilty or not guilty of one crime or of both, hindering him in sentencing and rendering appellate review difficult or impossible; it could also be prejudicial in regard to evidentiary rulings. He also noted that the Bill of Particulars in this case did nothing to cure the duplicitous counts.

In fact, only Count 28, a third charge of Endangering the Welfare of a Child charge involving J.A.J. was dismissed, (Certificate of Conviction A-7). Clearly, Counts 27 and 48 should have joined it, and the trial court's failure to dismiss those counts was clearly error.

## Identical Counts

Mr. Clark moved to dismiss Counts 6 and 7, 10 through 19, 21 through 23 and 29 through 49 as identical counts, "as to the complainant, charge, date and physical act (If any is alleged), and further, each of the following groups are the same, word for word":

a. Charges 6 and 7, Charging Attempted Sodomy, 1st. Degree.
b. Charges 10, 11 and 12, Charging Rape, 1st. Degree.
c. Charges 13 and 14, Charging Sodomy, 1st. Degree.
d. Charges 15, 16 and 17, Charging Sodomy, 1st. Degree.
e. Charges 18 and 19, Charging Sodomy, 1st. Degree.
f. Charges 21, 22 and 23, Charging Sodomy, 1st. Degree.
g. Charges 29 and 30, Charging Sexual Abuse, 1st. Degree.
h. Charges 31 and 32, Charging Sexual Abuse, 1st. Degree.
i. Charges 33, 35 and 37, Charging Rape, 1st. Degree.
j. Charges 34, 36 and 38, Charging Rape, 3rd. Degree.

(Page 13)

k. Charges 39 and 41, Charging Sodomy, 1st. Degree.
l. Charges 40 and 42, Charging Sodomy, 3rd. Degree.
m. Charges 43, 44, 45, 46 and 47, Charging Incest.

The indictment effectively denies petitioner's due process rights under the United States Constitution, as they do not allege what specific conduct forms the basis for each individual count. These counts allege conduct which took place over a long period of time, with no specificity as to date and time. It is thus impossible for petitioner to have prepared a defense against such vague allegations, sometimes spread out over a week and even as much as a month (See, e.g. Counts 8, 10-17, 24, 25, 26 and 27).

Nor was the evidence presented at trial much more specific. Only the events alleged on November 29 and 30 were testified to with anything close to specificity; and even there, the exact time nor order of assaults exclusive to each perspective victim. However, in order to prove that the sexual contact among the adults was not consensual, testimony was brought forth alleging events which had allegedly taken place years ago, with no specific date or time rendering it impossible for petitioner to mount an effective defense (See, e.g., Trial, pp. 242, 248-9, 251 ("he would always make me go up into his room to have sex with me"), 255("When we would get downstairs he would always make me.."), 256).

Mr. Clark argued that these counts made it impossible to determine whether or not the grand jurors agreed upon a specific act by petitioner with regard to each individual count of the indictment. It was thus equally impossible for the Trial jury to have determined which conduct related to which count of the indictment, which raises the possibility that petitioners right to be tried and convicted only of those crimes charged in the indictment would be violated, as well as petitioners right to be convicted only by a unanimous verdict of the jury, because of the danger that different jurors might find different conduct to be a basis for conviction regarding the same count.

(Page 14)

And if the grand jury and the **Trial** jury were unable to differentiate between the counts of this indictment, then it would be equally impossible for this Court to do so. As Mr. Clark correctly argued:

"Without knowing what the specific act was that the grand jury Believed was sufficient to support an individual count, the Defendant and the Appellate Court is left to speculate as to what evidence the jury relied upon to find guilt on each count. **Meaningful Appellate Review is Impossible without additional particularization of the indictment** (Emphasis supplied)."

Of course, no additional particularization was ever supplied. The Bill of Particulars shed no more light on the specificity of these charges than did the indictment itself. It merely alleged that the acts charged were separate, and that they took place in "the same transaction" or on "the same day". This gave no more information, shed no more light upon the sequence of events or the relationship of acts to counts than did the original document. If anything, it muddied the waters even further. It certainly did nothing to facilitate Appellate Review. Thus, Counts 6, 7, 10-23, 29-46 and 48 should properly have been dismissed as duplicitous and violative of petitioners Federal Constitutional Rights. The Failure of the trial Court to do so was clearly error. (Petitioner's 48 Count Indictment was Inflammatory & Prejudicial due to it's Duplicitous, Multiplicitous and Identical Counts covered in a shroud of Non-Specificity so as to be Indefensible. It was so pervasive as to Deprive Petitioner of his Right to a Fair Trial and Due Process of Law as Guaranteed through operation of the Fifth, Sixth and Fourteenth Amendments Warranting Reversal of Conviction).

## GROUND FOUR

PETITIONER'S STATEMENTS WERE TAKEN IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT IN VIOLATION OF THE SUPREME COURTS MANDATES ESPOUSED IN MIRANDA, (U.S. Const. Amend. V).

After a Huntley Hearing, which took place on March 23, 2001, the lower

court held that several statements allegedly made by petitioner to Kathy Bonisteel, a Child Protective caseworker for the Monroe County Department of Social Services were not taken in violation of petitioners constitutional rights and could be used at trial against him (3/23/01 Trans.pp.45,48-49). Mr. Jackson made all of these alleged statements to Ms. Bonisteel after he was in custody at the Greece Police Department (3/23/01 Trans.,pp.12-13). Prior to the interview conducted by Ms. Bonisteel, Mr. Jackson had been placed under arrest by Greece Police Sergeant Chris Bittner, read his Miranda rights and placed in a holding cell (Ibid.,pp.7-21). It should also be noted that when Mr. Jackson first asked Sgt. Bittner if he was in fact under arrest, Sgt. Bittner told him he was not, but when Mr. Jackson tried to leave the interrogation room, Sgt. Bittner restrained him and immediately placed him under arrest and gave the Miranda warning (Ibid.,pp.12-13).

