# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

SHAWN A. JACKSON,

                              Petitioner,

        -vs-

JAMES CONWAY, Superintendent
Attica Correctional Facility,

                              Respondent.

**MEMORANDUM AND LEGAL AUTHORITY IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

05-CV-0571A

The facts and procedural history of this case are set forth in the Petition and exhibits attached thereto and will not be reiterated below, except as necessary to clarify the arguments made in this Memorandum.

**THE TRIAL COURT'S RULING THAT THE STATEMENTS OBTAINED FROM MR. JACKSON DURING QUESTIONING AFTER HE HAD EXPRESSLY REFUSED TO WAIVE HIS RIGHT TO REMAIN SILENT VIOLATED MR. JACKSOM'S CONSTITUTIONAL RIGHT TO REMAIN SILENT, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.     Introduction**

The United States Supreme Court has held that "once in the custody of law enforcement officials, an accused must be informed of his constitutional rights to remain silent and to counsel, and a waiver of those rights, to be effective, must be voluntarily, knowingly and intelligently made. *Colorado v Spring*, 479 US 564 (1987); *Miranda v Arizona*, 384 US 436, 444 (1966)." *Campaneria v Reid*, 891 F2d 1014, 1020 (2d Cir 1984). Petitioner Jackson urged at every stage of the state court proceedings in his case that he had

been unconstitutionally subject to custodial interrogation after he had expressly declined to waive his rights and that the statements made during such interrogation were, thus, inadmissible. The trial court denied petitioner's motion to suppress, ruling that the Child Protective Investigator Bonisteel, who conducted the custodial interrogation was not a law enforcement officer and was, thus, not subject to the *Miranda* requirements (Hearing Minutes (HM) 47-49). This holding was affirmed by the Appellate Division, Fourth Department which, also held that "the case worker was not required to advise Defendant of his *Miranda* rights before speaking to him (citation omitted). *People v Jackson*,  4 AD3d 848, 849 (4th Dept 2004). After an application for leave to appeal, which, inter alia, raised issue was denied,  Mr. Jackson filed a petition for habeas corpus which, in part, challenged these rulings.

Respondent, in answering this petition, argued that a writ of habeas corpus cannot be granted upon this ground because there was independent state law basis for the state court's denial of these claims. Specifically, Respondent urges that the state court findings that the Child Protective Investigator was not acting as an agent of the police and that she was not required to read a defendant *Miranda* rights were matter of state law (Respondent's Answer in Opposition to Federal Habeas Claim and Memorandum of Law).

As detailed below, the holding of the state courts on this issue were exclusively based on an erroneous application of the requirements of *Miranda*, and not on any independent state law ground. Further, as detailed below, Mr. Jackson is entitled to prevail on his Petition pursuant to 28 U.S.C. § 2254, as amended in 1996, since the record demonstrates "that the

state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(1), (2); *Williams v Taylor*, 529 US 362, 375-76 (2000)." *Allen v Filion*, 371 F Supp.2d 284, 290 (WD NY 2004).

**B.     Mr. Jackson's Statements to Investigator Bonisteel Were the Product of Custodial Interrogation in Which Investigator Bonisteel, Having Been Informed Both That Mr. Jackson Was in Custody and Had Refused to Waive His Right to Remain Silent, Questioned Mr. Jackson, With the Police Listening In, Without Renewing the *Miranda* Warnings.**

During the early morning hours of November 30, 2000, Mr. Jackson was awakened by officers of the Greece Police Department and transported to the police building Trial Minutes (TM) 335-338). Once there Mr. Jackson asked whether he was under arrest or free to leave. When he was told by Greece Police Sergeant Bittner that he was not under arrest and free to leave, Mr. Jackson attempted to leave (TM 488). He was immediately stopped and told by Sergeant Bittner that he was under arrest (TM 488-489). Sergeant Bittner then proceeded to read Mr. Jackson his *Miranda* rights (TM 479-482). Sergeant Bittner testified that when Mr. Jackson was asked if he was willing to waive his rights, Mr. Jackson "clearly answered, no he did not wish to speak..." (HM 12-13).

