# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

SHAWN A. JACKSON,
Petitioner,

**POST-SPARMAN HEARING
MEMORANDUM**

vs.

 JAMES CONWAY, Superintendent
Attica Correctional Facility,

Respondent.

05-CV-0571A

**EASTON THOMPSON KASPEREK SHIFFRIN LLP**
By: **BRIAN SHIFFRIN, ESQ.**
   **WILLIAM T. EASTON, ESQ**
Attorneys for the Petitioner
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
(585) 423-8290

October 8, 2009

The Supreme Court has held that the constitutional right to counsel means "the right to effective assistance of counsel." *McMann v. Richardson,* 397 US 759, 771 n. 14(1970).   In order to establish a violation of the right to effective assistance of counsel a petitioner must show that (1) counsel was "deficient," in that he made errors so serious that he did not function as "counsel" guaranteed by the Sixth Amendment; and (2) the deficient performance prejudiced the defense. *Strickland v Washington,* 466 US 668, 687(1984).  A petitioner shows prejudice by demonstrating a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 US at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 US at 694.

The need for effective assistance of counsel in cases of sexual assault--where there is often questionable physical corroboration of the complainant's allegations--has been repeatedly recognized by the Second Circuit.  *Gersten v Senkowski,* 426 F3d 588, 607 (2d Cir.2005); *Eze v Senkowski,* 321 F3d 110 (2d Cir 2003); *Pavel v Hollins*, 261 F3d 210 (2d Cir2001); *Lindstadt v Keane,* 239 F3d 191 (2d Cir 2001) (decided prior to Mr. Jackson's trial). In such cases, the Second Circuit has held that "because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten,* 426 F3d at 607.

The Second Circuit stated in *Eze*,  "[a] lesson to be learned from *Lindstadt* and *Pavel* is that when a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the 'vagaries of abuse indicia' is critical. The importance of consultation and pre-trial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation." *Eze*, 321 F3d at 128.

1

As the Second Circuit reasoned "[d]efense counsel may not fail to conduct an investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence." *Gersten* at 611.Thus, where counsel failed to make a reasonable investigation reasonably necessary to the defense, a court will usually conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *Gersten v Senkowski,* 426 F3d at 611; *Pavel v Hollins*, 261 F3d at 223 ); *Lindstadt v Keane,* 239 F3d at 201

Mr. Jackson has advanced five primary claims of ineffective assistance of counsel in this case:

**1.** The failure to adequately investigate the case (counsel did not speak to treating medical personnel regarding their findings, failed to consult with a qualified expert in sex abuse cases, did not investigate the laboratory findings, particularly the missing report #2);

**2.** The failure to introduce favorable laboratory reports or otherwise establish for the jury that the rapes kits, clothing, bedding and other evidence seized was tested and that the tests did not produce any evidence tending to corroborate the allegation;

**3.** The stipulation to the admission of the medical reports without requiring or presenting testimony to explain both what was and what was not found during the medical examinations (particularly the *insignificance* of the undefined "abrasion" and the old blood in C.J.'s vaginal vault);

**4.** The failure to counter the prejudicial impact of the prosecutor's calling an expert witness, after stating in writing that she would not, who testified regarding the old blood in C.J.s vaginal vault and that the abrasion was consistent with penetration;

**5.** The lack of knowledge of elements of sodomy (the erroneous assumption that penetration was an element that must be proved).

As the testimony at the *Sparman* hearing (*Sparman v Edwards*, 154 F3d 54 [1998]) revealed, these failures cannot be explained as reasoned strategic decisions because trial counsel failed to consult a qualified expert on sexual assaults and failed to conduct a reasonable pre-trial investigation

despite there being little, if any, physical evidence to corroborate the allegations. Thus, as detailed below, these decisions which prejudiced Mr. Jackson were not the product of reasoned strategy. Indeed, trial counsel consistently proceed contrary to how he would have been advised to proceed by an expert should he have consulted with one.