Sgt. Bittner testified at the Huntley Hearing that after being read his rights, Mr. Jackson had exercised his right to remain silent, and refused to speak to the police regarding the incident involving his daughter, C.L.J., his wife R.J.J. and his ex-wife K.L.J. (3/23/01 Trans.,p.13). This refusal to discuss the incident came before Mr. Jackson's interview with Ms. Bonisteel. Despite his having refused to speak with them, Sgt. Bittner contacted Ms. Bonisteel, told her that he had refused to speak with the police, and allowed her to interview Mr. Jackson about the identical incident the police were investigating (Ibid.,pp.15,17,18,20,34). At the time, Sgt. Bittner was aware that Ms. Bonisteel was conducting a parallel CPS investigation of the same incident (Ibid.,pp.17,21,38). Sgt. Bittner testified at the Huntley Hearing, "Mr. Jackson was let out his cell, was not handcuffed, and that the officers went around the corner out of Mr. Jackson's sight, where, allegedly out of concern for Ms. Bonisteel's safety, they were able to hear the entire conversation" (3/23/01 Trans.pp.10-11 and 21). And of this conversation which lasted either 15-20 minutes (Bittner, 3/23/01 Trans.,p.21) or 45 minutes (Bonisteel, 3/23/01 Trans.,p.41) there is no record, audio, video or signed statement.

Mr. Clark strenuously argued that the DSS and Greece Police

(Page 16)

investigations were concurrent, obviously involved the same incident and that Ms. Bonesteel was essentially an agent of the police (3/23/01 Trans., pp. 42-46). However, the Court held that Ms. Bonisteel's investigation was part of a "completely separate civil proceeding" and not "part of any criminal proceeding" (3/23/01 Trans.,p.49). The Court further held that Mr. Jackson's constitutional rights were not violated, and that his statements could be used against him at trial because Ms. Bonisteel "was not a public servant and, in this case, did not act as a law enforcement officer, but a child protective worker. There is no requirement on the part of the protective worker to give any Miranda Warnings" (Ibid.,pp.48-49). This ruling constitutes Reversible Error on the part of the Trial Court.

Case worker Bonisteel was acting as a Law Enforcement Officer, since the Arresting Officer, by contacting her, was seeking to Accomplish that which he could NOT do on his own: to Interrogate Petitioner after petitioner asserted his right to remain silent.

There can be no serious contention that petitioner was NOT in Custody. Petitioner had first asked Sgt. Bittner if he was under arrest and had been told that he was not, when petitioner tried to leave, he was stopped by Sgt. Bittner and immediately placed under arrest.

There in no question that petitioner was in custody at the time of his interrogation by Ms. Bonisteel. Therefore, the legal question becomes whether, first, Ms. Bonisteel was an agent of the police, and second, whether as a consequence Miranda Warnings should have preceded such interrogation.

What makes Ms. Bonisteel's actions in conducting the unquestionably custodial interrogation of petitioner particularly egregious is her status as a State Employee. There comes a point where a government employee's normal day to day functions end and the pseudo-police functions begin. Petitioner's interrogation by the non-police government employee was made in custody, and concerned the petitioners suspected involvement in a crime, and were preceded by Miranda Warnings, they are inadmissible since they were part

of a continuous interrogation. Petitioner refused to discuss the alleged incident with the police before he was interviewed by Ms. Bonisteel (3/23/01 Trans.,p.13). Sgt. Bittner contacted Ms. Bonisteel and told her that he had refused to speak with the police, then removed petitioner from the cell, was not handcuffed, then the officers went around the corner out of Petitioner's sight, where, allegedly out of concern for Ms. Bonisteel's safety, they were able to hear the entire conversation. And of this conversation which lasted either 15-20 minutes (Bittner, 3/23/01 Trans.,p.21) or 45 minutes (Bonisteel, 3/23/01 Trans.,p.41) there is no record, audio, video or signed statement.

At the point of Ms. Bonisteels interrogation of petitioner her actions were the functional equivalent of those of a police officer. Therefore, in order to dispel the potential for coercion which inheres a custodial interrogation by a police officer Federal Law Requires Administration of the Miranda Warnings to dispel the potential coercion in order for the petitioner's alleged statements to be admissible in a criminal trial.

This ruling by the Trial Court constitutes Reversible Error. Petitioner's alleged statements were taken in violation of his fifth amendment right to remain silent in violation of the Supreme Court Mandates Espoused in Miranda. Moreover Warrants Reversal of his Conviction.

(Page 18)

On the foregoing reasons, I respectfully request this Court to issue the Writ as requested on the Instant Petition.

**WHEREFORE**, Petitioner respectfully prays that, by virtue of each of the foregoing issues, and all papers previously submitted before the State Courts on Appeal, the instant application be granted, and this Court issue a Writ of Habeas Corpus, and for any such other and further relief as this Court may deem just and proper.

I Declare Under Penalty of Perjury that the Foregoing is True and Correct.

Respectfully Submitted,

Dated: August 9th, 2005.

Shawn A. Jackson

Sworn to before me this 9th Day of August, 2005.

Notary Public

JAMES E. WALKER
Notary Public, State of New York
No. 01WA5034484
Qualified in Wyoming County
Commission Expires October 11, 2006