Also, at the Greece Police Department that day was a Kathy Bonisteel, an Investigator for Child Protective Services (TM 499), who had been called by the Greece Police when they learned of the allegations against Mr. Jackson (HM 15, 34-35). Investigator Bonisteel

participated in the police interviews of Christal and Karen Jackson conducted at the Greece Police Department (HM 15, 35-36, TM 507). Later that day Investigator Bonisteel wanted to speak to Mr. Jackson about the allegations. She knew that he was in the custody of the Greece Police in their holding facility and had been told by the Greece Police that Mr. Jackson refused to speak with them  (HM 40).

At Investigator Bonisteel's request, the police unlocked the door of the holding cell Jackson was in and brought him to a table outside of that room to be questioned by Bonisteel (HM 25,TM 484, 497-498). He was still in custody - could not leave. Further, police sat themselves around the corner in earshot of the table so that there could here everything that was said (HM 21-22). Investigator Bonisteel did not renew or repeat the *Miranda* warnings which had been read to Mr. Jackson earlier and did not ask if he was now willing to waive those rights (HM 38, TM 510).  Instead, she  simply told him that she "need[s] to address the allegations of my report with him." and asked if he would she could speak to him  (HM 27).

Bonisteel did not inform Mr. Jackson that the police who he had refused to speak with were sitting close by listening to every word. Nor did she inform him that, as required by New York law (NY Social Services L § 424 [4] and [8]), having been contacted by the police, she had a duty to report evidence of abuse to law enforcement and that she would be providing her notes of her conversation with Mr. Jackson to the District Attorney. Over the next 45 minutes Mr. Jackson proceeded to answer Investigator Bonisteel's questions about his relationships with his family and the allegations of sexual assault which lead led to his arrest (HM 23-34 41).

C.      **The Statements Obtained From Mr. Jackson Were the Product of a Custodial Questioning Contrary to the Constitutional Obligation to Scrupulously Honor Mr. Jackson's Right to Cut Off Any Questioning After Being Read His *Miranda* Rights.**

In *Miranda v Arizona* (384 US 436 [1966]) the United States Supreme Court promulgated a set of safeguards to protect the constitutional rights of persons subjected to custodial police interrogation.  The *Miranda* Court held that unless law enforcement officers gave certain specified warnings before questioning a person in custody and followed certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him. Specifically, the Court held that

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

*Miranda v Arizona,* 384 US 436 at 473-474.

Subsequently, in *Michigan v Mosley* (423 US 96 [1975]), the Court considered when a person who upon being read his *Miranda* rights had exercised his right to remain silent could be constitutionally again subjected to further custodial interrogation. The Court first held that

> [a] reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . .' 384 U.S., at 479. The critical safeguard identified in the

passage at issue is a person's 'right to cut off questioning.' Id., at 474.

*Michigan v Mosley*, 423 US 96, 103 (1975).

The Court, taking language from its earlier *Miranda* opinion, then concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was *'scrupulously honored*.'" (emphasis supplied). *Michigan v Mosley*, 423 US 96, 104 (1975) . This test and standard for determining the admissibility of statement made by a suspect after he invoked his right to be silent remains in effect. *Campaneria v Reid*, 891 2d 1014 (2d Cir 1989); *United States v Barone*, 968 F2d 1378 (1st Cir 1991); *Allen v Filion*, 371 FSupp.2d 284 (WD NY 2004).

In applying this test, the Court in *Mosley* held that the test was satisfied when, hours after Mr. Mosley stated that he did not wish to discuss robberies for which he was suspect, a different officer read him full and complete *Miranda* warnings prior to initiating an interrogation into an unrelated crime *Michigan v Mosley*, 423 US 96, 104-107 (1975).

In applying the decision in Mosley, the Court of Appeals for the Second Circuit has held that.

> Questioning *can be resumed after fresh Miranda warnings are given and the right to remain silent is otherwise scrupulously honored*, for example, by renewing the questioning only after the passage of a significant period of time *and by limiting the renewed questioning to a different subject matter than the original interrogation*. *Michigan v Mosley*, 423 US 96 at 104-07 (emphasis supplied).

*Campaneria v Reid*, 891 2d 1014, 1021 (2d Cir 1989).

In *Campaneria* the Second Circuit held that where the *Miranda* rights had not been

re-read, the statements obtained during the second interrogation were inadmissible under the *Miranda* and *Mosley* decisions because Mr. Campaneria's right to remain silent was not scrupulously honored. *Campaneria v Reid*, 891 d 1014, 1021-1022 (2d Cir 1989).