The first witness at the *Sparman* hearing was Julia DeBellis, M.D., a medical director of a facility focusing on child abuse and neglect.("HM 1"- 6; Exhibit 1)  Dr. DeBellis has presented to law enforcement, and defense counsel on the medical aspects of child sexual abuse, has published on the topic, and had testified and consulted for both prosecutors and defendants as an expert on this topic. (HM1-6-9). Dr. DeBellis testified, upon her review of the records in this case (HM1- 28-29) as to the advice she would have given defense counsel if she had been retained prior to trial (HM1- 26-27).  Dr. DeBellis testified that she would have advised counsel:

a.      Not to stipulate to the admission of the complainants' medical records without expert testimony(HM1-20-21, 33), particularly since without a witness testifying to the records, the jury would not be aware of the deficiencies in the examination of C.J. [1],

b.      To  seek the admission of the laboratory reports of the testing of the physical evidence in this case (HM1-23);

c.      To note that the examination of C. J. was not in compliance with protocols and that there was a failure to conduct the most appropriate type of examination for determining the presence of trauma consistent with sexual assault (HM1-11-15);

d.      To bring to the jury's attention that C.J.'s anal area was documented as having no lacerations, and that there was no evidence of bleeding. fissures or splits in the anal area or any other evidence of trauma (HM19-20);

e.      To bring to the jury's attention that there are numerous types of trauma medical personnel look for and document in cases of alleged sexual abuse which were *not*

---

[1]  These include the failure to find evidence of tearing, notches, and other signs of trauma in her vaginal and anal exams and that insignificance of the findings of old blood in her vaginal vault and of an "abrasion" not referenced as to size, depth, or precise location (HM1-15-19).

found in the examination of C. J. (HM1-18-19); and

**f.**     To emphasize that a trained expert cannot determine from what is contained in the report regarding the abrasion on C. J. whether it an indica of inflicted trauma or merely the result of a self inflicted scratch (HM1-12-13, 17-18).

Further, Dr. DeBellis testified that, had she had been a consultant, she would have advised counsel to present an expert (HM1-23) to explain how Dr. Lenane's testimony "was not a fair presentation of exactly what the medicine is" (HM1-22) and that, contrary to the testimony of Dr. Lenane, neither the old blood in C.J.s vaginal vault nor the ill-described abrasion was diagnostically significant in helpful in determining whether there had been penetration. (HM1-16-18).[2]

Trial counsel, Joseph S. Damelio, then testified. He explained that he had been appointed to represent Mr. Jackson little over a month before trial and never consulted with a qualified expert (HM 2, 7-10). Rather, he consulted a nurse to help him understand the medical records (HM2- 9-10). Mr. Damelio testified that he was aware of the reference to the abrasion and old blood in the vaginal vault in the medical records, but he thought it better to simply argue that the records did not show evidence of trauma, rather than call a witness to explain how the records fail to show sexual assault. (HM2-14-17).

Similarly, he testified that he was aware that laboratory reports detailed that numerous items, including rape kits, clothing, and bedding were tested and no evidence corroborating the allegations was discovered, but that he thought it better strategy to not introduce evidence of such tests and the negative results (HM2-30-36, 75-80). Rather, he chose simply to argue to the jury, which was

---

[2] Nothing in Dr. Lenane's Affidavit of October 6, 2009 undermines either Dr. DeBellis's testimony as to what she would have advised an attorney or the criticism as to the errors of commission and omission of counsel. Indeed, paragraphs 6-10 confirm that better practices were not employed in the examination of C.J. due to grant funding parameters, not because they were not medicably appropriate or helpful.

4

unaware of such testing or results, that there was no corroborative evidence (HM2- 34-35). Counsel also testified that although the presence or lack of trace evidence (hairs, fecal material, fibers, lubricants, and other artifacts of sexual acts on the evidence seized (HM2-37)) "would be critical" (HM2-38), and he was unaware that the trace evidence had not been tested prior to trial, it would not have altered his strategy if he had been so aware (HM2-38-40).