The holding in *Campaneria* makes clear that renewal or re-reading of the *Miranda* rights is a critical and essential component for establishing that the right to remain silent had been scrupulously honored. Other courts have also relied on the failure to re-read *Miranda* warnings after a suspect has invoked his right remain silent in finding that the subsequent interrogation was in violation of *Miranda*. See, e.g., *United States v Barone*, 968 F2d 1378 (1st Cir 1991); *United States v DeGounette*, Not Reported in F Supp2d, 2007 WL 607234 (WD NY 2007); *Stewart v United States*, 668 A2d 857 (DC App 1995). As one court explained

> once a suspect has unequivocally invoked the right to remain silent, the police are not forever precluded from resuming questioning. However, the police must give the suspect his Miranda warnings again, and they must scrupulously honor his right to remain silent, for example, by renewing the questioning only after the passage of a significant period of time and by limiting the renewed questioning to a different subject matter than the original interrogation.

*United States v Plugh*, 522 F Supp2d 481, 493 (WD NY 2007), affd __ F3d __ , 2009 WL 2341966 (2d Cir 7/31/09).

In this case, Investigator Bonisteel, aware that Mr. Jackson had refused to speak to the police, did not re-read the *Miranda* right to Mr. Jackson prior to starting her questioning of Mr. Jackson (HM 38, TM 510).

A second factor relied by the Court in *Mosley* (at104-107), and re-affirmed by the Court in *Campaneria* (at 1021), in determining whether the invocation of a suspect's right

to remain silent had been scrupulously honored was whether the questioning after such invocation pertained to the same subject matter as the original questioning. As the Second Circuit explained the holding in *Mosle*y, questioning can be resumed after fresh *Miranda* warnings are given and the right to remain silent is otherwise scrupulously honored, ... *by limiting the renewed questioning to a different subject matter than the original interrogation*. *Michigan v Mosley*, 423 US 96 at 104-07 (emphasis supplied). *Campaneria v Reid*, 891 2d 1014, 1021 (2d Cir 1989).  That has not been done in *Campaneria* and the Second Circuit held the renewal of questioning to have been in violation of *Miranda*. *Campaneria v Reid*, 891 2d 1014, 1021-1022 (2d Cir 1989). See also, *United States v Plugh*, 522 F Supp2d 481, 493 (WD NY 2007), affd __ F3d __ , 2009 WL 2341966 (2d Cir 7/31/09).

As in *Campaneria* and *Plugh*, the renewed questioning of  Mr. Jackson had not been preceded by the re-reading of *Miranda* warnings and pertained to the same subject matter - in this case, the allegations of sexual assault.  Thus, as in *Campaneria* and *Plugh*, the renewed questioning of Mr. Jackson violated Mr. Jackson's rights as set forth by the United States Supreme Court in *Miranda* and *Mosley*.

It should be emphasized that the test for determining a violation of *Miranda* after a suspect, such as Mr. Jackson, has clearly invoked his right to remain silent, is not a broad general inquiry into voluntariness, As the Court of Appeals in the Sixth Circuit had recently explained, it is error to conflate

the inquiry into the voluntariness of [the suspect's statement] with the inquiry required under *Mosley*. The two inquiries, however, are distinct. 'While the suspect's state of mind is central to the voluntariness finding, the *Mosley* test focuses on what the police did, and when, after the suspect exercised his or her right to remain silent.' *United*

*States v Barone*, 968 F2d 1378, 384 (1st Cir.1992). Thus, under *Miranda* and *Mosley*, 'a court need determine specifically whether there has been a voluntary waiver only after the government has carried its burden of showing that it complied with the required procedures.' Id. at 1383 (citations omitted).

*Fleming v Metrish*, 556 F3d 520, 549 (6th Cir 2009).

In this case, in which, after Mr. Jackson clearly invoked his right to remain silent, Investigator Bonisteel renewed questioning of Mr. Jackson, with the police listening, about the same allegations without re-reading the *Miranda* rights, the government has failed to satisfy the *Mosley* test of showing that Mr. Jackson's right to remain silent had been scrupulously honored.