Having not consulted an expert, the decision to not develop an effective means to communicate to the jury the lack of evidence of inflicted trauma or artifacts of sexual assault or that tests for evidence were conducted and came up empty cannot be the result of reasoned strategy. Rather, the options of consulting and calling an expert were never explored. Instead, Mr. Damelio, who had never hired an expert or consultant in a sex assault case prior to Mr. Jackson's trial (HM2-67-68), testified that he would only have retained an expert if the People had called an expert. Having not consulted with an expert (HM2-48), he did not see the harm in either permitting the medical records to be received without testimony or in not informing the jury about the items that had been tested and that the tests did not corroborate the allegations (HM2-36, 54, 76-80).

Counsel's "strategy" was simply to argue that the complainants were not credible. Yet, as a consequence of his failure to consult with an expert he did not introduce evidence that would have enabled the jury to accept his arguments. Counsel's actions were not the product of reasoned strategy, but of ignorance due to his failure to consult with an expert. *See*, *Gersten v Senkowski,* 426 F3d 588, 607(2d Cir.2005); *Eze v Senkowski,* 321 F3d 110, 128 (2d Cir.2003).

Among trial counsel's decisions prejudicing Mr. Jackson were:

**1**.    the stipulation to the admission of the medical records of the complainants' medical records without a having a doctor explain what the records do and do not establish, particularly regarding the examination of C.J., including the failure to find evidence

of tearing, notches, and other signs of trauma in her vaginal and anal exams and the insignificance of the findings of old blood in her vaginal vault and of an "abrasion" not referenced as to size, depth, or precise location;

2.    the failure to seek the admission of the laboratory reports of the testing of the physical evidence and to establish what items had been tested and that the laboratory had failed to discover any evidence corroborating the complainants' allegations;

3.    the failure to discover and exploit to Mr. Jackson's advantage the failure of the laboratory to test the evidence for trace evidence;

4.    the failure to have an expert establish that the examination of C. J. was not in compliance with standard protocols and that there was a failure to conduct the best kind of examination (colposcopy) for determining the presence of trauma consistent of sexual assault;

5.    The failure to have an expert establish that C.J.'s anal area was documented as having no lacerations, bleeding. fissures or splits in the anal area or any other evidence of trauma and that there are numerous types of trauma medical personnel look for and document in cases of alleged sexual abuse which were *not* found in the examinations of either C.J. or K. J.;

6.    The failure to have an expert testify as to the deficiencies of the description of the "abrasion" in the report of examination of C. J. and whether it an indica of inflicted trauma or merely the result of a self inflicted scratch;

7.    The failure to timely and effectively respond to the prosecutor's calling of an expert, in violation of her stipulation that she would not do so.

As Dr. DeBellis's testimony established, the value of consulting with an expert would have been far greater than merely trying, in the words of trial counsel, to "neutralize" an opposing expert. The ability to appreciate the weaknesses of the evidence, what to avoid, and what to address, and the ability to respond to the unexpected (such as the calling of Dr. Lenane) all depended on trial counsel having consulted with an expert. Indeed, without consulting with an expert trial counsel could not know what he needed to do to prepare for trial and, thus, how much time he needed to prepare.

By stipulating to the admission of the medical records without an expert, counsel ensured

that the jury did not learn of the various types of trauma associated with sexual assault which were *not* found in this case. Similarly, the jury never learned that the seized items were forensically tested, and those tests failed to find any evidence corroborating the allegations. The jury did not learn that the laboratory tested for but failed to find even a single drop of the blood of the menstruating C.J. on the sheets of the bed upon which she allegedly had been repeatedly violated.