> **D.    The Requirements of *Miranda* and *Mosley* Apply to the Custodial Questioning by Child Protective Investigator Bonisteel, Conducted with the Police Listening to Every Word, Who Was Required to and Did Report What She Learned to Law Enforcement Officials.**

The Respondent urges, and the New York Courts (*People v Jackson*, 4 AD3d 848, 849 [4th Dept 2004]) held that Mr. Jackson's argument that the requirements of *Miranda* did not apply to the interrogation conducted by Investigator Bonisteel because she was not engaged in law enforcement activity. As detailed below, this argument and holding of the New York Courts is contrary to or involved an unreasonable application of clearly established Supreme Court precedent.

In *Estelle v Smith* (451 US 454 [1981]) the United States Supreme Court considered when the questioning by a person who is not a law enforcement officer is subject to the requirements of *Miranda*. The issue in *Estelle* was whether the statements he made to a psychiatrist at a court ordered competence examination, in which *Miranda* warnings had not

been administered,  could be used at the penalty phase of the defendant's court proceedings.

The Supreme Court, in holding that the defendant's *Miranda* and Fifth Amendment rights

had been violated, the Court explained that

> When [the doctor] went beyond simply reporting to the court on the issue of
> competence and testified for the prosecution at the penalty phase on the crucial issue
> of respondent's future dangerousness, his role changed and became essentially like
> that of an agent of the State recounting unwarned statements made in a postarrest
> custodial setting. During the psychiatric evaluation, respondent assuredly was "faced
> with a phase of the adversary system" and was "not in the presence of [a] perso [n]
> acting solely in his interest." (citation omitted). Yet he was given no indication that
> the compulsory examination would be used to gather evidence necessary to decide
> whether, if convicted, he should be sentenced to death. He was not informed that,
> accordingly, he had a constitutional right not to answer the questions put to him.

*Estelle v Smith*, 451 US 454, 467 (1981).

Subsequently, the Court of Appeals for the Second Circuit has held that the Fifth

Amendment, as interpreted by the Supreme Court in *Estelle,* requires the suppression of

statements to a psychiatrist during an in-custody competency interview not preceded by

*Miranda* warnings, where the psychiatrist recounted statements made by the appellant rather

than only his medical conclusions about the defendant's competency. *United States v Chitty*,

760 F2d 425 (2d Cir 1985).

More recently, in *United States v Cortes* (922 F2d 123 [1990]), the Second Circuit has

explained the holdings in *Estelle* and *Chitty*, noting that in both of those cases, the defendant

was questioned by a psychiatrist for one purpose and then testified for the prosecution against

the defendant in the sentencing proceeding, thus exposing the defendant to consequences in

the criminal proceeding he had not foreseen at the time of questioning. The *Cortes* Court

explained that those cases held that the Fifth Amendment barred this use of the defendants'

statements since they had not voluntarily consented to the examination after being informed

of their right to remain silent and that their statements might be used against them. *United*

*States v Cortes*, 922 F2d 123, 126 (1990).  The Court explained that "[w]e think it is

significant in the context of the issue before us that the defendant in both *Estelle* and *Chitty*

was ordered to submit to the interrogation for a stated purpose, and did not know that the

prosecution would subsequently use the information against him in a manner unrelated to the

purported purpose of the interrogation. See 451 US at 467-68; 760 F2d at 430-31." *United*

*States v Cortes*, 922 F2d 123, 126 (1990).

As one treatise has summarized, custodial questioning by "any government employee

comes within *Miranda* whenever 'prosecution of the defendant being questioned is among

the purposes, definite or continent for which the information is elicited,' (footnote citations

omitted) as will often be manifested by the fact the questioner's duties include the

investigation of reporting crimes (footnote citations omitted)." LeFave, Israel, and King,

Criminal Procedure (2d ed), § 6.10(c).

As in *Estelle* and *Chitty*, Mr. Jackson was not informed by Investigator Bonisteel that

the statements she was obtaining would be used at the criminal proceeding against him. Nor

was he informed that the police would be listening to the conversation.  Nor was he informed

that  Investigator Bonisteel was required by law to refer suspected cases of child abuse or

maltreatment to law enforcement and to forward immediately to the appropriate district

attorney a report on what she learned upon request by the district attorney (NY Social

Services L § 424 [4] and [8]). Nor did she explain that proceedings started in New York

Family Court can be transferred to criminal court and referred to the District Attorney (NY Family Ct Act § 1014). Under these circumstances, pursuant to the holdings of *Estelle* and *Chitty* and the cases applying *Estelle* cited in LeFave, Israel, and King, Criminal Procedure (2d ed), § 6.10(c), Investigator Bonisteel would have been required give Mr. Jackson *Miranda* warnings even if Mr. Jackson had not already asserted his right to be silent.