Further, because counsel made no inquiry, he did not ever learn that the items sent to the trace analysis section of the laboratory languished without being tested (See People's Response to Third Discovery Request). (HM2-37-39). If he had known why there was no Report #2, he could have either asked for the trial to be delayed for those tests to be performed or he could have argued that the laboratory had tests they could and should have performed, and asked if this failure was due to a concern that more tests would produce more negative results or ask for an adverse inference jury instruction. Having not investigated the anomaly of having Reports 1 and 3, but no Report number 2, he did not know that no trace tests had been performed and, thus, was not in a position to make an informed strategic decision about this failure to conduct trace analysis tests. So he said nothing, depriving Mr. Jackson of any benefit from this conspicuous failure.

Even worse, because he stipulated to the admission of the medical records without having an expert to explain the insignificance of the "abrasion," the prosecutor was able to argue, without objection, how the abrasion was at a place "where his penis would have been rubbing, rubbing, rubbing, and abraiding her body to leave the mark." (TM 634). Further, the prosecutor, having not presented the treating doctor, was able to argue in summation that the records describing the abrasion are the "most reliable part of the record." (TM 635). Yet, in fact, if counsel had consulted an expert he would have been able to insure that the jury understood that the so called abrasion, without any

7

description of its size, depth, precise location, and healing characteristics was of no significance in terms of corroborating the allegations. (HM1-16-18).

Further, the District Attorney's calling Dr. Lenane as an expert witness, after having expressly told defense counsel she would not do so, not only constituted misconduct, as detailed in the Petition and supporting papers, but exacerbated the prejudicial impact of the failure of trial counsel to have consulted with an expert. Not only did counsel fail to counter the prejudicial impact of the prosecutor improperly calling Dr. Lenane, by failing to object as soon as her name appeared on the witness list (TM 17), but, having failed to consult with an expert, he was not in a position to effectively deal with Dr. Lenane's testimony that the old blood in the vault "means that he was inside her (TM 528)" and that the abrasion was consistent with penetration. (TM 529).

Trial counsel candidly admitted that striking the Lenane's testimony was less effective than presenting expert testimony to refute it. (HM2, 22-23,). Counsel admitted that, after having failed to timely object to Dr. Lenane taking the stand and having failed to consult with an expert, he was not in a position to do anything other than ask for what even he recognized as the ineffective remedy of striking of Lenane's testimony. (HM2, 20-22). As counsel told the court at the time - he did not have time mid-trial to get an expert to eliminate the misleading and prejudicial impact of this improper testimony. (HM2, 20-21). He had such time *prior* to trial and had failed to hire an expert.

Although counsel argued to the jury in opening remarks (TM 230-231) and summation (TM 610-616) there was no corroboration of the complainants' testimony, this argument was fatally undermined by counsel's failure to introduce evidence (such as the laboratory reports or an expert to explain the medical records) establishing a basis for his contentions. Having unreasonably failed to lay the foundation for his arguments during the evidentiary phase of the trial, his argument in

summation was mere rhetoric not supported by evidence. Further, counsel's rationale that if he had presented an expert or the laboratory reports, with or without testimony, the prosecutor could have called someone to "neutralize" this evidence was an unreasonable strategy based on generalized and baseless speculation and not on the facts of Mr. Jackson's case. The proof of this was trial counsel's acknowledgment that he was unaware of anything damaging in the laboratory records (HM2, 30-33,75-80), but was concerned that if the jury were made aware of these reports the negative results could have been explained away as a result of testing limitations or that, in any event, not all sex crimes leave physical evidence behind (HM 2, 34-35, 77-79). Yet even under such a scenario, the negative test results could have not possibly hurt Mr. Jackson.