The legal duty for Investigator Bonisteel to have provided *Miranda* warnings is even greater in this case since Mr. Jackson had asserted his right to be silent and that the police were listening in on the conversation. The duty to scrupulously honor an invocation of the right to remain silent cannot be so easily satisfied by the police sitting out of sight, but within earshot, while a government employee with a duty to report abuse questions the suspect, without re-reading *Miranda* rights, on the very same allegations as to which the suspect, upon being informed of his rights earlier had stated a desire to not speak.

The sole case cited by the Appellate Division, Fourth Department, in rejecting Mr. Jackson's *Miranda* argument (*People v Brooks*, 184 AD2d 274, 275-276 [1st Dept 1992], lv den 80 NY2d 901 [1992]), does not mention Mr. Brooks' custodial status. The Court in *Brooks* cited only case, *People v Smith*, 62 NY2d 306 (1984), for its holding that the caseworker in *Brooks* was not required to give *Miranda* warnings. In *Smith*, the Court considered whether New York's state right to counsel holding applied where a child protective investigator conducted an *out of custody* interrogation *preceded by the giving of Miranda warnings and those rights were waived. People v Smith*, 62 NY2d 306, 306 (1984). ("although Smith was not then in custody, *Miranda* warnings were administered to him and

he stated that he understood them and was willing to make a statement without an attorney"). The Court noted that "[t]he giving of *Miranda* warnings was apparently an excess of caution on [the Investigator's] part, for defendant was not then in custody (citations omitted)." *People v Smith*, 62 NY2d 306, 307, fn 2 (1984).  Thus, the *Smith* decision not support a holding that a Child Protective Investigator is not required to give *Miranda* warnings prior to a *custodial* interrogation. Nothing in the Brooks decision, which as mentioned above cites and relies on *Smith*, indicates that Brooks involved a custodial interrogation.

In any event, as detailed below in Point IE, *infra*, the decision of the United States Supreme Court in *Estelle v Smith* (451 US 454 [1981]) regarding the applicability of *Miranda* to non-police officials is controlling.

**E.    New York Court's Are Bound by the United States Supreme Court's Decisions Interpreting and Applying Miranda v Arizona, and Their Failure to Comply with Those Decisions Is Properly a Subject of Review in a Habeas Corpus Proceeding.**

The decision of the United States in *Miranda v Arizona*, 384 US 436, 444 (1966) was a federal constitutional decision binding on state courts. *Dickerson v United States*, 530 US 428, 438 (2000). Indeed, as pointed out in *Dickerson*, "both *Miranda* and two of its companion cases applied the rule to proceedings in state courts-to wit, Arizona, California, and New York (citations omitted). Since that time, we have consistently applied Miranda 's rule to prosecutions arising in state courts (citations omitted)." *Dickerson v United States*, 530 US 428, 438 (2000). Thus, the Court has repeatedly held that alleged *Miranda* violations in state court proceedings, such as those claimed by Mr. Jackson,  may be raised in federal courts in habeas corpus proceedings. See, *Dickerson v United States*, 530 US 428, 439, n.3

(2000); *Thompson v  Keohane*, 516 U.S. 99 (1995); *Withrow v Williams*, 507 US 680, at 690-695 (1976).

Because states, pursuant to the Supremacy Clause of the United State Constitution (United States Constitution, article VI, paragraph 2), cannot lawfully interpret the United State Constitution differently than interpreted by the United States Supreme Court (See, *Arkansas v Sullivan*, 532 US 769, 772 [2001]; *Oregon v Hass*, 420 US 714, 719 [1975]), New York's interpretation and application of the *Miranda* decision in rejecting Mr,. Jackson's *Miranda* claim is not, as urged by the Respondent, supported by adequate and independent state grounds. *Kansas v Marsh*, 548 US 163 (2006); *Michigan v Long*, 463 U.S. 1032 (1983). Instead, as described above, New York's rejection of Mr. Jackson's *Miranda* claims was contrary to, involved an unreasonable application of clearly established Supreme Court precedent, and resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.