Perhaps the most vivid proof of the failure to adequately prepare for trial and the impact such lack of preparation had on defense counsel occurred when counsel, after summation, learned for the first time in court that the crime of sodomy (for which Mr. Jackson was charged and ultimately convicted of 15 counts) did not require proof of penetration, but rather only touching (TM 652). Yet, for more than twenty years prior to Mr. Jackson's trial, New York courts had consistently held that penetration is not an element of the crime of sodomy. *See*, *e.g.*, *People v Griffith*, 80 AD2d 590 (4th Dept 1981); *People v Griffin,* 96 AD2d 720 (4th Dept 1983). Counsel's arguments had been premised on the baseless assumption that the prosecutor had to prove penetration. He tried the entire case without knowing what the People had to prove, learning the law *after* he gave his closing argument. This ignorance of the law perhaps explained his damaging failure to introduce testimony regarding the medical and laboratory records.

As held in *Pavel v Hollins* (261 F3d at 210, *Lindstadt v Keane* (239 F3d at 201) and *Burch v Millas* ( __ FSupp2d__, 2009 WL 2507406 [WDNY]), the case must be reviewed under

*Strickland*'s prejudice prong.  The Supreme Court has explained that a verdict "only weakly supported by the record is more likely to have been affected by [counsel's] errors[,]" *Strickland*, 466 US at 696. The verdict here was weakly supported. The allegations in this case that Mr. Jackson, committed numerous acts of oral, vaginal, and anal intercourse with three women, rotating between them (these allegations are detailed in the Memorandum Submitted in Support of Miranda Claim, filing # 32, pp. 15-17) were uncorroborated by any physical evidence. In this case, in which there were allegations of repeated acts of oral, vaginal, and anal intercourse, as well as the placement of Mr. Jackson's penis on his menstruating daughter's abdomen after having allegedly engaged in these multiple acts of intercourse, there was no testimony regarding the finding of fluids (such as blood, semen, saliva, or lubricants), DNA, pubic hairs, fecal matter, injuries, or other artifacts one would expect to discover if these allegations of multiple and repeated sexual assaults were true.  As the Second Circuit wrote in  *Gersten,* "Not only was the evidence against petitioner relatively thin, but most of it could have been, but was not, effectively challenged by defense experts or an informed cross-examination." *Id*. at 613.

Further, although these errors (other than those involving knowledge of the elements of sodomy) referred to the defense of the 26 counts involving the allegation of crimes on November 29-30, 2000, the impact of the deficient representation of these charges infected the entire case. *See*, *Gersten*, 426 F3d at 614-615. These allegations dominated the trial, in terms of the percentage of testimony devoted to those charged, the arguments of counsel, and the jurors' assessment of the complainants. If those charges are not credited, then the entire set of allegations for which very little corroboration was presented are likely to fall. Thus, like in *Gersten*, the ineffective assistance of counsel impacted the entire case.

10

s/ William T. Easton

**WILLIAM T. EASTON, ESQ.**
Attorney for Shawn Jackson
Easton Thompson Kasperek Shiffrin LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
(585) 423-8290
wteaston@etksdefense.com

Clerk, United States District Court
Western District of New York
100 State Street
Rochester, New York 14614

**KELLY WOLFORD, ESQ.**
Special Assistant District Attorney
Monroe County District Attorney's Office
47 South Fitzhugh Street
Rochester, New York 14614
kwolford@monroecounty.gov

# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

---

SHAWN A. JACKSON,

                           Petitioner,

        -vs-


JAMES CONWAY, Superintendent                    05-CV-0571A
Attica Correctional Facility,

                           Respondent.

---

## CERTIFICATE OF SERVICE
## FRCP 5(a)

---

        I hereby certify that on August 19, 2009, I caused a copy of the Petitioner's Post-Hearing Memorandum to be served electronically by submitting the foregoing with the Clerk of the District Court using the CM/ECF system, which sends notification of such filing to the following parties:

Kelly Wolford
KWolford@monroecounty.gov

COURT  CLERK
UNITED STATES DISTRICT COURT
Western District of New York
282 Federal Building
100 State Street
Rochester, New York 14614

<u>s/ William T. Easton</u>
William T. Easton
Attorney for Shawn Jackson
Easton Thompson Kasperek Shiffrin,LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
wteaston@etksdefense.com