## F.    The Erroneous Admission of the Statements Made by Mr. Jackson to Investigator Bonisteel Cannot be Deemed Harmless Error.

Where, as in Mr. Jackson's trial, a confession has been erroneously admitted in violation of the defendant's *Miranda* rights, this constitutional error is subject to a harmless error analysis. See *Arizona v Fulminante*, 499 US 279, 310 (1991); *Brown v Keane*, 355 F3d 82, 91 (2d Cir.2004) ("A habeas petitioner is entitled to relief only if the constitutional error at trial was not harmless."). The Supreme Court has held in *Brecht v Abrahamson* (507 U.S. 619 [1993]) that, on collateral review of a state conviction, an error is harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507

U.S. 619 (1993) (internal quotation marks omitted). See also, *Fry v Pliler*, 551 US 112 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*...").

In *Arizona v Fulminante* (499 US 279 [1991]), the Supreme Court considered numerous factors in holding that the erroneous admission of a confession had a substantial and injurious effect on the jury's decision. The Court noted that the prosecutor made extensive use of the confession in its opening and closing statement,, that the confession was a crucial piece of evidence and not merely cumulative of other evidence, and that the prosecution's case was weak absent inclusion of the confession (*Fulminante,* 499 US at 296-299). Reviewing *Fulminante* and other Supreme Court precedents, the Second Circuit has concluded that the Supreme Court has found the following factors to be relevant in determining whether the erroneous admission of a confession was harmless error: (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence. *Zappulla v New York*, 391 F3d 462, 468 (2d Cir 2004).   Applying these factors, as detailed below, the erroneous admission of Mr. Jackson's statements had a substantial and injurious effect on the jury.

The indictment against Mr. Jackson (as clarified by the Bill of Particulars) charged, in part, that between 11:30 pm. on November 29, 2000 and 2:00 a.m. on November 30, 2000

Mr. Jackson committed three acts of anal intercourse with Karen Jackson, three acts of oral intercourse with Rebecca Jackson, and two acts of anal intercourse, three acts of vaginal intercourse, and four acts of sexual abuse with then 14 year old Christal Jackson (TM 672-707).

The People's case primarily consisted of the three complainants testifying how over this period of time Mr Jackson first engaged in acts of oral sodomy with Rebecca and Karen (TM 258, 360) and then in an act of anal sodomy with Karen in the living room of their home (TM 258). Then, it is alleged that Mr,. Jackson then went upstairs and engaged in an act of vaginal and two acts of anal sodomy with Christal (TM427-428), on the bed in the bedroom he shared with his wife and his two younger daughters (Katelyn and Brittney) who were in the room (TM 312, 431).

After those acts, it is alleged that Mr. Jackson went back downstairs where he again allegedly had Rebecca perform oral sex on him (TM 361) and that he then engaged again in anal sex with Karen (TM 264). After those alleged sexual acts, it was contended that he went back upstairs where he again had intercourse with Christal and placed his penis on her abdomen (TM 432). Then, Karen and Rebecca testified, Mr. Jackson returned downstairs where he again placed his penis in Rebecca's mouth (TM 361) and tried to have vaginal(TM 363) and anal sex with Karen (TM 266). They testified that he fell asleep downstairs in his clothes, they called the police, and Karen and Christal were taken to the hospital where they were examined (TM 268). Vaginal, and anal swabs were taken as well as pubic hair samples, the women's clothing, the sheets from the bed and that allegedly used downstairs, and

photographs of the women (TM ). Rebecca did not go to the hospital. (TM 300).

Christal, who was menstruating and wearing a sanitary pad at the time (TM 430, 448) described how she had said "ow" when her father was having sex with her, that there had been both vaginal and anal penetration (TM 452) without a condom (TM 450) and that it hurt a lot (TM 453). Christal had not cleaned herself up prior to being examined at Rochester General Hospital (TM 447). At the hospital, here clothes were taken and vaginal and anal swabs were taken form her to tested (TM 449, 452). Rebecca described how when she performed oral sex on Mr. Jackson after one if the time he came down from being with Christal there was a pubic hair on his penis which she wipe onto the sheet that they were having sex on which was seized by the police and tested (TM 391, 392).

The People's case largely rested on the uncorroborated allegations of the complainants. The People did not present any of the treating physician's or medical personnel from Rochester General Hospital. Nor did the People introduce or seek the admission of the results of the testing of the various swabs, clothing, and bedding that had been seized and tested. Redacted medical records were admitted, but no testimony was received and before the jury which explained the findings.

Thus, in this case in which there were allegation of repeated acts of oral, vaginal, and anal intercourse, as well as the placement of Mr. Jackson's penis on his daughter's abdomen after having allegedly engaged in these multiple acts of intercourse, there was no testimony regarding the finding of fluids (such as blood, semen,  saliva, or lubricants), DNA, pubic hairs, fecal matter, injuries, or other artifacts one would expect to discover if these

allegations of multiple and repeated sexual assaults were true.

The medical records mention in part that there was an abrasion near the entrance to Christal's vagina, but there was not indication as to the cause of that abrasion and whether it was inconsistent with it being caused by her wearing her sanitary pad or whether it was likely caused by intercourse (Trial Exhibits 10A, 11A, 12A).

The absence of physical evidence one would have expected to exist in this case to corroborate the bizarre  allegations of the complainants was the theme of the closing argument of defense counsel (TM 611-616). So the District Attorney had a problem - how to convince the jury beyond a reasonable doubt that the complainants' version was true. The District Attorney's solution was to spend a considerable portion of her summation restating in detail Investigator Bonisteel's testimony as to what Mr. Jackson allegedly told her (TM 636-639), culminating in her repeating how Bonisteel had asked Mr. Jackson was it possible that he had been so drunk that he did not remember raping Christal and that Mr. Jackson's supposed response "yeah, that's possible" is something that an innocent man would never had said (TM 639). The District Attorney argued that "the reason he says 'Yeah, maybe, I could have' is because he did. It's that simple." (TM 639). Thus, the District Attorney argued that Mr. Jackson's erroneously admitted statement was an admission and that this admission corroborated the wild allegations of the complainants.

In sum, given the absence of physical evidence and testimony from treating or expert witnesses about medical and/or laboratory results which corroborated the allegations, the People's case was weak and the District Attorney understandably relied heavily on the

erroneously admitted statements to Investigator Bonisteel, which were non cumulative to other evidence. Applying the applicable harmless error test summarized in *Zappulla v New York (*391 F3d 462, 468 [2d Cir 2004]), the erroneous admission of Mr. Jackson's statements had a substantial and injurious effect on the jury, and consequently was not harmless.

### G.    Conclusion.

To prevail under 28 U.S.C. § 2254, as amended in 1996 by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), Pub L.. 104-132, § 104, 110 Stat. 1214, 1219, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication on the merits of his federal constitutional claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76(2000). At detailed herein, and in the previous filings of Petitioner, the rulings of the New York courts permitting the admission of Mr. Jackson's custodial statements obtained after he exercised his right to remain silent were unreasonable applications of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. Thus, this petition should be granted.

Respectfully submitted

s/Brian Shiffrin
Brian Shiffrin
Easton Thompson Kasperek Shiffrin
16 West Main Street Suite 243
Rochester, New York 14614

585-423-8290
bshiffrin@etksdefense.com

Kelly Wolford, Monroe Co. Special Asst. District Attorney

# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

SHAWN A. JACKSON,

                                Petitioner,

        -vs-


JAMES CONWAY, Superintendent                   05-CV-0571A

Attica Correctional Facility,

                           Respondent.

## CERTIFICATE OF SERVICE
## FRCP 5(a)

        I hereby certify that on August 14, 2009, I caused a copy of the Petitioner's

Memorandum to be served electronically by submitting the foregoing with the Clerk of the District

Court using the CM/ECF system, which sends notification of such filing to the following parties:


Kelly Wolford
KWolford@monroecounty.gov


COURT  CLERK
UNITED STATES DISTRICT COURT
Western District of New York
282 Federal Building
100 State Street
Rochester, New York 14614

                          <u>s/ Brian Shiffrin</u>
                          Brian Shiffrin
                          Attorney for Shawn Jackson
                          Easton Thompson Kasperek Shiffrin,LLP
                          The Powers Building
                          16 West Main Street, Suite 243

Rochester, New York 14614
bshiffrin@etksdefense.com