IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

SHAWN A. JACKSON,

                            Petitioner,                    **DECISION AND ORDER**
                                                          **No. 05-CV-0571(VEB)**

        -vs-

JAMES T. CONWAY, Superintendent, Attica
Correctional Facility,

                            Respondent.
_____

## I.      Introduction

        Shawn L. Jackson ("Jackson" or "petitioner") filed a *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his detention state

custody as the result of a judgment in Monroe County Court convicting him after a jury trial of

47 counts, including multiple counts of sodomy in the first degree (New York Penal Law former

§ 130.50(1)), assault in the third degree (New York Penal Law ("P.L.") § 120.00(1)), sexual

abuse in the first degree (P.L. § 130.65(1)), rape in the first degree (P.L. § 130.35(1)), rape in the

third degree (P.L. § 130.25(2)), sodomy in the third degree (P.L. former § 130.40(2)), and incest

(P.L. § 255.25).

        The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

        The following summary of the facts and procedural history of Jackson's case is drawn

from the trial transcript, available documents from the state court record, and from the pleadings submitted by Jackson *pro se*, Jackson's state-court appellate counsel, Jackson's habeas attorneys, and respondent's attorney.

### A. Pre-Trial Proceedings

On November 30, 2000, police officers from the Town of Greece police department were summoned to Jackson's house on Tobin Drive, where they were met by his wife, Rebecca Jackson ("Rebecca"); his ex-wife, Karen Jackson ("Karen"); and his teenaged daughter "CJ". All three women accused Jackson of raping them each multiple times earlier that evening. Jackson was found sleeping on the living room sofa, and was taken to the Greece Police Department for questioning. Karen and CJ were taken to Rochester General Hospital for medical evaluation.

Once at the police station, Sergeant Christopher Bittner ("Sgt. Bittner") of the Greece Police Department spoke with Jackson in an interview room. When Jackson asked if he was under arrest, Sgt. Bittner replied no. Jackson got up as if to leave the room, and Sgt. Bittner immediately placed him under arrest and read him his *Miranda*[1] warnings. Jackson invoked his Fifth Amendment right to remain silent and refused to speak with the police. Jackson then was placed in a holding cell.

Soon thereafter, Sgt. Bittner contacted Kathy Bonisteel, a Child Protective Services caseworker for the Monroe County Department of Social Services ("Caseworker Bonisteel") who was investigating the allegations of abuse, and facilitated an interview between her and Jackson. Caseworker Bonisteel's report contained statements from Jackson regarding his extremely unconventional sexual relationship with his wife and ex-wife and his belief that he was the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"Alpha Male" of the family. *See* T.27, 38. 499-506.[2] The report also indicated that Jackson had

agreed with Caseworker Bonisteel that it was "possible he was so drunk that he wouldn't have

remembered if he raped [CJ]" and that "[h]e said it was a possibility . . . he said he could have

been the one to rape [CJ]." T.504.

Jackson initially was charged in a five separate felony complaints with two counts of first

degree rape, two counts of first degree sodomy, and one count of incest. All of these charges

involved CJ, Jackson's daughter. Subsequently, on or about January 18, 2001, a 48-count

indictment was issued against Jackson, which included charges of first degree sodomy, first

degree rape, first degree sexual abuse, first degree coercion, attempted first degree sodomy, third

degree rape, third degree sodomy, incest, third degree assault, and endangering the welfare of a

child. The indictment lacked specificity as to the dates, times, and places of each alleged crime.

Most of the crimes in that indictment stemmed from the incidents alleged to have occurred on the

night of November 29, 2000, and the early morning of November 30, 2000, at Jackson's house.

A suppression hearing was held pursuant to *People v. Huntley* on March 23, 2001, before

Justice Stephen R. Sirkin in New York State Supreme Court, Monroe County, to determine the

admissibility of Jackson's statements contained in Caseworker Bonisteel's report. The judge

heard testimony that Sgt. Bittner was aware that Caseworker Bonisteel was conducting a parallel

Child Protective Services investigation of the same incident underlying Jackson's arrest. Sgt.

Bittner told Caseworker Bonisteel that Jackson had refused to speak with the police, and

arranged for Caseworker Bonisteel to have access to Jackson to interview him in connection with

her investigation on behalf of Child Protective Services. Although the police did not officially

---

[2]     Citations to "T.__" refer to pages from the trial transcript.

take part in this interview, several officers, including Sgt. Bittner, overheard the 45- minute conversation between Jackson and Caseworker Bonisteel, in which Jackson made inculpatory statements. *See Huntley* Transcript dated March 23, 2001 ("*Huntley* Tr.") at 12-13, 7-21, 27, 33-34, 38.

Trial counsel, who at that time was Matthew Clark, Esq., of the Monroe County Public Defender's Office, argued that the investigations being conducted by Child Protective Services and the Greece Police Department were concurrent, obviously involving the same incident. Attorney Clark argued that Caseworker Bonisteel essentially was acting as an agent of the police when she spoke with Jackson on the night of his arrest at the police station. *Huntley* Tr. at 42-46. The suppression court held that Caseworker Bonisteel's investigation was part of a "completely separate civil proceeding" and was not "part of any criminal proceeding." *Id.* at 49.. The suppression court specifically found that Caseworker Bonisteel "was not a public servant and, in this case, did not act as a law enforcement officer, but [as] a child protective worker." *Id.* As such, there was "no requirement on the part of the protective worker to give any *Miranda* warnings." *Id.* at 48-49. Accordingly, the suppression court ruled that Jackson's constitutional rights were not violated, and his statements to Caseworker Bonisteel could be used against him at trial by the prosecutor as evidence-in-chief. *Id.* at 45, 48-49.

On May 31, 2001, Associate Justice Peter E. Corning–the third trial judge to be assigned to the case–addressed the prosecutor's intended introduction of testimony concerning numerous prior bad acts and uncharged crimes on Jackson's part. T.201-20. Initially, the trial court ruled that it would not admit every act the prosecution intended to introduce, but rather would rule on the admissibility of each incident as it was adduced by the witnesses, leaving it to trial counsel to

object. T.206. Newly assigned trial counsel Joseph D'Amelio, Esq., opposed the prosecution's motion to introduce the prior bad acts evidence and moved *in limine* to preclude the prosecutor from asking any questions of her witnesses in regard to those alleged acts. Trial counsel argued that the only purpose of the prior bad acts would be to demonstrate Jackson's alleged criminal propensity, and that the prior bad acts would unduly prejudice the jury against him and make the jurors believe that he was more likely to have committed the crimes with which he was charged. Trial counsel argued that the inflammatory and prejudicial nature of the prior bad acts clearly outweighed any probative value they might have. Finally, trial counsel argued that the prior bad act testimony did not fall within any of the exceptions set forth in *People v. Molineux*, 168 N.Y. 264 (N.Y. 1901), and should be excluded. T.207-09.

The trial court ruled that evidence of Jackson's alleged prior bad acts was admissible to show "background information relevant to the issues of forcible compulsion and delayed disclosure" at trial, since the prosecution's theory was that "forcible compulsion is based upon the implied threats of violence provided by [Jackson] if the victim did not comply." T.211-12. Essentially, the trial court ruled that the prior bad act testimony could be introduced to establish certain elements of the crimes charged. T.212.[3] The trial court noted, however, that its decision

---

[3]      New York law allows "evidence regarding prior bad acts, including sexual abuse, to prove the element of forcible compulsion even when the defense is not consent, if its probative value exceeds its prejudicial effect." *Morris v. People of the State of New York*, No. 07-CV-3418 (JG), 2008 WL 850679, at *5 (E.D.N.Y. Mar. 29, 2008) (citing *People v. Cook*, 93 N.Y.2d 840, 841 (N.Y. 1999) ([W]hen appropriate–as here, in light of the relationship between defendant and complainant–evidence of a defendant's prior abusive behavior toward a complainant may be admissible to prove the element of forcible compulsion in a rape case. This is true even though, as in this case, the defense is not consensual sex, but that the rape never occurred and that the complainant's allegation was a lie.) (citing *People v. McClain*, 250 A.D.2d 871, 672 N.Y.S.2d 503 (App. Div. 3d Dept. 1998) ("Mindful that it was the People's obligation to establish both the victim's lack of consent and the defendant's forcible compulsion, the admission of limited instances of prior misconduct by defendant against this victim was not excessive in light of the prosecution's effort to prove a pattern of abuse[.]") (citations omitted); *People v. George*, 197 A.D.2d 588, 589, 602 N.Y.S.2d 643 (App. Div. 2d Dept. 1993) ("[E]vidence of the defendant's prior physical abuse of the complainant was admissible, since it was probative of the victim's state of mind and relevant to prove

was "not a blanket order that all and any such testimony is admissible," and that such testimony

would be "taken from a witness as it comes, subject to decision and ruling." T.214. Finally, the

trial court decided that while prior alleged acts and threats of violence were admissible, acts

committed "any further back from five years" prior to the alleged crimes were too remote.

Accordingly, the trial court stated that it was "going to confine such testimony to a period

subsequent to 1994." T.214. The prior bad acts testimony would be "subject to proper

presentation, proper objection." T.219.

### B.     The Trial

In the following section is a summary of the testimony from the witnesses called on

behalf of the prosecution at Jackson's trial. The defense called no witnesses.

#### 1.     The Victims

##### a.     Karen Jackson – Petitioner's Ex-Wife

###### 1.)     Direct Examination

Karen Jackson testified that she married petitioner in 1983 and divorced him in 1990.

She was pregnant with Gregory at the time they got married. T.281. When they divorced in 1990,

neither had a lawyer; they used a "Divorce Yourself" kit. T.281. Over the seven years they were

---

that the defendant used 'forcible compulsion', a necessary element of the conviction of rape in the first degree and
sodomy in the first degree and the probative value outweighed any prejudice to the defendant[.]") (citations omitted),
*lv. denied*, 83 N.Y.2d 852 (N.Y. 1994)); *People v. Chaffee*, 30 A.D.3d 763, 765, 816 N.Y.S.2d 615, 618) (App.
Div. 3d Dept. 2006) ("Also unpersuasive is defendant's argument that County Court erred in permitting the People to
introduce testimony from the victim concerning the events surrounding defendant's conviction for admittedly
sexually assaulting her when she was approximately four or five years old. Where probative value outweighs the
prejudice to defendant, 'evidence of a defendant's prior abusive behavior toward a complainant may be admissible to
prove the element of forcible compulsion in a rape case . . . even though, as in this case, the defense is not consensual
sex, but that the rape never occurred and that the complainant's allegation was a lie[.]' Here, County Court permitted
the evidence because it was relevant with respect to intent and the element of forcible compulsion.") (internal
quotation omitted).

married, she had sexual intercourse with petitioner on a regular basis. Petitioner moved out for four months, but "he was over every single day." Karen did not tell petitioner not to come over during that time, nor did she call the police. Karen admitted she continued to have sexual intercourse with him regularly even after they were divorced.

Karen and Petitioner had three biological children (17-year-old GJ 15-year-old CJ, and 10-year-old JJ). T.238-39. They also had a daughter named KJ, as to whom Karen relinquished her parental rights and who was subsequently adopted by Rebecca Jackson, the woman who petitioner married after divorcing Karen. T.240. Karen testified that Petitioner decided he was not going to allow Karen to raise KJ. Apparently, Petitioner and Rebecca were having trouble conceiving a child "so that was his way of conceiving, to have me give her to them." T.240. Rebecca and Petitioner also had a 5-year-old daughter named BJ. All of them lived together in one house. New York. T.241.

Karen testified that petitioner and his second wife, Rebecca, lived with Karen and her children at 21 Tobin Drive off and on from the beginning of their marriage. Karen, Rebecca, and petitioner all owned the house jointly and were on the deed together. T.245. Karen testified that she believed she had to buy the house with them in order to be able to keep her children. He said that "[they] would buy it together to raise the children together," and if she did not agree, then "he would try to get custody of the children from [her]." T.246. Trial counsel's objection to this was overruled.

When asked what did he say would happen if she tried to leave, Karen replied, "That he would hunt me down and find me." T.247. The trial judge sustained trial counsel's objection based on lack of foundation/time-frame but did not strike the answer. *Id.* Karen testified that,

over the past five years, petitioner said he was going to hunt her down "[f]ifteen to twenty [times] maybe." T.247. When asked to come up with a date, the most recent she could think of was "[p]robably like the winter of early 2000," when petitioner said, "He would kill me." T.248. Karen "[m]ost definitely" believed him.

Karen testified that even though she was divorced from Petitioner, she had to "ask permission to go anywhere, to do anything." Karen stated, "I was never allowed to date or remarry or anything like that with another person. I was always his property." T.242. That is what petitioner told her after they were divorced. T.242. Karen testified that once she had a friend over to the house watch a movie, and when Petitioner found out, he "took [her] out to a field and was going to chop off [her] fingers." T.242. Karen related that this occurred "[p]robably [in] 1992." T.243.

Karen related that "[i]n '95, the spring, summer," petitioner told her that "he would hunt me down, and if he couldn't find me, he would go to my family," if she went to somebody else for help. T.249. He said "[h]e would hurt them or kill them, just to get my attention, if he couldn't find me." T.249. Karen testified that she believed petitioner.

On June 25, 1999, Karen recalled, Petitioner beat her up, leaving "bruises all over [her] face so that [she] was not able to attend [her nephew's] graduation ceremony." T.250. Karen testified, "[Petitioner] hit me in the head, slapped my face, grabbed my arms. He strangled me and I lost consciousness and the blood vessels in my face broke." T.250. Karen recalled that after abusing her, Petitioner slapped her to make her regain consciousness. Karen testified that Petitioner, after the beatings, "would apologize, but then he would always make [her] go up into his room to have sex." T.251. Karen testified that is what happened on June 25, 1999. Petitioner

engaged in oral sex and then anal sex with her. Karen admitted, "I didn't verbally say no, but I wasn't allowed to either." T.252. When asked her reason for not refusing to comply with Petitioner's demands, Karen replied, "Because then it would just always be worse at times when you did say no, he would–" T.252. At that point trial counsel objected but it was overruled. Karen was allowed to testify, "If I said no, he would hit me and punch me more, so–" Karen confirmed that those retaliatory beatings "in [her] mind on that date" because "[h]e had already just done it to [her], so–" T.252.

After the June 1999 incident, in addition to the broken blood vessels, Karen was left with ringing in her ears; and her vision was blurry for several days and she suffered from headaches. T.252. When asked why she did not go to the authorities, Karen testified, "Because I didn't–I was scared that he would find out. He would beat you even more at that point. I'm sure he would kill you." T.253. Trial counsel objected; the judge stated, "No, that's her state of mind, isn't it?" Trial counsel disagreed. The trial court stated, "Okay." The answer was allowed to stand on the record. T.253.

In January of 2000, on an unspecified date, the prosecutor asked if Karen "recall[ed] a day in January of 2000 before school that [his older son, GJ] got in trouble with the defendant?" T.269. Karen said that GJ had written a report the way the teacher wanted instead of how petitioner wanted it done. (The trial court overruled defense counsel's objection. T.269.) Petitioner asked to see the report and then started "hitting and kicking [GJ], and [GJ] ended up – the door was open in the kitchen . . . and [Petitioner] pushed him out through the door and broke the door, the kitchen door, and he just . . . so he fell up against the car, and then [Petitioner] ended up dragging him back inside and hitting him repeatedly. [Petitioner] was punching him."

T.271. Karen witnessed only "[s]ome of [the beatings]" because then "[Petitioner] [would] tell[ ]
you to leave the room because you are not supposed to watch." T.271. There was no objection to
this testimony.

The prosecutor continued this line of questioning, asking Karen, "You indicated the
defendant told you to leave the room; is that right?" T.271. Karen testified that she "did leave the
room because of other times when he is beating you up you are supposed to leave so–"

| | |
|---|---|
| [Trial Counsel]. | Objection, your Honor. |
| The Court. | Sustained. |
| [Trial Counsel]. | Move to strike her answer. |
| The Court. | Okay, strike that answer. . . . |

T.271.

When asked if she tried to intervene and protect her son, GJ, Karen responded no,
explaining that she did not do so "[b]ecause then if someone tries to intervene, then they get it
worse." T.272. Trial counsel objected, but the trial court overruled the objection, commenting, "It
goes to her state of mind. I'll allow it for that purpose." T.272.

| | | |
|---|---|---|
| Q. | When you say 'they get it worse,' what do you mean? | |
| A. | That person would get beaten also. | |
| Q. | The person [who] tried to help? | |
| | [Trial counsel]: | Judge, I am going to object. We are talking about something someone would do and wouldn't do. I mean, this is about the facts. When did this occur? Let's get some dates. |
| | The Court: | Well, we did get that, I thought. |
| | [Trial counsel]: | That's not what the question and answer – what I just heard. |
| | The Court: | Okay. |
| Q. | When you say the person would get it worse, you mean the person who was trying to help? | |
| A. | Yes. | |
| | [Trial counsel]: | Judge, what person are we talking about? |
| | The Court: | Well, that is subject to cross-examination. |

T.273.

The prosecutor then turned her inquiry to the incident involving their younger son, JJ, which occurred sometime "during November of 2000." T.273. Karen testified that when Petitioner saw their son JJ "was finishing eating one [cinnamon roll] and he still had one more in his dish, [Petitioner] started getting upset with him and yelling at him that why was he eating two cinnamon rolls, that he shouldn't be eating two, he was too fat. And then so I took the rolls away from him . . . . And then [Petitioner] started hitting [JJ], and then [Petitioner] came out to the kitchen and he started hitting me, and he punched me, and I fell to the floor, and then he started kicking me saying that I was making his child fat and I was feeding him unhealthy [sic], and it was all my fault, and what right did I have giving him two cinnamon rolls when that's the same amount that I had given Shawn. And he just started beating, kicking and hitting me, and he had already hit [JJ] across his face, both sides." T.274. There was no objection to this testimony. Karen recalled that JJ had "hand marks on his face." *Id.*

The next incident about which Karen testified occurred on November 27, 2000, two days before the assault that culminated in Jackson's arrest. Karen recalled that Rebecca had came upstairs and woken her up late at night. T.254. Rebecca was just wearing a blanket. They went downstairs to the living room where petitioner was waiting for them. Karen had to "take off [her] clothes so that he could have sex with us." T.256. Karen explained, "[Petitioner] would have Rebecca perform oral sex on him, and then he was – he would fondle my breasts, and then he would – he made Rebecca and I go onto the floor and he would make me perform oral sex on Rebecca while he had anal sex with me." T.256. The prosecutor asked Karen if she saw Petitioner "do anything to Rebecca that evening that possibly caused her injury[.]" T.256. Over

-11-

defense counsel's objection, Karen testified, "[He] would put his hand onto [Rebecca's] throat so that she would almost pass out. She had foam coming out of her mouth and she could barely breathe. I could hear her struggling for air." T.256.

Karen did not tell Petitioner "no" that night because she "didn't want him to beat [her] up." T.257. Nor did she report the incident because she was "[v]ery, very scared. I didn't want him to attack me or the kids or anything else, anyone else." T.257. There was no objection to any of this testimony.

Two days later, on November 29, 2000, Karen was asleep in the bedroom she shared with their 15-year-old daughter, CJ. T.257.[4] Karen testified that Rebecca woke her up and brought her downstairs to the living room where Petitioner made Karen disrobe. Karen explained that she laid a bed sheet down the middle of the floor which is where the sexual activity took place. T.314. Karen testified that first Rebecca performed oral sex on Petitioner, and then Karen performed oral sex on Petitioner. Then Petitioner directed Karen "to get down to the floor and . . . perform oral sex on [Rebecca] while he had anal sex with [her]." T.258. When asked if Petitioner had an erect penis, Karen recalled, "[s]omewhat, but not fully." T.259.

After a couple of minutes, Karen testified, Petitioner withdrew his penis from her anus. Petitioner then stood up and left the living room and went upstairs. T.259. Moments later, Karen could hear "[t]he floor creaking" in her bedroom, which was directly above the living room. Karen explained that their teenage daughter, CJ, was up there sleeping. T.259-60.

Karen testified that she could hear Petitioner's voice over the baby monitor "sometimes".

_____

[4] Petitioner, Rebecca, and the two younger daughters, KJ and BJ, shared another bedroom. The boys, GJ and JJ, shared a bedroom. Karen testified that there was a baby monitor in petitioner and Rebecca's room. T.259.

"He would say things like, [r]ub, rub me. We couldn't understand why at first." T.260. Karen recalled, "[Petitioner] said that – he said at different times that whatever happens between you and me stays between you and me." T.260. Karen testified, "He said, [d]o you understand, and I heard CJ's voice say yes to him." T.260. "He told [CJ] to sit on top of him and I don't remember the other ones right now." T.260. Karen recalled that she heard her daughter say "it hurt." T.261. At that point, the trial recessed for fifteen minutes because Karen was crying. T.261.

When she resumed the stand, Karen testified that Petitioner eventually came back downstairs. Once again, he made Rebecca perform oral sex on him, and he had anal sex with Karen. Karen testified that Petitioner was not able to fully penetrate her because he "didn't have a full erection." T.262.

After several minutes, Karen testified, Petitioner left the living room and returned upstairs, where he went "back into his room with [CJ] and had sex with her" in the bed usually slept in by him and Rebecca. T.263. (A flower-patterned fitted bed sheet was taken from this bed by the police. T.315). Over the baby monitor, Karen "could hear [CJ] say, Ow, it hurt, that he was squishing her, she couldn't breathe." T.263. Karen testified, "You could hear him saying [to CJ] just to relax, and it's okay, and then he just kept repeating, Whatever happens between you and me stays between you and me." T.263. Karen then heard Petitioner tell CJ to go back to bed.

When Petitioner came downstairs again, he told Rebecca to perform oral sex on him. Karen recalled that because Petitioner could not get an erection, he "was just rubbing his penis against [her] butt." T.263. Petitioner was able to get his penis inside her anus "[a] little bit after he was rubbing for a while." T.263.

Then Petitioner went upstairs again. Karen testified that it sounded like Petitioner went

-13-

into CJ's room and brought her into his and Rebecca's bedroom. Karen said, "You couldn't make out too much. It was kind of mumbling, but you could hear – you could hear moans and groans" over the baby monitor next to the bed in which Petitioner and CJ were. T.264.

Meanwhile, in the living room, Karen testified that she and Rebecca "were trying to figure out what to do, the safest and fastest way to do it." They decided that Rebecca should call emergency services. While Rebecca was on the line with 911, they thought they heard Jackson coming back into the living room, and so Rebecca hung up. T.263-64. Karen related that immediately the phone rang, and it was the 911 emergency operator, "recalling back to make sure everything was okay, and [Rebecca] just said yes, and that's when [Petitioner] came back downstairs, when he heard the phone ring." T.264. Petitioner wanted to know who it was, and "star 66'd [sic] the phone to try to get the phone number," but "nothing came up because he just kind of came back to Rebecca and me, in the living room." T.265.   At one point during the evening, Petitioner hit Karen in the head "because he didn't think [she] was performing well enough on Rebecca." T.266.

Eventually, Jackson returned upstairs to CJ. Karen testified, "You could just hear [CJ], [saying] [']Ow['], and then [']it hurt['], but nothing else really because she – he told her to be quiet and just relax." When asked if she could hear any other sounds, Karen testified, "You could hear the bed moving, squeaking, kind of, creaking, whatever. You could hear it getting a little faster and faster, but there was – a lot of moans and groans." T.265. Karen testified that it sounded as though Petitioner "sent [CJ] to bed for the last time, and then he came back downstairs. Once again, Petitioner tried to have more anal sex with Karen. Karen explained that Petitioner "got frustrated because he couldn't get an erection, and finally, he sent [her] to bed, he

says – he said to just – just get out of here, go to bed." T.266. Karen ran upstairs where she found CJ "pretending to be sleeping because she didn't know if it was him again or what." T.266. Karen testified that they both cried. Karen recalled that they were scared. She explained, "We didn't know what to do right away because you could smell alcohol on his breath, so you knew that he had had several drinks. And he is just a very violent person. We didn't know what he would do. . . ." T.266.

Eventually, Rebecca came upstairs and told Karen and CJ that petitioner was sleeping, so they used Karen's cell phone and called 911. T.266. Karen testified, "We called the police and asked them to come very quickly, very quietly, and we asked them to just come in and immediately put him in handcuffs. And they told us that they couldn't, that we had to go downstairs, one of us had to be downstairs to open the door for them. We tried to explain that he was very violent and if he woke up, that there would be a lot of trouble, but he said that's the way they had to do it." At that point trial counsel objected:

| [Trial Counsel]: | Judge, I am going to object to what someone else is telling her. |
|---|---|
| The Court: | Well, it is hearsay. I question whether it is an exception. It really doesn't go to the truth or falsity of the statements. But anyway, cease that line of questioning and we will go on. |

T.266.

When the police came, Rebecca answered the door and "just said that he is in the living room, that way." Some officers went to the living room where petitioner was, and some of them came upstairs. T.268.

Karen explained why she did everything Petitioner told her to do that night: "I didn't

-15-

want to be hit or beaten or–you could smell the alcohol on his breath right away so you kn[e]w that he had alcohol in him, and I didn't want anything violent to happen." T.269.

### 2.) Cross-Examination of Karen Jackson

Trial counsel attempted to question Karen about how long it took before the three of them started having sex together, after Rebecca and petitioner got married. T.284. The trial court excused the jury and the following colloquy occurred:

| | |
|---|---|
| The Court: | I am going back to my ruling made prior to the trial concerning a limitation in time here. I think by nature of your cross-examination, though, you may be opening the door to the nature of the relationship that existed prior to 1995, so as long as you know that– |
| [Trial Counsel]: | Judge, the witness got it out after you made your ruling, she got that out, and I am trying to cure that at this point. We tell the jury to disregard these things, but they have heard it already. |
| The Court: | As long as you – I didn't tell them to disregard that, but now that you are into this, I guess it's –  I don't know what [the prosecutor] intends to do, but I just want you to k now that I feel this line of questioning negates my ruling of 1995. Okay. |
| | . . . |

T.284-85.

Karen admitted that she, Rebecca, and Petitioner had group sex regularly "a couple times a week" for the past five years. She admitted she did not call the police after any of the previous times they had sex. T.287. Nor did Rebecca call the police on any of these occasions. T.288. Karen testified that she only "pretended" to have oral sex with Rebecca. T.287. Karen claimed that she "put [her] head between [Rebecca's] legs, but [she, i.e., Karen] didn't do anything[.]" T.288.          Trial counsel attempted to discredit Karen's claim that Petitioner "would not let her get on with her life" by pointing out that while all this allegedly was going on,  she had a job

at a flower shop and worked outside the home. Karen acknowledged this but testified that she did not work "right away" after the divorce. T.289. She agreed that she never called the police to complain about having to live with Petitioner after the divorce or that petitioner had threatened to hunt her down if she left.

Trial counsel's questioning had the unintended effect of allowing Karen to provide further details about Petitioner's prior threats and acts of violence against her:

| | |
|---|---|
| Q. | Did you ever leave him? |
| A. | Yes. |
| Q. | When was that? |
| A. | When we were married. |
| Q. | He didn't kill your family, right? |
| A. | No, he found me. |
| Q. | You are alive right now, right? |
| A. | Yes, after a very hard beating. |
| Q. | But you didn't call the police after that, right? |
| A. | No, I was scared to. |
| Q. | So you took a beating, but you didn't call the police? |
| A. | Correct. |
| Q. | As a matter of fact, you moved back into his house, right? |
| A. | Yes. |

T.290.

Karen admitted that during the time period when Petitioner was attempting to have her relinquish her parental rights with regard to their youngest daughter, she did not call the police and did not seek the assistance of a lawyer. T.296-97.

Karen explained that on the night that they called the police, she, CJ, and Rebecca sat up for "[p]robably an hour, hour and a half" before they called 911 the second time. T.298. Karen said that they "were crying and shaking and very scared." T.299. Rebecca stayed at the house while Karen and CJ went to the hospital.

Trial counsel questioned Karen about the tests they did at the hospital, eliciting that they took vaginal and anal swabs, samples of pubic hair, photographs of her breasts, and a saliva sample. However, because the medical records were not in evidence, the prosecutor's objection thwarted trial counsel's attempt to cross-examine Karen about what he apparently perceived to be the lack of positive findings during her medical examination:

> Q.   You didn't have any bruises or cuts or lacerations, or anything like that when you reported, correct?
> A.   No, because he had hit me in my head, so there wasn't a bruise.
> Q.   There was no bruise on your head?
> A.   No, because it was inside of my hair.
> Q.   And your anal area and vaginal area, no bruises, lacerations, cuts, anything like that?
>
> [The prosecutor]:   Objection, beyond the scope of knowledge.
> The Court:           Sustained, unless there is some foundation.
>
> Q.   Did you complain of any injuries in your vaginal or anal area?
> A.   Injuries, no.
> Q.   From your observations did you see whether or not you were scratched or bruised or cut in those areas?
> A.   I didn't personally look.
> Q.   You didn't feel any, right?
> A.   Around my anal area it always felt like there was cuts.
> Q.   I'm sorry?
> A.   Around my anal area there always felt like there were cuts, so–
> Q.   The medical personnel, they took a swab of this?
> A.   Yes.
> Q.   And they put it in a bag and sealed it, and what, gave it to the police?
> A.   I assume so, yes.
>
> . . .

T.301-02. Karen did not know what happened to the clothes that she was wearing at the hospital. She did "[n]ot really" remember talking to the police at the hospital. T.303. She and CJ were taken to the Greece Police Department and were separated to give statements. Karen had not had any sleep was "very, very tired and having a hard time staying awake . . . ." T.304. She did not

recall what time of day it was. She repeated that she was "very scared." T.305. The police interview lasted a "couple of hours." The police officer prepared the typewritten statement. The police did not give her a piece of paper and say, "write down everything that happened." T.306.

Trial counsel questioned her about her statement that petitioner could not penetrate her fully. He asked if she told petitioner to stop; she replied, "No, I didn't want him to beat me up." T.306. During trial counsel's cross-examination, Karen reiterated her reasons for not ever saying no to Petitioner–because she was scared of being beaten:

> Q. The five years, two times a week, that this happened, did you tell him to stop?
> A. I did in the beginning, and I got beat up for it, so therefore, I learned not to.
> Q. You just stopped saying, Don't do it?
> A. Right, because he said not to argue with what he was saying, what he wants goes.
> Q. During the five years you didn't call the police and say, Mr. Jackson is doing this to me and I don't want him to do it?
> A. No, because I was scared.
> Q. And you were scared for your children, too?
> A. Very much so.
> Q. And you didn't call the police based upon that also, correct?
> A. Correct.
>
> . . .

T.306-07.

Trial counsel attempted to question Karen about her being involved in a Family Court matter with respect to the allegations in this case that pertained to her children. T.316. The trial court sustained the prosecutor's objection on relevancy grounds. Trial counsel argued that he should not be precluded from "getting into the specifics of her actions because it gives her a bias or a motive to lie in this proceeding, it goes directly to bias[,]" because "[s]he is the respondent in a neglect/sexual abuse case." T.317. The trial court found that even if the Family Court matter was

-19-

not based solely on the criminal charges at issue, "it is only an allegation of someone else." *Id.*

Trial counsel argued that there were "certain statements" made by Karen to the child abuse caseworker that constituted "admissions . . . that could very well be *Brady* [material]," presumably impeachment material regarding Karen. T.317, 319. The trial court reiterated that the fact of the Family Court proceeding and Karen's involvement therein were "absolutely irrelevant to anything" at trial. T.319-320. The trial court asked trial counsel to "show [him] an admission," and trial counsel indicated that he did not believe he was supposed to review the child protective services file because of privacy issues. The trial court stated, "Well, it is going to take hours to review this entire matter. Do you know–if you know of something, fine; otherwise, we will go ahead with this, and in my leisure I will go through it." T.320. Trial counsel asked if Karen would be subject to recall. The trial court replied, "*Brady* [sic], and subject to recall, but I don't see anything at this point in time, other than a rehash of this incident. I mean, just off the record, it appears that [Karen] may be the respondent in an action in Family Court by virtue of passive [sic], which they [sic] do all of the time." T.320, 321.

After reviewing the file, the trial court did not find anything that deviated from the testimony provided by Karen, and there was no indication that a final determination had been made. T.334. The trial court stated that it "mirrors most of what the investigation apparently has indicated and Counsel has had access to." T.325. Therefore, the court declined to allow trial counsel to cross-examine Karen about the Family Court proceeding. T.335.

### 3.)    Re-Direct Examination of Karen Jackson

On re-direct examination, Karen was permitted to provide more details about how petitioner continued to have sex with her after their divorce despite her lack of an invitation to do

so. *See* T.325-26. Karen testified what would happen any time she "tried to refuse to have group sex with [Petitioner]." T.326-27. She stated, "He would forcibly hold you down, hold me down to do as he wished, and if I did, when I did refuse, he would hit me, and then I learned not to [refuse], didn't want that to happen again." T.327.

Karen provided further details about what happened on the one occasion when she left him during their marriage; the promises he made to change; and the beating he inflicted when he found her. T.327-38. Over objection, Karen testified further about the time he attempted to have her surrender parental rights to KJ, stating that she felt like she had no choice because he told her that if she did not, he was going to have to sign off her rights for all of the other children, too. T.328. When asked what made her decide that calling the police was the right thing to do, she replied, "I didn't want anything to ever happen again. It just crossed the line. I didn't want her [i.e., CJ] to be hurt ever again like that." T.330.

### 4.) Re-Cross-Examination of Karen Jackson

Trial counsel attempted to use this last round of questioning to get Karen to admit that "the sex [she] was having with Shawn and with Rebecca was permissible[.]" T.330. Karen would not agree that she consented to it, but admitted, "I did not say no to him verbally, no." T.331. Karen claimed that on every occasion that she had sex with petitioner, she did not really consent to it because she was scared. T.331. She claimed that she "never wanted him" to have sex with her. She stated she said no in the beginning, but she "got beaten up for it." She did not call the police because she "was too scared" and "[h]e threatened [her]." T.332-33. She stated that given her fear for her children, she did not call the police. T.333.

### b. Rebecca Jackson, Petitioner's Current Wife

### 1.)     Direct Examination of Rebecca Jackson

At the beginning of her testimony, Rebecca described an incident in which Petitioner had allegedly raped Karen six years earlier, leading to Karen becoming pregnant with their youngest daughter, KJ (not a victim identified in the indictment). T.349. Trial counsel moved for a mistrial because this testimony was in violation of the trial court's prior bad acts ruling, but the trial court denied the motion, and again directed the jury to disregard that testimony. T.349.

Rebecca's testimony regarding the events of the night of petitioner's arrest was in all essential respects the same as that provided by Petitioner's ex-wife, Karen. *See* T.358-365. Rebecca also testified about the incident in June of 1999, when GJ had gotten a bad grade on a test at school, and Petitioner had started punching and kicking him, and saying that Child Protective Services "was going to come and take everything away and that [GJ] put our house in jeopardy by" allegedly telling his teacher that he would get being beaten if he did not get good grades. T.365-66. Rebecca testified that she did not try to intervene "because I had seen in the past, and in the past when he was beating somebody –" T.366. Trial counsel objected based upon the lack of a specific time frame. T.366-67. Rebecca was allowed to testify about an incident "a few years ago", "[l]ess than five", when Karen "tried to prevent [petitioner] from hitting [GJ]and it made him angrier, and he beat Karen up and he hit [GJ] worse because she was trying to help him." T.367. Trial counsel did not object to this testimony.

Over trial counsel's objection, Rebecca was permitted to testify about a "an incident occurred during June of 1999 when [Petitioner] was angry at her for something[.]" T.350. Petitioner locked her out of the house, and then he cut the crotch out of her shorts and took off her underwear, and cut her shirt really short, and "said that [she] was going to work for him, and told

[her] to get in the van." T.351. He then drove her downtown to the Driving Park Bridge, and made her get out and walk around on the bridge while he followed her in the van. Petitioner told Rebecca that she was "his bitch" and he was "going to prostitute [her] to make money for him because [she] was worthless." T.352. She complied with his demands "[b]ecause any time I didn't do what he said he would hit me." *Id.* Rebecca testified, "[Petitioner] always threatened me and told me that if I broke the sanctity of our marriage by telling anybody about the abuse that he would cut me into little pieces and spread my body through the Tri-county [sic] area so nobody would find me or know that I was gone." T.353.

Rebecca was allowed to testify about another incident that occurred around Father's Day of 2000 when Petitioner got mad at her for smiling at one of his friends. The next day, he chased her into the kitchen and punched her in the face, and knocked out her right front tooth, breaking it in half.  T.353. Rebecca did not seek dental care "[b]ecause I wasn't allowed to. How would I explain how that happened?" T.354. Karen went to the store and bought SuperGlue and glued the tooth back in. Rebecca had just gotten it fixed a month before trial. She did not report the abuse because she was afraid Petitioner would kill her. Rebecca testified that Petitioner had also threatened to kill her family members and anybody from whom she sought help. T.354-55.

About a week after the Father's Day incident, Rebecca recalled, she told Petitioner about a bad dream she had about her teeth falling out, and he told her it was all her fault and it would not have happened if she had not smiled at his friend. Rebecca recalled that Petitioner held her down by the throat so that she could not breathe. He became mad because she was resisting him, and he then punched her in the face. Rebecca testified that her face got all swollen. This incident occurred in their bedroom while their two youngest daughters were sleeping merely several feet

away from them, and the incident began to wake the two youngster. Petitioner hit her body "a couple of times". T.355. As a result of the punch to her face, her jaw was sore and it was hard to open her mouth and chew food.  Later that day, he had sex with her "[a]t least five times." They had both vaginal and anal sex. She never told him that she did not want to have sexual intercourse that day "because if I did anything to resist him, then he would get angry with me and he would hit me, so I just stopped resisting him." T.357.  She did not report the abuse that day because she was afraid he would kill her or her family. T.357.

Finally, Rebecca testified about an incident on Thanksgiving of 2000, when JJ was doing certain reading Petitioner required him to do in the morning, and GJ was shoveling  the driveway. Petitioner got angry because JJ was not helping GJ and "told him he was going to kick his ass" and "chased him around the hallway and started kicking him with steel-toed boots . . . ." Petitioner kicked him two or three times. T.368. Trial counsel did not object to this testimony.

### 2.)        Cross-Examination of Rebecca Jackson

Trial counsel attempted to demonstrate, through questioning about their living arrangement and sexual activities with petitioner, that all of the sexual activities in which she engaged were consensual. T.376-77. Rebecca explained they began having group sex in 1996; they would always have sex downstairs in the living room and often would watch pornographic videotapes. T.377-78. Rebecca testified that "[e]very time" they had sex, she "pretended to do things" with Karen so that "he wouldn't hit us." T.378. Trial counsel later argued that this representation could not have been true and showed that Rebecca was not credible.

Rebecca admitted that during the incident on Driving Park Bridge when Jackson made her pretend to be a prostitute, she did not flag down any cars or walk into a store or in any other way

try to get help. T.380-81. She admitted that she never told him not to call her his bitch. She volunteered that "petitioner stressed to [her] many times as far as [she] was concerned [she] was his property and [she] had to do what he [told] her to." T.381. She testified petitioner "insisted" that they have sex at least three times a day, but she never told him no. T.387.

Rebecca admitted that she did not go to the hospital that evening. She was never examined by medical personnel about the alleged sexual assault. T.385. She did not go to the police station; rather, the officers took a statement from her at the house. T.385.

On the night of the arrest, she told CJ that they had to call the police because "there is evidence." T.386. She admitted that "[m]aybe an hour" elapsed between Petitioner falling asleep and their calling 911 for the second time. T.388, 390. She admitted she did not tell the police "that evening" she also had been sexually assaulted; rather, she first told the police when she "gave [her] statement that morning," T.391, that is, the morning after the arrest.

During cross-examination, trial counsel asked if she wiped anything on the sheet during the sexual activity, and she replied that when Petitioner put his penis in her mouth, "there was [sic] pubic hairs that [she] could feel." T.391. So she wiped her tongue with her fingers and wiped it on the sheet. T.391-92. (This sheet was collected by the police.)

Trial counsel then asked her to identify pictures of rooms in their house at Tobin Drive and elicited that after Petitioner was arrested, she moved out for one week from the Tobin Drive residence and went to stay with a person named David DeJohn, a friend of Petitioner's. Trial counsel also elicited that the children were required to ask permission before playing with the video games.

### 3.) Re-Direct Examination of Rebecca Jackson

Rebecca also was permitted to testify, over objection by trial counsel, that Jackson had killed a puppy in front of her by smashing its head repeatedly. T.396-97. Trial counsel unsuccessfully objected that it was too prejudicial and remote and was being allowed merely to show Petitioner's alleged propensity to be violent, contrary to the trial court's prior ruling on bad-act testimony. *See* T.168. The prosecutor questioned Rebecca about why, during the incident on Driving Park Bridge, she did not try to escape:

> Q.     What was it that was in your mind that kept you from trying to escape?
> [Trial counsel]:          Judge, that's been asked and answered on direct.
> The Court:     I don't recall it, but I will allow it.
> A.     He told me that if I ever tried to escape or leave from him that he would hunt me down, that he would kill my family. He had once murdered a puppy in front of me with a hammer.
> [Trial counsel]:          Objection, Judge.
> Q.     When was it that that happened?
> [Trial counsel]:          Objection, Judge
> The Court:     What is the objection?
> [Trial counsel]:          *People v. Molineux.*
> The Court:     I have already ruled on that. Overruled
> Q.     When was it that the incident happened with the puppy?
> A.     In 1998 when we lived on North Greece Road.
> Q.     What was it that happened that was in your mind in June of 1999.
> A.     Just fear and knowing what he is capable of.
> Q.     What was it that he did to the puppy that was in your mind that you remember?
> A.     He took a hammer and smashed it in the head and murdered it and then kept hitting and pounding it and looked very scary. He did it in front of me.

T.396-97.

### 4.)     Re-Cross-Examination of Rebecca Jackson

> Q.     This puppy that you say Shawn killed with a hammer, before this puppy – before he killed it, you threw the thing down the stairs, right?
> [The prosecutor]:          Objection. It is irrelevant.
> The Court:          No, I will let him go into it.
> Q.     You threw him down the stairs?
> A.     No.

Q. And his back was broken?
A. No, that's not –
Q. And his leg was broken; isn't that right?
A. No, it is not.
Q. Shawn bought the puppy, right?
A. Yes.

T.396-97.

Rebecca admitted that she knew how to use a phone, and that she never told any family members on the night of the arrest to tell them what she was doing. Trial counsel attempted to question Rebecca about incidents and occasions that she had attended outside the home with other family members, apparently to show that she never took opportunities to ask for help. However, the trial court sustained the prosecutor's objection on the grounds that it was beyond the scope of re-direct. She admitted that she was afraid for her children's safety on the night of the bridge incident, but she still did not call the police. T.400.

### 5.) The Trial Court's Limiting Instruction Regarding the Prior Bad Act Testimony

At the conclusion of Rebecca Jackson's testimony, the trial judge issued the following instruction to the jury:

> Ladies and gentlemen, before – I want to say this to you. Obviously, the defendant is charged with certain acts alleged in the indictment which have been indicated to you. There has been evidence submitted through testimony of witnesses concerning other acts which we call "bad acts" or crimes which are not charged. Now, the admission of those acts into evidence is not and should not be construed by you as establishing defendant's propensity to commit a crime. They are only allowed into this case to establish some other element.
> For instance, in this case it is alleged that the victims were subject to sexual abuse or other activity and did not resist by virtue of the fact that they were in fear, as has been testified. So, the evidence of what placed them in fear is submitted only so that you can establish what the state of mind of the victim was and whether they were justified or not in acting as they did.

So again, let me say that the admission of this testimony should not be construed by you as a propensity of the defendant to commit a crime. It is only admitted for the purpose of establishing an element of the crime which will become more apparent as I instruct you on the principles of law that apply in this case.

The Court notes, as an aside, that the prior bad acts issue was raised during the first witness's testimony when Karen testified regarding an alleged 1992 incident in which Petitioner threatened her. T.242. The previous day, the trial judge clearly had informed the attorneys that no "bad act" testimony prior to 1995 was going to be admissible. Trial counsel immediately objected to Karen's testimony concerning the 1992 incident, and the trial court directed the jury to disregard the testimony. The trial court clarified to the witness and the prosecutor that testimony regarding any bad acts alleged to have occurred prior to 1995 would be inadmissible. T.243. Trial counsel's motion for a mistrial based on the prosecutor having violated the trial court's *in limine* ruling was denied. T.243.

Trial counsel later renewed his motion for a mistrial, arguing that any curative instruction to the jury regarding prior bad acts earlier than 1995 would do more harm than good by leaving the jury wondering what had happened before 1995. T.463. The trial court again denied the motion, pointing out that its preclusion of bad acts prior to 1995 was based on an "arbitrary" cut-off date, and relevant case law would permit prior bad act evidence from before 1995. T.464, 466. The trial court also ruled that the prosecutor had no control over the witness' testimony concerning the 1992 incident; that the 1992 incident involving Jackson's purported threat to Karen was relevant and admissible; and, if anything, its previous instruction to the jury to disregard that testimony was erroneous, since the incident demonstrated that Karen's state of mind–that she feared petitioner. T.465. Trial counsel moved for a mistrial following this

testimony. However, it was denied. The trial court gave this curative instruction:

> Ladies and Gentlemen, I have made a ruling that any testimony of events prior to 1995 will not be admitted. Obviously, testimony, according to the witness, of that event was 1992. I'm going to direct that the answer be stricken, and that you should disregard it on the basis that I have ruled that anything prior to '95 is not going to be admissible.

### c.     GJ, Petitioner's Son

GJ, 17-years-old, testified that the rules regarding his school work were "[t]hey [sic] had to be done, I had to have at least a C average and just be tied down to the school." T.408.  One day, after he failed an Earth Science quiz, GJ was "nervous and crying, and my teacher called and wanted to talk to him [i.e., petitioner], and he came in, and when we went home it got taken out on me." T.409. GJ was scared to show him his failing grade because he afraid he "was going to get beaten." T.409. When they got home after petitioner met with the teacher, petitioner said that he thought the teacher had called child protective services, and then petitioner "punched" him and "was just beating on [him]." T.410. GJ was sitting in a chair; petitioner grabbed his ankle and pulled him out of the chair. He hit him in the face, the side, and the back with his fists, and kicked him while he was on the ground. As a result of the beating, GJ "just had some bruises." T.410.

Another time, in January 2000, GJ had to pick a song that made them think about the results of World Wars I and II. He did not pick one that petitioner liked, and when he would not change it, petitioner punched him in the face, rammed his head into the kitchen cupboard a couple of times, and punched him in the face after he went through the kitchen screen-door. Jackson was kicking him and threatened if GJ was not done in a certain amount of time, he

would kill him. T.411. GJ did not really remember how many times he was hit. He lost consciousness "[a] little bit, not completely." T.412. He had bruises on his face and arms and the back of his leg. He had headaches for a couple of days afterward but was not allowed to get medical attention for his injuries.

### d. JJ, Petitioner's Son

Ten-year-old JJ was the victim in the endangering the welfare of a child count. He testified about the "cinnamon bun" incident in December fo 2000, when petitioner said "that [he] was eating too much, so [he] got yelled at." T.403.

> Q. Did he do anything besides yell at you?
> A. Yeah.
> Q. What did he do?
> A. He hurt me.
> Q. Can you tell everyone what he did to hurt you?
> A. I don't remember it.
> Q. Well, did he hurt you physically?
> A. I think so, yeah.
> Q. Do you remember how it was that you got hurt physically?
> A. How I got hurt? No, I don't remember how I got hurt.

Despite the prosecutor asking leading questions, over trial counsel's objections, JJ was not able to testify how many times petitioner hit him or where he was hit. T.404.

JJ's testimony about what happened with regard to the snow-shoveling incident was markedly different than Rebecca's. T.405. JJ testified that he was not wearing a coat when he was going out to shovel the driveway with his brother, and petitioner told him to get his coat, and JJ was running, and petitioner "was kicking me while I was running to my room" "[i]n my butt" about "four times." When asked if it hurt, JJ said yes. T.405.

Trial counsel did not cross-examine JJ.

### e. CJ, Petitioner's Daughter

#### 1.) Direct Examination of CJ

Fourteen-year-old CJ testified on the night of the arrest, Petitioner came into her room, woke her up, and brought her into his room. He had her lie down on his bed with him and he then started touching her on her breasts and made her touch his penis. CJ recalled, "Then he had sex with me" "[a] couple" of times but "I don't remember the exact number." By "sex", CJ meant that Petitioner put his penis in her vagina. He also put his penis into her anus twice. While doing this, Petitioner "was telling [her] to be quiet and not to tell anybody." T.428. He also "kept telling [her] to relax." T.429.

CJ explained why she did not tell Petitioner to stop: "I didn't want him to hurt me anymore, I didn't want him to hit me." T.429. CJ testified that she was afraid that he would hit her if she said no because she had seen him hit had other family members in their house. When asked if there had "ever been a time that he ha[d] hit [her] before November 29th of 2000," CJ replied affirmatively. CJ agreed that incident was in her mind the night he came into her bedroom. CJ felt that she could not escape because Petitioner was putting all his body weight on her. All CJ recalled saying was "[o]w" during the assault. T.430. CJ recalled that she had about two days left in her menstrual cycle at the time, and the flow of menstrual blood was light.

CJ testified that Petitioner brought her into his room twice that night. T.430, 432. He did "[j]ust more of the same stuff, did it again." T.432. He had sexual intercourse with her "[a]round three" times that night. At one point Petitioner put his penis "on [her] abdomen." T.432.

Petitioner later came upstairs to her room and "said he was sorry and that he was wrong for doing what he did and it was his fault, and not to tell anybody." T.433. She said that she

would not tell. T.433. Then Petitioner went downstairs, and Karen came upstairs and "[r]olled

[her] over and told [her] she heard everything, so [they] started crying." T.433. Rebecca came up

later and they talked about the calling the police. CJ did not want to call the police: "I was scared

and I didn't want to go to the hospital and I didn't want anything to happen that he would get out

. . . [of] [j]ail." T.434. CJ was afraid that he "would kill [them]" "[b]ecause he threatened to all

of the time and he is a very strong man." T.434.

> Q.     What happened at the hospital?
> A.     They gave me a rape kit.
> Q.     What's that?
> A.     Where they test to see that he had actually had sex with me to make sure I wasn't lying.
> Q.     So they did an examination.
> A.     Yes.
>        [Trial counsel]:     Judge, I'll object to that characterization. It is beyond her knowledge.
>        The Court:     Well, I agree. The jurors disregard that. It was probably a bad question.

T.434-35.

CJ testified that at the hospital an internal, or pelvic, examination was performed, and the

medical personnel took some pubic hairs from her with a little comb. T.435.

With regard to the incidents involving GJ's report card, CJ testified that she was outside

at the time and only heard petitioner yelling and GJ crying. With regard to the snow-shoveling

incident involving JJ, CJ saw him get "kicked in the butt" by petitioner once, "but you could hear

like two or three times" that JJ was struck.  T.436.

### 2.)     Cross-Examination of CJ

On cross-examination, CJ testified that she reviewed the transcripts from the grand jury

proceeding a couple of hours before trial. T.438.

CJ did not remember telling the doctor at the hospital that she was in the third day of her period. She had put a sanitary napkin on before she went to bed; she was not using tampons at the time. The pad she was wearing when she went to the hospital had blood on it. Petitioner did not use a condom that evening. She and her mother were instructed to bring a change of clothes and underwear with them to the hospital. She did not douche or clean her vagina before the examination; she did not have a bowel movement but she did urinate. T.447-48. They took anal and vaginal swabs. T.452. CJ testified that she knew what an "ejaculation" was, and that she did not know whether or not there had been any ejaculation by Petitioner that night. T.457.

Trial counsel asked if she was crying in the ambulance; she said yes.

Trial counsel asked if it hurt "when this was happening"; she said, "yes" and agreed that it "hurt a lot[.]" T.453. She testified that she did tell the doctor at the hospital that. T.453. She agreed that she did not have any bruises or scratches, and that is what she told the medical personnel.

CJ admitted that petitioner "hadn't threatened [her]" but "threatened other people in the house." T.455. When asked if he was "pretty strict around the house," she replied, "[v]ery." T.455. Petitioner did not allow her to date, even though that was something she wanted to do. T.456. She admitted that she had to quit dance lessons the year before the incident. She agreed that she "[was]n't too happy" about these things. T.456.

CJ agreed that when Rebecca called 911 that night, she "heard everything that [Rebecca] had to say[.]" T.459.

### 2. Other Prosecution Witnesses

#### a. Greece Police Department Sergeant Christoper Bittner

When p\Petitioner was brought into the police station, Sergeant Christopher Bittner ("Sgt. Bittner") was with him. Petitioner asked if he was free to go; Sgt. Bittner replied affirmatively. Then petitioner got up to leave, and Sgt. Bittner told him he was under arrest. T.488-89. At that point, Bittner read him his *Miranda* warnings. T.482, 491. Petitioner said that he understood them. When Bittner asked Petitioner if he agreed to give them up and talk to the police, Petitioner said, "No, I do not." T.483. Bittner had no further conversations with Petitioner. Shortly thereafter, Petitioner was brought down to booking.

Later that day, at about 3:30 p.m., a Child Protective Services caseworker asked to have Sgt. Bittner facilitate an interview between her and Petitioner. Petitioner was brought from the jail to the general processing area in the police department to talk to the Child Protective Services worker. There is no dispute that Petitioner was *not* re-advised of his *Miranda* rights before his interview with the caseworker.

#### b. Child Protective Services Caseworker Kathy Bonisteel

According to a Child Protective Services worker Kathy Bonisteel ("Caseworker Bonisteel"), Petitioner explained to her that they all lived together because it was better for the children to be in one household. T.499. Petitioner said that he had sex with Rebecca about two or three times a day; that he also was sexually active with Karen; and that the three of them often had sex together. Petitioner stated that they had a "ritual[,]" and that "the women knew exactly what they were supposed to do" and "never had any questions about how they would have to go about having sex with each other." T.500. Caseworker Bonisteel asked him to elaborate on what

-34-

he meant, and Petitioner "just – he repeated that they just knew what to do." *Id.*

The night of the arrest, Petitioner had gone to a couple of bars for some drinks, and then to a friend's apartment for a few more drinks. Petitioner admitted to Caseworker Bonisteel that he had "snort[ed] a couple lines of cocaine." T.501. Petitioner told her that he used cocaine about two to three times a week, and used marijuana on a regular basis but not that night. T.501. When Petitioner got home, he said he remembered pulling in the driveway and "feeling happy that he had made it home safe." T.501. Caseworker Bonisteel testified that Petitioner told her that Rebecca was sleeping on the couch so he tried to "wake Becky up for a little lovin' [sic]". T.502. Petitioner told Caseworker Bonisteel that he was not able to get an erection, however. T.502. Petitioner told her that "[t]he next thing he knows the police were at his door." T.502.

At that point during the interview, Petitioner began shivering and said he was hungry. When asked if he had anything to eat, Petitioner said he "wasn't able to eat what the deputies brought him," at which point he "proceeded to take out his teeth and set them on the table." T.502. Caseworker Bonisteel asked what happened to all his teeth, and he replied, "that's just the life of the 'Alpha Male.'" T.502. Petitioner explained that the "Alpha Male" "defends the pack." She asked if he was the "Alpha Male" in his family, and he said that he was, "and that's why he was so surprised that the police were called." T.502. Caseworker Bonisteel asked him why he was surprised, and "he said that Becky and Karen just know what to do." T.502. Petitioner "didn't get into any more detail than that." *Id.* Caseworker Bonisteel asked what happens if Karen and Rebecca "go against what he says to do, what happens," and he "denied that he hits either of them." T.503. "He stated that they just know the routine, they know what to do." *Id.*

Caseworker Bonisteel asked Petitioner "why he thought that he was there." Petitioner said

he "overheard one of the deputies saying that not only was he fucking his two wives but he was also molesting his daughter." T.503. When asked if he remembered doing anything like that, "he said he would never hurt [CJ]." T.503. Caseworker Bonisteel asked him again if anything happened the night before when he got home, and Petitioner repeated he would never hurt CJ. T.503.

When Caseworker Bonisteel told him that CJ was saying he had raped her, Petitioner stated again he would never hurt CJ. When Caseworker Bonisteel asked who else would hurt CJ, Petitioner mentioned the name of his older son, GJ. T.503. When asked "if it could have been [GJ] that raped [CJ]," Petitioner "adamantly replied no." T.503. When asked if there was anyone else, Petitioner said no. Caseworker Bonisteel related that she then commented, "That leaves you. Could it have been you?" Petitioner repeated, "he wouldn't hurt CJ[.]" T.504. Caseworker Bonisteel testified that she asked "was it possible that he was so drunk that he couldn't remember raping [CJ]? And he said it was a possibility." T.504.

On cross-examination, the caseworker admitted that the phrase, "it is a possibility," did not represent Petitioner's exact words. Rather, Caseworker Bonisteel testified, Petitioner said "that it was a possibility that he could have done this if he was really drunk," but he did not do so in those "exact words." T.517-18.

### c.    Jailhouse Informant Tony Arnold

The prosecution called Tony Arnold ("Arnold"), who was incarcerated with petitioner at the Monroe County Jail on a parole violation regarding a forgery conviction, in early December of 2000. Arnold recalled that Petitioner approached him and asked some questions about his (Petitioner's) case. Arnold testified that Petitioner said that he had been drinking Jack Daniels

whiskey, and had had sex with both of his wives. When he fell asleep, Petitioner related, the two women went upstairs and called the police. T.549. Petitioner said that "they were trying to charge him with raping his daughter." Arnold recalled that Petitioner "also said that he was locked by the daughter in the cage and he said he was looking for somebody to kill them." T.549. Arnold testified that Petitioner offered to pay him $100,000 to "do the killing". Petitioner said he wanted "[t]he two wives, his wife and his ex-wife" killed. T.550. Arnold testified that they had no further conversation beyond that. Arnold did not agree to kill Petitioner's family. T.551.

Arnold ultimately decided to tell someone about what Petitioner had said to him and got in touch with his parole officer, who recommended that he contact the district attorney's office. T.551. After Arnold spoke with the prosecutor about the matter, the prosecutor let Arnold know that she would inform his parole officer that he had given helpful information to her. T.552.

On cross-examination, trial counsel elicited that, in the past, Arnold had violated the terms of his parole. T.554. Trial counsel accused Arnold of being a "snitch" for being an informant regarding three separate robberies in Monroe County; Arnold explained that he had to do so because his car had been used in the crimes. T.555-56. Trial counsel elicited that Arnold had given information to the district attorney's office in Syracuse involving an assault case in which he had been indicted as a co-defendant. T.556-57. Arnold admitted that he had prior felonies, involving grand theft auto, resisting arrest, burglary, and forgery. T.557-59, 561. In addition, Arnold had a number of convictions for non-felonies, including assault, possession of burglars' tools, criminal trespass, criminal mischief, possession of stolen property, and unauthorized use of a motor vehicle. T.560-64. Arnold admitted that he had used aliases in the past, and had been caught possessing marijuana while in jail. T.565-68.

Arnold stated that he had come forward with the information about Petitioner's solicitation of him to murder his wives because he (Arnold) had children of his own, and brothers and sisters. T.569. Arnold admitted that he did not pay child support for his four children, who were between the ages of 16- and 22-years-old.

### d.      Dr. Ann Lenane, Medical Expert Witness

The prosecutor called as her last witness Dr. Ann M. Lenane ("Dr. Lenane").[5] Without objection or a request for an offer of proof by trial counsel, the prosecutor elicited from Dr. Lenane that she was a pediatrician in the emergency room at the Strong Memorial Hospital at the University of Rochester, and worked in the Child Abuse Program there, doing consultations with children and adolescents in cases of suspected abuse. T.520-21. After Dr. Lenane gave her educational background, and affirmed that she kept abreast of the current literature with respect to child sexual abuse, trial counsel objected. A colloquy was held outside the presence of the jury. T.521.

Trial counsel asserted that the prosecutor was trying to elicit expert testimony, that the prosecutor had not given notice of an expert witness, and had in fact represented that no experts were going to be called. T.522, 523-24. The prosecutor argued that this was "simply a physician who is interpreting the medical records[.]" *Id.* Trial counsel responded that if the witness was "going to be getting into an opinion as to the lack of evidence in this case . . . , that's expert." *Id.* Trial counsel explained that he believed the prosecution was "intending to offer through this witness . . . an explanation as to the lack of medical evidence regarding these alleged victims;

---

[5]      Prior to trial, the prosecution did not provide to the defense notice that it would be calling any expert medical witness, and trial counsel proceeded upon that assumption. However, on June 1, 2001.

specifically, the lack of semen, vaginally or anally, with respect to these alleged victims," T.523, and that this was not testimony of a treating physician, but expert opinion testimony, *id.* Trial counsel stated that there had been a pre-trial conference before the first assigned judge, and Petitioner's first attorney, at which time the prosecutor had stated that she was not producing an expert witness. T.524. The prosecutor asserted that with respect to that conference, the type of expert witness that was being discussed was "somebody of a psychological nature" and "whether there would be an expert testifying regarding rape trauma or delayed disclosure . . . ." T.524.

The prosecutor further noted that the previous trial attorney had the medical records before she (the prosecutor) did, and therefore the defense "has been aware of the possibility and the likelihood that a doctor or sexual assault nurse examiner would come in and testify in this case." T.524. Trial counsel stated that he had a copy of a letter confirming that the prosecution would not be calling an expert witness, and was asked by the court to produce it. T.525. The prosecutor then conceded that such a letter existed.

Meanwhile, the prosecutor inquired whether Dr. Lenane "would . . . be able to testify to the meaning of the physical findings[.]" T.525. The trial judge answered affirmatively, but stated that Dr. Lenane could not "go off into studies or "theories[.]" T.525.[6] The trial judge stated, "As a treating physician, I am going to allow her to testify." T.526. Trial counsel did not object to this ruling, but rather asked for an adjournment of an hour to prepare for her cross-examination because he believed she was an expert medical witness. T.526. He also moved for a mistrial, which was denied. T.526.

---

[6] This ruling demonstrates that the trial court mistakenly believed that Dr. Lenane had actually treated the victims, an assumption that was not challenged by trial counsel. T.525

Recalled to the stand, Dr. Lenane testified that she kept current with regard to literature on child sexual abuse, and that she had treated between 800 and 1,000 child victims of sexual assault. T.527. Dr. Lenane then read from the medical records of CJ what she perceived to be the "relevant physical findings" that CJ displayed at the time of the examination:

> [There was] an abrasion, on the written notes they said was at the introitus, and when they circled on the diagram where that was, it is in the area of the genitalia that is just below the hymen and above the rectal area, so–and that's the main physical finding that they noted. The other finding that they noted was old blood in the vulva [sic],[7] which means he [sic] was inside the vagina and they also noted they didn't see any clinical lacerations of the vagina, so they must have been assuming that the blood was old and not from active bleeding at the time of the examination.

T.529.

The prosecutor then posed a hypothetical to Dr. Lenane involving a fourteen-year-old, menstruating female, asking if Dr. Lenane had an opinion as to what effect menstruation would have on the likelihood of injury from sexual penetration. T.529. At that point, trial counsel objected on the basis that any answer would go "beyond treatment." T.529. The trial court sustained the objection.

The prosecutor's next question was as follows: "[W]ith respect to the abrasions[8] that were noted, are those abrasions consistent with penetration?" T.529-30. Trial counsel did not object as this point. Dr. Lenane testified that the "abrasions" were "consistent with some type of trauma" which "could include penetration, but it wouldn't necessarily have to." T.530. The prosecutor

---

[7] This word is actually "vault" in the medical records, which was confirmed later by Petitioner's medical expert witness at the evidentiary hearing held in this matter.

[8] It should be noted that the medical report of CJ only refers to "abrasion" in the singular; nowhere on the report does it mention an observation of more than one abrasion.

reiterated her question as to whether the "abrasions" were "consistent with penetration," and Dr. Lenane answered affirmatively. Still there was no objection from trial counsel, as he apparently believed that Dr. Lenane was the treating physician.

Dr. Lenane next was questioned about the "relevant physical findings with respect to Karen Jackson's medical records[.]" T.530. Trial counsel then requested an opportunity to *voir dire* the witness "[o]n her treatment." T.530. The trial court declined, noting that counsel was "only entitled to *voir dire* on whether she is a competent witness." T.530. Trial counsel noted that he "would also object to foundation" because "[i]t hasn't been established that she has treated–that Karen Jackson ever saw her." T.530-531. The trial court sustained the lack-of-foundation exception and told the prosecutor to proceed; the prosecutor resumed her questioning of Dr. Lenane as to the "relevant physical findings" from the examination of Karen at the emergency room. T.531.

At this point, the trial judge apparently realized that Dr. Lenane was not a treating physician, and inquired as to her "function in regard to this case[.]" Dr. Lenane's reply made clear that she had been consulted as an expert witness: "I was asked to review the records and express an opinion about the consistency of the history and the physical findings." T.531. The trial court sustained the defense's objection based upon the lack of foundation, at which point trial counsel stated he "would move to strike the Doctor's response to the Court or at least the last portion." T.531.

During a colloquy outside of the jury's presence, the prosecutor argued that if she had called the doctor who treated the victims, that doctor could state what he or she had found and whether or not it was consistent with penetration. T.532. The prosecutor asserted that she was

"not taking [Dr. Lenane's] [testimony] beyond the realm of what the treating physician would be able to say[.]" T.532. Trial counsel asserted that Dr. Lenane was improperly "giving her opinion as to what the findings were[,]" while she "wasn't even present" for the examinations or treatment. T.532. To this the prosecutor responded, "So? You knew a doctor would be coming in. What's the different whether it is a doctor that treated the person or not?" T.532-33. The trial court acknowledged that although it was "a very fine, if no line there[,]" Dr. Lenane nevertheless was "[t]echnically . . . being called as an expert" because she had not actually examined or treated CJ or Karen, and there was no evidentiary foundation for her testimony. T.532.

At that the trial court excused the jury. The judge noted that based on Dr. Lenane's responses, her testimony was "clearly expertise, pure and simple[;]" that there had been "no foundation as to who did what[;]" and that Dr. Lenane was "not properly before the Court as an expert." T.533. The trial judge stated that the only way the prosecutor could have Dr. Lenane testify as an expert was by "giving defendant notice now that you intend to call an expert witness, and he is entitled to, you know–even then it is questionable because you had just then given the notice [at the time Dr. Lenane took the stand]. It might be salvageable by giving him enough time to theoretically go out and get his own expert if he wants to challenge it, but I mean he [defense counsel] is entitled to rely on your assertion to him that there would be no experts, Ms. Briggs." T.533-34.

The prosecutor insisted that Dr. Lenane should "at the very least . . . be able to testify about the relevant physical findings" in the victims' medical records, and maintained that "[s]imply interpreting the records" was not expertise. . T.534.  The trial court explained repeatedly that for Dr. Lenane to testify from another doctor's report was hearsay, and that

interpretation was, in fact, expertise. T.534; *see also* T.535. The trial judge was not persuaded by the prosecutor's assertion that the defense "had to have known" that a doctor would be testifying about the medical records, observing that the District Attorney's office had given written notice to the defense that there would be no expert witnesses called. T.535.

At that point, trial counsel moved to strike all of Dr. Lenane's testimony "because she [was] giving opinion testimony" and "never indicated that she ever set eyes or [sic] Karen Jackson or [CJ]." T.536. Trial counsel argued that the jury had already "heard too much . . . because she testified about an abrasion, and in the same medical records there's such a thing called an irritation, which is described, which she did not–what [sic] she did not testify to." T.536. Counsel then requested a mistrial, stating, "I don't think the bell can be unrung at this point . . . ." T.536. Since the defense had focused on the lack of physical evidence in the case in his opening statement–which he said that he made "because he knew an expert would not be testifying as to these ancillary other issues"–trial counsel argued that he was "stuck with a jury saying, wait a second, this guy said the following on his opening and the doctor came up and she said something a little bit different than what he said." T.537. Trial counsel argued that the "spillover effect of what [Dr. Lenane] just said to the jury taints the whole jury." T.537.

The prosecutor pointed out that the jury had the medical records, but trial counsel disagreed, noting that the court had not "redacted the applicable [sic] parts and . . . with the medical records alone, we don't have an expert saying what these things were." T.537. The prosecutor observed that they would not be redacting the physical findings, and asserted that there were "some things that the jury can read for itself and figure out . . . ." T.537.

Trial counsel observed that Dr. Lenane had not mentioned a notation regarding a

"localized irritation" made by a Dr. Everett in CJ's medical record . Trial counsel argued, "This doctor here will tell you the difference between an irritation and an abrasion. One can be mechanical [sic], one could be self-produced by the body. That is expert testimony. That is what I'm stuck with now." T.538. Trial counsel stated that he could not call an expert "to tell the jury what an irritation is versus an abrasion because that's what this person–this doctor was going to testify to." T.538.

The prosecutor pointed out that trial counsel had been in possession of the medical records for a while and, had he wanted to call an expert to testify about "irritation versus abrasion," he could have done so regardless of whether the prosecutor called any medical-related witness. T.539. Trial counsel argued that the defense did not have the burden of calling any witnesses and were entitled to rely on the prosecutor's representation that no expert was being called. T.539.  Trial counsel then withdrew his stipulation to the medical records. *Id.*

After having Dr. Lenane's testimony read back, the trial court ruled that it "could be considered expert testimony in [regard to] her opinion that the abrasion [on CJ's vaginal introitus] is consistent with penetration. T.528-30; *see also* T.539. The trial court offered the defense four options: granting a mistrial; striking the testimony and telling the jury to disregard it; precluding the doctor from testifying further and giving the defense "sufficient time to do whatever he wants with that opinion"; or allowing the doctor to continue to testify as an expert, giving defense counsel what time he needed to obtain and prepare a rebuttal witness. T.540.

Trial counsel argued that trial could not "go forward" because of what he told the jury in his opening statement–presumably, counsel was referring to his assertion that there was no evidence of rape or sodomy. Trial counsel urged that if the court were to allow Dr. Lenane's

testimony with regard to the abrasions, in the plural, then the jury would think trial counsel was

"a liar because he didn't say that . . . on his opening statement." T.541.

> The Court: Well, if you would have read the hospital records you would have seen the word "abrasion" there.
>
> [Trial counsel]: And I received [sic] the word "local irritation" and there is a big difference between the two.
>
> The Court: Which one was it?
>
> [Trial counsel]: I don't know, Judge. I'm going to argue–
>
> The Court: That's up to the jury.
>
> [Trial counsel]: Judge, but I based the opening statement upon that, upon the fact that there was going to be no expert to explain this stuff away.

T.541.

The trial court expressed astonishment that trial counsel would not have expected the

treating physician to come in and testify regarding the physical findings (i.e., the "abrasion" and

the "irritation") noted on CJ's and Karen's medical records:

> The Court: You could not have presumed that there wouldn't be a doctor who didn't come in and testify of [sic] what the findings were.
>
> [Trial counsel]: That's correct.
>
> The Court: And certainly they could, at that point, that treating physician would be entitled to say, you know, that is consistent with, in my opinion–I mean, that's just common sense. . . .

T.542.

The trial court then recessed the proceedings in order to review the transcript containing

Dr. Lenane's testimony, after which it offered defense counsel two options:

> I can do one of two things. I can either direct the jury to disregard it, or I would allow you, Mr. Damelio, over the weekend to–you've got–you have authorization to hire an expert to come in here Monday, if you want to, with an expert to say that trauma is not consistent with penetration.

T.544. The trial court took the mistrial option off the table. Trial counsel complained that since it

was Friday, he knew he could not get an expert by over the weekend. *Id.* The trial court

expressed surprise that trial counsel had not an expert:

| | |
|---|---|
| The Court: | Well, you were–didn't you discuss this with some doctor? |
| [Trial counsel]: | No. No. |
| The Court: | You were given authorization to– |
| [Trial counsel]: | Yes. Let me explain. . . . I did review the records with a nurse, and I'm certainly not going to bring a nurse in here to try and combat what a doctor had to say on the issue of abrasion versus irritation. |

T.544-45. Because trial counsel believed it would be "impossible" to find a doctor who was not

"not out on the golf course" at the time, he decided he would "have to go for the other

option"–that is, having Dr. Lenane's testimony stricken. T.545. Trial counsel requested a curative

instruction stating that the jury was to disregard the doctor's testimony in its entirety, that

whatever testimony "was gathered from her so far was gathered in error, and should not be

considered by the jury." T.545. The trial court agreed to the proposed contents of the instruction,

and the prosecutor did also. T.546.

When the jury returned, the trial court issued the following curative instruction:

Ladies and gentlemen, in the course of the trial when matters of science or art or of almost any specifics are brought up which laypeople aren't expected to understand, the Court on occasion allows an expert to come in to assist you, and purely for your assistance–they don't substitute their judgment for yours–to assist you in your duties. In this case it was a little bit unclear to me whether this doctor had been brought in as a treating physician or brought in as an expert, but as it turned out, she was brought in as an expert to take the medical records that had been put in and help you try to interpret them. That's ultimately your job. If they are in the records [sic] or part of the evidence, it is up to the jury to determine what they mean.

Procedurally, as I explained to you before, before bringing in an expert, the People must give notice to the defendant that they are going to bring in an expert, which they failed to do. Accordingly, the expert is not allowed to testify since no notice was given. Accordingly, I am directing you to disregard the testimony of Dr.

Lenane on the grounds that she was called as an expert and no notice was given; therefore, her testimony is excluded. Any statements of fact or any conclusions that she would render to you I direct that you disregard in their entirety, strike them from your mind as if they had never been heard.

You will be able to, subject to whatever further evidence comes in, to evaluate the evidence as it is in the record, but again, her testimony must be stricken from your minds and not be considered by you in your deliberations.

Is there anyone who can't do that? I assume you can because I'm telling you that .

T. 546-47.

The Court notes that Petitioner's trial counsel did not contemporaneously object to the trial judge's curative instruction given regarding Dr. Lenane's opinion testimony. At a later point, however, trial counsel did object, arguing that the court's curative instruction implied that the only reason for striking Dr. Lenane's testimony was that the prosecutor had not complied with a procedural requirement. The trial judge stated that he believed his instruction to have been proper, and overruled the objection. Appellate counsel did not assert on direct appeal that the trial judge's curative instruction was inadequate or that trial counsel was inadequate in failing to timely object. Nor did Jackson in his *pro se* C.P.L. § 440.10 motion assert any claims regarding the curative instruction, or trial counsel's or appellate counsel's performance in connection therewith. Accordingly, there is no properly exhausted claim regarding the propriety of the jury instruction before this Court.

In any event, the Supreme Court consistently has instructed that "the almost invariable assumption of the law [is] that jurors follow their instructions[.]" *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Francis v. Franklin*, 471 U.S. 307, 325, n. 9, 105 S.Ct. 1965, 1976, n. 9, 85 L.Ed.2d 344 (1985)). In *Bruton*, however, the Supreme Court "recognized a narrow exception

to this principle" and "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson*, 481 U.S. at 207 (citing *Bruton*, 391 U.S. at 135-36) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. . . .") (citations omitted in *Richardson v. Marsh*). The *Richardson* court characterized *Bruton* as a case where the codefendant's improperly introduced confession was, on its face, "powerfully incriminating," such that there was an "overwhelming probability" of the jury's being unable to ignore the incriminating inference. *Richardson*, 481 U.S. at 208. The Supreme Court observed in that "while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there d[id] not exist [in *Richardson*] the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule." 481 U.S. at 208.

Notwithstanding the narrow exception of *Bruton*, the assumption that juries faithfully obey instructions given to them has been applied in many and varied contexts. *Richardson*, 481 U.S. at 207 (citing *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding that statements elicited from a defendant in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), can be introduced to impeach that defendant's credibility,

even though they are inadmissible as evidence of his guilt, so long as the jury is instructed accordingly); *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967) (holding that evidence of the defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt); *accord*, *Marshall v. Lonberger*, 459 U.S. 422, 438-439, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983); *Tennessee v. Street*, 471 U.S. 409, 414-416, 105 S.Ct. 2078, 2081-2083, 85 L.Ed.2d 425 (1985) (jury instruction to consider accomplice's incriminating confession only for purpose of assessing truthfulness of defendant's claim that his own confession was coerced); *Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981) (jury instruction not to consider erroneously admitted eyewitness identification evidence); *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (instruction to consider unlawfully seized physical evidence only in assessing defendant's credibility). *See also Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("Moreover, even if there were some risk of prejudice [in joint trials], here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'"); *Greer v. Miller*, 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . , unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions.") (quoting *Richardson v. Marsh*, 481 U.S. at 209); *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963) (When a limiting instruction is clear, "[i]t must be presumed that the jury conscientiously observed it."); *Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir. 1996) ("We assume that a jury applies the instructions it is given.").

### e.  Brian Barnard, GJ's Former Teacher

Brian Barnard ("Barnard"), an earth science teacher at Greece Olympia High School, had GJ as a student in summer school in 1999. T.572. Barnard had an arrangement with GJ's father with regard to sending grade reports home; Jackson had asked Barnard to sign a sheet on a daily basis for GJ's grades to be sent home. Barnard was permitted to testify regarding his observation of GJ's demeanor on one day that GJ had received a bad grade that was going to be sent home. T.573. Barnard said that GJ "seemed emotionally concerned" and was "crying." T.574.

Trial counsel's cross-examination of Barnard elicited that GJ had been his student for the last quarter of the previous school year. The class met every weekday during the school year and during summer school. T.574-75.

### 3.  *In Limine* Motions

The prosecution rested after Barnard's testimony, at which time defense counsel moved again for a mistrial on the basis that Barnard's testimony "went to nothing" on the charges of endangering the welfare of a child and third degree assault charges involving GJ, and merely "was an appeal for sympathy." T.576. Trial counsel renewed his request for a mistrial based on "all of [his] prior motions[,]" stating that the "prejudicial effect and the cumulative effect of what has been going on here has finally taken its toll." T.577. The trial court found that the teacher's testimony corroborated the testimony of the victim, GJ, who stated that he had gotten a bad grade and was crying. The teacher asked GJ what was the matter. GJ went home, told petitioner, petitioner went into school, and when he came home, he beat GJ *See* T.578-79. The prosecutor also argued that since trial counsel had argued that all the allegations were false, the teacher's testimony was relevant to disprove recent fabrication. T.579. In any event, the trial court denied

the mistrial motion.

Defense counsel then moved for a trial order of dismissal pursuant to C.P.L. § 290.10 with regard to all counts of the indictment. T.579. First, with regard to Count 28 (the endangering the welfare of a child count involving the youngest son, JJ), trial counsel argued that the witness did not testify to anything that petitioner did to him, instead stating that he did not remember. The trial court agreed that the testimony concerning that count was "certainly conflicting" and granted the motion to dismiss. T.580-81.

Trial counsel next addressed in his motion to dismiss the first degree forcible sodomy counts (Counts 1, 3, 5, and 7 involving Karen; and Counts 13, 14, 15, 16, 17, 18, 19, 21, 22, and 23 involving Rebecca); and the first degree (non-consensual) sodomy count (Count 39) involving CJ), asserting generally that the prosecution had not set forth a *prima facie* case. Alternatively, trial counsel requested that they be reduced to third degree sodomy. T.581-82. Next, with regard to the first degree rape charges (Counts 10, 11, and 12 involving Rebecca; and Counts 33, 35, and 37 involving CJ), trial counsel argued generally that the prosecution had not established a *prima facie* case as to all the elements. T.582. Counsel noted that with regard to Count 10, the testimony lacked specificity as to the dates. Trial counsel also argued that several of the rape and sodomy counts were alleged to have occurred during the same time frame with regard to the same victim (e.g., Counts 11 and 12, rape counts involving Rebecca alleged to have taken place between June 22 and June 29, 2000). T.583-84. Counsel argued that the same problem occurred with regard to the first degree sodomy charges involving Karen, Rebecca, and CJ. T.584.

The prosecutor noted that Petitioner's first trial counsel had moved to dismiss the indictment on lack of specificity, and the first trial judge (Judge Marks) had found that the

indictment, as amplified by the bill of particulars, was adequate. T.585. The trial court accordingly denied the motion to dismiss. T.586.

Trial counsel next argued that the incest charges (Counts 44 through 47 involving CJ) should be dismissed because they did not "alleged any particular acts other than they were acts of Incest," that it was a continuing act and should have been charged four separate times, and that having four counts over the course of two days would give the jury an "undue impression about what the evidence is." T.586. Trial counsel requested that three of the counts be dismissed and that only one be submitted to the jury. T.586. Finally, trial counsel argued that the prosecution had not set forth a prima facie case on Count 48, endangering the welfare of a child, with regard to CJ. T.586.

The prosecutor responded that incest was not a crime that could be charged as a continuing offense; to charge one count of incest for five different acts of incest would result in duplicity issues. T.587. The trial court agreed that the evidence taken in the light most favorable to the prosecution indicated that CJ testified to at least four acts, on the night of November 29th and the morning of November 30th, of vaginal sexual intercourse and/or deviate sexual intercourse. Thus, there was a question of fact for the jury, and the motion to dismiss was denied. T.587. In sum, other than Count 28, all the remaining counts, 47 in total, went to the jury. T.587-88.

Trial counsel then objected to the curative instruction that the trial court had given following its direction to strike Dr. Lenane's testimony. T.594. Trial counsel had not objected at the time the instruction was given. Now, trial counsel argued that the instruction was legally incorrect because the court indicated that the reason for striking the testimony was that the

prosecution had not given proper notice. T.594. The trial court stated that the impression, wrongly given, was "but for" the improper notice, the jury could have considered Dr. Lenane's testimony. T.594-95. The trial court stated simply that one had to assume that the jury agreed to follow the law, and he had properly directed them to entirely disregard Dr. Lenane's testimony.

Finally, trial counsel requested that any reference to "rape", "possible rape", "possible sexual assault" in the medical records be redacted from the copies of the medical records submitted to the jury. T.595-96. As the prosecutor noted, any mentions of "rape" and "sexual "assault" were part of the treatment and explained why the patients were being examined. T.596-97. Furthermore, trial counsel had questioned CJ about the hospital's preparation of the "rape kit", in order to explain to the jury that it was a method of collecting evidence. T.597. Finally, the prosecutor noted that all of the subjective narrative portions in the medical records had been redacted. T.598.

## 4. Closing Arguments

### a. Defense Counsel's Summation

During his closing statement, trial counsel emphasized that the prosecution had the burden of proof, beyond a reasonable doubt, and that the defense had no obligation to prove anything. T.600-01, 602. Counsel asked the jury to "[t]ake sympathy away from" its consideration of the case and look at the facts only. T.601. Counsel argued that the only point of much of the witnesses' testimony was to arouse the jurors' sympathy. T.604-05. Trial counsel reiterated that he "can't prove that someone is lying" and he did not "have to because that's the law." T.603. Trial counsel conceded that petitioner's life was unconventional, even dysfunctional; however, counsel argued, petitioner was not on trial for his lifestyle. T.606.

Counsel emphasized that both Karen and Rebecca had lived this same lifestyle for years; although they were out of the house working every day, they never called the police–because, counsel argued, they "consented to this thing." T.606-07.  As trial counsel pointed out, Rebecca married him twice–the second time "supposedly . . . when all of these rapes and sodomies are going on . . . ." T.607. Counsel argued that Karen's testimony that after she was divorced from petitioner she nevertheless was "forced to live with [petitioner and his new wife], . . . forced to have sex them""doesn't make sense". T.608 (Trial counsel: "Is he raping her and sodomizing her all of these times? No way. Was it against her will? Come on. No. Not in today's day and age.") T.608. Counsel urged that Karen's testimony about Jackson's alleged threats was nothing more than an appeal to the jury's sympathy. T.608.

Trial counsel asked the jury to consider, given the frequency with which the three of them had sex over numerous years, why "all of a sudden it is a rape and all of a sudden it is a sodomy[?]" T.607, 609. Counsel asked the jury to consider how were the sexual acts charged in the indictment any "different than the thousands of times before" that the three of them had sexual relations. T.610.

Reminding the jury that Rebecca said that they decided to call the police "because there's evidence," trial counsel asked, "Did you see any evidence? Did you hear any evidence? So what evidence do we have to corroborate what these people said?" T.611. Trial counsel argued that with so many alleged sexual acts occurring on the night of petitioner's arrest, there should have been some evidence. T.611. Counsel pointed out that Rebecca said she had wiped her mouth on the sheet after performing oral sex on petitioner because she had a pubic hair in her mouth, but the prosecution, although the police confiscated the sheet, "didn't even produce a pubic hair for

you . . . ." T.612. There was, trial counsel reminded the jury, no semen or DNA found on the sheet. Counsel argued that "if this really happened, someone from the lab would have got up and testified and told you what they found. They found nothing." T.612.

Trial counsel also pointed to the sheet confiscated from the bed in which Petitioner allegedly had sex with his daughter, who was menstruating at that time. T.612. However, counsel noted, there was no blood on that sheet from the victim; if there had been, the jury would have heard about it. Nor was there pubic hair, semen, or DNA, or any other physical traces of sexual intercourse. T.612-13. Furthermore, trial counsel emphasized, there was no physical evidence collected from the victims' clothing or from the sanitary napkin that the daughter was wearing, or from any of the swab samples or pubic combings taken by the medical personnel from the victims. T.613-14. Nor was there any physical evidence on petitioner's clothing or underwear. T.614. In sum, there was "no evidence right now to show that a crime was committed." T.614.

Moving on to the medical evidence, trial counsel noted that the jury "didn't hear a doctor tell you anything about injuries." T.614. Counsel observed that the jury had started to hear from a doctor, but then "the [J]udge told you to disregard entirely what she had to say because it was improper." T.614-15. Trial counsel noted that the first emergency room doctor, Dr. Everett, who saw CJ, indicated there was a "local irritation at the basis or the bottom of her vagina, I think they call it the introitus[,]" while "[a]nother doctor calls it 'an abrasion.'" T.615. Counsel argued that "[t]wo doctors can't agree on the same thing[,]" and urged that there was a difference between an irritation and an abrasion: "An irritation can be a pimple" or "anything that can be manifested by the body" while "[a]n abrasion, better term for the Prosecution, suggests some scraping or something." T.615. Counsel pointed out that no one came on the stand to tell the jury

"what it was, if it was caused by clothes, if it was caused by a sanitary napkin or pad. No one can tell you that it was caused by Shawn Jackson, that it was caused by someone else. Could be caused by toilet paper, for that matter. We don't know. Because you didn't hear it. So, that's consistent with absolutely nothing." T.615-16.

With no physical evidence or medical evidence, trial counsel argued, the prosecution was forced to "go for the sympathy" and "[t]hat's why a 15-year-old girl came walking into this courtroom with a little stuffed animal in her hands, and the way she sat on the stand, she plopped it right up in front of you[,]" as a way to "appeal to you[,]" as "part of the show." T.616-17.

### b. The Prosecutor's Summation

The salient points of the prosecutor's closing argument are discussed below in this Opinion in the section concerning the claim of ineffective assistance of counsel based upon the failure to call an expert medical witness and in the section regarding the harmless error analysis of the *Miranda* claim.

### 5. The Jury Verdict and Sentencing

As noted above, the trial court dismissed Count 28 in the indictment charging Petitioner with endangering the welfare of a child (his younger son, JJ). T.580. On June 4, 2001, the jury returned a verdict convicting him on the remaining 47 counts of the indictment. T.746-54. Petitioner was sentenced to consecutive sentences, which totaled, in the aggregate, a term of 64 years. By operation of law, the maximum term was reduced to 50 years.

### B. State Court Post-Conviction Proceedings

### 1. Direct Appeal

Represented by new counsel on appeal, Jackson pursued direct review of the judgment of

conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Appellate counsel raised the following points on appeal: (1) prosecutorial misconduct throughout trial deprived Petitioner of a fundamentally fair trial; (2) Caseworker Bonisteel was acting a law enforcement officer, and Petitioner's statements to her were inadmissible because they were not preceded by *Miranda* warnings; (3) the trial court erred in permitting Dr. Lenane to testify; (4) the trial court erred in allowing testimony concerning Petitioner's prior bad acts and uncharged crimes; (5) the indictment was inflammatory and prejudicial; multiplicitous and duplicitous, and contained identical counts; (6) the verdict was against the weight of the credible evidence; (7) trial counsel was ineffective in failing to introduce the forensic laboratory reports and failing to call a medical expert witness;[9] (8) the sentence was illegal and unduly harsh and severe; and (9) Jackson was prejudiced by having his case heard by three different judges at critical stages of the trial. *See* Petitioner's Appellate Brief (Respondent's Appendix "E"); Petitioner's Reply Appellate Brief (Respondent's Appendix "O").

The prosecution argued that the verdict was amply supported by the credible evidence, and noted that even appellate counsel conceded the testimony from each of the five victims supported and corroborated the testimony of the other victims. As to the *Miranda* claim, the prosecution asserted that the indicia which may transform private conduct into state action–i.e., a clear connection between police and private investigation; completion of the private act at the instigation of the police; close supervision of the private conduct by the police; and a private act

---

[9]     In support of his ineffective assistance argument, appellate counsel cited two then-recently decided Second Circuit cases, *Miller v. Senkowski*, F.3d (2d Cir. 2003) and *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001). *See* Petitioner's Appellate Brief at 42-47 (Respondent's Appendix ("E")), the separately bound volume of state court records filed by respondent with his Answer and Opposition Memorandum of Law in the instant habeas proceeding.

undertaken on behalf of the police to further a police objective– were not present in Jackson's case. With regard to Dr. Lenane's testimony, the prosecution argued that, assuming the trial court correctly excluded her testimony, the prejudice to the defense was "non-existent or "negligible." Petitioner's prior bad acts and uncharged crimes were properly admitted, argued the prosecutor, because the testimony established that Jackson engaged in violent acts and/or threats of violence against the victims or against other persons (and, in this case, a family pet) in the victim's presence. The prosecutor argued these acts were directly relevant (1) to show that Jackson's sexual assaults were perpetrated against the victims by forcible compulsion; (2) to negate the defense of consent; and (3) to explain the victims' failure to make a prompt complaint. People's Appellate Brief at 12 (Respondent's Appendix "O" at 205) (citing *People v. Chase*, 277 A.D.2d 1045 (App. Div. 4th Dept. 2000); *People v. Hudy*, 73 N.Y.2d 40, 45 (N.Y. 1988)). Furthermore, the prosecution argued, the trial court's limiting instruction, *see* T.400, 662-63,  regarding the prior bad acts testimony was proper.

With regard to the claim of misconduct by the assistant district attorney, the prosecution argued that there was no misconduct committed during jury selection or during opening and closing statements. Furthermore, the prosecution argued, the assistant district attorney did not commit misconduct in calling Dr. Lenane as a witness despite the failure to give proper notice to the defense and the written representation that the prosecution would not be calling any expert witnesses.

Jackson's complaints regarding the indictment were factually baseless, argued the prosecution, and not supported by any case law.

As to Jackson's claim of ineffective assistance of trial counsel, the prosecution argued

that it was based upon factual assertions *dehors* the appellate record, and therefore the proper vehicle for asserting these claims was a C.P.L. § 440.10 motion. The prosecution noted that no certificate granting leave to appeal the denial of the C.P.L. § 440.10 motion had been granted, and thus the record from the C.P.L. § 440.10 motion was not properly before the Appellate Division. The prosecution did not address the merits of Jackson's ineffectiveness claim.

With regard to Jackson's assertion that he was prejudiced because different judges presided at various stages of the proceeding, the prosecution argued it was not only unpreserved but also was meritless since Jackson failed to demonstrate how the outcome of his trial was affected.

Finally, the prosecution conceded that the maximum aggregate sentence in Jackson's case could not exceed 50 years. However, the prosecution argued, the sentence did not need to be modified on appeal, but rather it could be left to the Department of Correctional Services to determine the maximum aggregate term of incarceration consistent with the applicable statutory limitations.

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the conviction on February 11, 2004. *People v. Jackson*, 4 A.D.3d 848, 772 N.Y.S.2d 149 (N.Y. App. Div. 2004). As to the length of sentence, the Fourth Department disagreed that it was unduly harsh or severe. However, the court directed that as a matter of law, the sentence had to be recalculated since the aggregate maximum term exceeded the 50-year limitation provided in N.Y. PENAL LAW § 70.30(1)(e)(vi). *Jackson*, 4 A.D.3d at 849.

Jackson's application for leave to appeal to the New York Court of Appeals was denied on May 20, 2004. *People v. Jackson*, 2 N.Y.3d 801, 814 N.E.2d 472 (N.Y. 2004). No petition

for a writ of *certiorari* to the United State Supreme Court was sought.

## 2.    C.P.L. § 440.10 Motion to Vacate the Judgment

Prior his appeal being perfected, Jackson, acting *pro se*, moved in the trial court to vacate

the judgment of conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10(1)(h), claiming that trial

counsel was ineffective on numerous grounds, namely, (1) failing to properly investigate the

forensic and medical evidence; (2) failing to adequately cross-examine the victims and other

prosecution witnesses; (3) failing to introduce an "extraordinary amount" of exculpatory

evidence; (4) failing to interview and call the medical personnel who treated the victims; (5)

failing to secure expert medical and forensic witnesses to demonstrate inconsistencies in the

physical and medical evidence; and (6) failing to subpoena Sergeant Griffin of the Greece Police

Department who allegedly would have substantiated his claim that he requested an attorney

during the booking process, but that the request was denied. *See* Petitioner's C.P.L. § 440.10

Motion dated May 22, 2003, with Exhibits A-P (Respondent's Appendix "F").

The prosecution opposed the motion, arguing that the issues raised by Jackson were such

that sufficient facts appeared on the record so as to permit adequate review of them on direct

appeal, and therefore denial was required pursuant to C.P.L. § 440.10(2)(b). *See* People's

Affirmation in Opposition to C.P.L. § 440.10 Motion at p. 2, ¶4 (Respondent's Appendix "G")

(citing *People v. Cooks*, 67 N.Y.2d 100, 103 (N.Y. 1986) (holding that the purpose of C.P.L. §

440.10(2)(b) is to prevent a motion to vacate from being employed as a substitute for a direct

appeal when defendant is in a position to raise such issues on appeal). The prosecution further

argued that, in light of Jackson's failure to present an affidavit from trial counsel explaining his

defense of the case, the motion should be denied without a hearing. *Id.* at 2-3, ¶5 (citing, *inter*

*alia*, *People v. Morales*, 58 N.Y.2d 1008, 1009 (N.Y. 1983)). Finally, the prosecution argued

that, in any event, trial counsel's conduct, viewed either with respect to specific alleged errors or

as a whole, did not rise to the level of egregious or prejudicial conduct necessary to prevail on an

ineffective assistance of counsel claim. *Id.* at 3, ¶6 (citing *People v. Flores*, 84 N.Y.2d 184, 187-

88 (N.Y. 1994)).

Petitioner subsequently filed a "Notice of Motion to Compel a Decision on the Pending

440.10 Motion," *see* Respondent's Appendix "J".

A different Supreme Court justice, Justice David D. Egan, issued a decision denying the

C.P.L. § 440.10 motion on November 17, 2003. At that time, Jackson's direct appeal was still

pending. The motion court first held that there were sufficient facts on the record so as to permit

adequate review of his claims on direct appeal, and thus denial pursuant to C.P.L. § 440.10(2)(b)

was required. C.P.L. § 440.10 Order at p. 2 (Respondent's Appendix "M" at p. 180 ) (citing,

*inter alia*, *People v. Minter*, __ A.D.2d __, 760 N.Y.S.2d 806 (N.Y. App. Div. 2003). The

motion court further held that Jackson's claims of ineffective assistance of counsel were without

merit. Noting that the "primary focus" of Jackson's motion was "his displeasure with his trial

counsel's strategy in defending his case[,]" the motion court held that Jackson had "failed to

demonstrate anything other than a simple disagreement with the strategy and tactics of his

counsel, and his conclusory assertions . . . are not enough to demonstrate that he received 'less

than meaningful representation.'" C.P.L. § 440.10 Order at pp. 2-3 (Respondent's Appendix "M"

at pp. 180-81) (citations omitted). Petitioner's applications for certificates to appeal to the

Appellate Division and then to the Court of Appeals were summarily denied.

### C.    Petitioner's Federal Habeas Petition

In support of his request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, Jackson raised four "points" concerning trial counsel's ineffectiveness in his Petition (Docket No. 1) and Addendum to the Petition, which refers to the Petition for a listing of the allegations. In the Petition, Jackson asserts under "Point One" that trial counsel's ineffective representation was "painfully exposed with his decision to NOT put on a Defense and go right for a Dismissal Due to the Fact that he was under the Incorrect Assumption that the prosecution was required to prove the element of penetration in order to sustain a conviction of Sodomy in the 1st." Petition at 6 (emphases in original omitted) (Docket No. 1). Under "Point Two," Jackson asserts that trial counsel failed to correctly investigate the "plethora of exculpatory evidence, (Physical, Medical, Forensic, Visual, Tactile, ALS [sic] Examinations, NYS Sexual Assault Kits and DNA Results all of which were collected following an alleged 90 Minute Attack)." *Id.* at 7 (emphases in original omitted) (Docket No. 1). Under "Point Three," Jackson faults trial counsel for not "consult[ing] a Doctor or Medical Expert . . . ." *Id.* (Docket No. 1). Finally, under "Point Four," Jackson asserts that all of the errors described in Points One through Three cumulatively prejudiced his "Right to Confront [His] Accusers through Effective Cross-Examination." *Id.* at 8 (Docket No. 1).

Jackson made several *pro se* motions for discovery pursuant to Rule 6 of the Federal Rules of Civil Procedure. The Court denied these, finding that he had not shown the requisite "good cause."

After reviewing the trial transcript and the related state court decisions denying post-conviction relief, the Court determined that an evidentiary hearing should be held. *See Sparman v. Edwards*. The Court accordingly appointed counsel and scheduled the *Sparman* hearing.

Jackson's habeas counsel made a renewed motion for discovery (Docket No. 34), pointing out some apparent discrepancies in the numbering and dating of the laboratory reports from the Monroe County Public Safety Laboratory. In particular, Report No. 1 ("the Serology Report") is dated February 6, 2001, and Report No. 3 ("the DNA Report") is dated March 27, 2001. Petitioner indicated that Report No. 2 ("the Trace Analysis Report") is dated May 3, 2002, subsequent to Petitioner's trial and more than a year after Report No. 3. In light of Petitioner's assertion that there was reason to believe that between the generation of Reports 1 and 3, a different Report number 2 was generated by the Monroe County Public Safety Laboratory ("the Laboratory"), the Court granted limited discovery (Docket No. 35) to determine whether there was a second report (other than the Report No. 2 dated May 3, 2002) prepared in the interim between Reports Nos. 1 and 3; if so, what were the contents of the report. The Court also requested that respondent explain the findings and results in Report No. 2, specifically, the notations of "no analyst assigned" and "no trace analysis, evidence was returned;" and why Report No. 2 post-dated petitioner's trial.

Respondent submitted a response (Docket No. 36), which was based upon respondent's attorney's discussions with individuals at the Laboratory concerning the generation of reports such as those referenced above. Respondent explained that when Jackson's case was assigned to the Trace Analysis section of the Laboratory, Trace Analysis portion of the report was assigned a number by the computer system; this was Report No. 2. Report No. 2, which was obtained by Petitioner *pro se* after trial, pursuant to a Freedom of Information Law request, indicates that no trace analysis was performed. Because no trace analysis was performed, there were no results to report, and a Report No. 2 was not generated at the time of trial. Before the Laboratory could

return the evidence to the police department's property office, a report had to be generated for record-keeping purposes indicating that no trace analysis had been performed. This return of the physical evidence occurred in May 2002, which is why Report No. 2 bears a date subsequent to Jackson's trial. The next section of the Laboratory to perform testing on evidence in the Jackson case was the DNA section, and it was assigned Report No. 3 by the computer system. Because DNA testing was performed, a report was generated at the time of trial, dated March 27, 2001. Respondent explained that the numbers appear out of sequence only because that is the order in which the written reports were generated, not the order in which the computer system assigned "report numbers", which was contemporaneous with the actual testing by the Laboratory. Respondent explained the notation of "no trace analysis performed" was made because the Laboratory was not requested to do any trace analysis; the only testing requested was DNA and serology testing, and the Laboratory was not authorized to perform any testing not specifically requested. *See* Respondent's Response to Petitioner's Third Motion for Discovery, ¶¶ 3-8 (Docket No. 36).

Petitioner filed no further discovery requests after receiving the foregoing response from respondent. After reviewing the pertinent documentation, the Court is satisfied with respondent's explanation concerning the out-of-sequence numbering of the reports and the notation of "no trace analysis performed" on Report No. 2. Furthermore, the Court is also satisfied finds that there was no withholding of evidence from Petitioner's trial counsel or any other type of impropriety in connection with the generation of the above-discussed laboratory reports.

## III. The *Sparman* Hearing

Dr. Julia DeBellis ("Dr. DeBellis") testified for Petitioner on the first day of *Sparman*

hearing. Respondent stipulated to Dr. DeBellis' qualifications. *See Sparman* Hearing Transcript dated September 14, 2009 ("SH1") at 5. Dr. DeBellis is a practicing pediatrician, who is also doing a fellowship in the area of child abuse and neglect at Cornell University in New York City. *Id.* She has testified about 35 to 40 times as an expert regarding the medical aspects of child sexual abuse. *Id.* at 7. She estimated that she testified for the prosecution in 80% of those cases. *Id.* at 7-8. She has also been retained as a consultant, as opposed to testifying; about 90% of the time, she consulted for the defense. *Id.* at 8.

Dr. DeBellis, in preparation for her testimony, reviewed hospital emergency room records for KJ, Petitioner's ex-wife; and CJ, Petitioner's daughter; the trial testimony given by Dr. Lenane; and the three victims' trial testimony and police statements. SH1 at 10, 29. In addition, Dr. DeBellis reviewed the police records and the laboratory reports. *Id.* at 11, 29. She did not review any other trial testimony, or the opening or closing statements of the attorneys. *Id.* at 29. After conducting her review, Dr. DeBellis concluded that the examination of CJ was lacking in certain details, and there was no indication that the individual who examined CJ had expertise in the area of alleged sexual assaults. *Id.*; *see also id.* at 15.

With regard to the medical findings, Dr. DeBellis noted that one portion of the record referred to an "irritation" at the vaginal introitus, while another part of the record referred to an "abrasion" at the vaginal introitus. Dr. DeBellis explained that the vaginal introitus is a large area, and so it would have been helpful if the examiner had specifically identified the exact location of the abrasion or irritation, e.g., the posterior shaft, the hymen, the vaginal wall, the vulva space. *Id.* at 12, 17. Dr. DeBellis testified that she did not use the terms "abrasion" and "irritation" interchangeably. *Id.* at 17. She testified on cross-examination that it was "possible"

-65-

that the two words have different meanings and within the medical records themselves, there were inconsistent; to use "irritation" and "abrasion" to denote the same finding is not accurate. *Id.* at 30-31. Dr. DeBellis testified that her understanding of an "abrasion" is that it is a disruption the tissue is disrupted on the surface; an "irritation" is something that she would described as even more superficial than an "abrasion." *Id.* at 17. Dr. DeBellis testified that it was, in any event, wholly unclear from the hospital record what exactly the "irritation" or "abrasion" was or looked like. *Id.* The record lacked any indication of the size, depth, precise location, or healing characteristics of the "irritation" or "abrasion," she explained. *Id.* Dr. DeBellis testified that although an "abrasion reflects trauma[,]" *id.*, that term alone does not help in determining how and by what mechanism the trauma was caused, *id.* at 18.

The record also referred to a finding of "old blood in the [vaginal] vault." SH1 at 12. Dr. DeBellis stated that the presence of "old blood" was to be expected given CJ's stage of menstruation, which was noted in the hospital record. *Id.* at 16. A finding of "old blood in the vault" did not, in and of itself, indicate trauma or penetration. *Id.* Such a finding would not be significant in determining whether penetration had occurred, in other words. *Id.* (The prosecutor at Jackson's trial did not argue the finding of "old blood" was the result of the alleged penetration.)

Dr. DeBellis noted there was a description of "no active bleeding" and "no active laceration" in CJ's genital area. SH1 at 16. There was no documentation of the size or quality of the abrasion; nor were there any photographs, which are typically part of an expert's evaluation for possible sexual abuse, according to Dr. DeBellis. *Id.* at 12. She opined that the diagram of the human body, pre-printed on the medical record form, did not depict exactly where the alleged

abrasion was. *Id.* Dr. DeBellis stated that the information in CJ's medical record was "very limited" and "would require more information from the examiner about what he or she actually saw, he or she actually did." *Id.* at 13.

In addition, there was no documentation in CJ's record describing the positions in which CJ was placed during the pelvic examination. *Id.* at 14. Dr. DeBellis testified that the placement of the patient can be important because, first, one expects changes on the genital or hymenal tissue when the patient is in different positions; and second, the examiner can confirm the presence of certain findings of trauma by seeing if they persist in different examination positions. *Id.*

Finally, Dr. DeBellis observed that there was no reference to the use of a colposcope, a viewing instrument typically used in evaluating patients presenting with sexual assault. *Id.* The purpose of the colposcope is not only to magnify the area, but to digitally photograph the area. *Id.* Essentially, a colposcope is a microscope that sits on a stand; it does not touch the patient, but allows the examiner to obtain a magnified view of the vaginal area in order to better see if the tissue is disrupted, how deep a laceration might be, whether there is the presence of a deeper scar, for example. It is an instrument that aids in identifying injury and trauma to a patient's anatomy. *Id.*

Dr. DeBellis testified that a colposcope was a recognized device used in medical examinations in 2001. She did not know whether colposcopes were readily available in hospitals, but opined that if a hospital has a specialized program for treating cases of suspected sexual assault, they "should have one[.]" SH1 at 14. In particular, the use of a colposcope is part of SANE and SAFE training. *Id.* at 32. She opined that it would be clinically appropriate to use on a

girl of CJ's age and even on younger children. *Id.* She did not know whether the hospital at which the victims were examined had a colposcope in 2000. *Id.* at 31.

Dr. DeBellis testified that if she had been hired as a consultant by trial counsel in this case, she would had advised obtaining an explanation from the medical professionals who examined CJ to not only clarify the vague portions of the record, but also to ascertain their expertise and ability to accurately record what injuries they claimed to have observed. SH1 at 19.

With regard to portion of CJ's hospital record summarizing the results of the examination of her anal area, the only observation was "no lacerations." *Id.* Dr. DeBellis testified that there are additional types of injuries that should be looked for and commented on in cases of alleged sexual assault to the anal area, such as tears, fissures, hematomas, and compromise or asymmetry to the anal sphincter. SH1 at 19-20.

Dr. DeBellis testified that in her opinion, it was "highly inappropriate" for medical records to be submitted without accompanying testimony from the individual who performed the examination. *Id.* at 20. She testified that "[j]urors are left to their own preconceived notions about sexual assault," and in her experience, "lay individuals tend to come to this issue with a very, kind of Hollywood version of what is supposed to be uncovered during a sexual assault from a physical standpoint." *Id.* at 20-21. Dr. DeBellis explained that "injuries need to be explained to the jury" and the jury needs to be educated that other mechanisms besides sexual penetration can cause injuries sometimes seen. *Id.* at 21. In this particular case, the findings that could be subject to misinterpretation by the jury included the presence of old blood in the vault

and the abrasion or irritation to the vaginal introitus. *Id.*[10] Dr. DeBellis, however, did not offer

any alternative mechanism (i.e., something other than a penis) that could have caused the

abrasion or irritation, such as a sanitary napkin or toilet tissue, which was suggested by defense

counsel in his closing argument.

With regard to Dr. Lenane's limited testimony, Dr. DeBellis opined that it "was damaging

and was not a fair presentation of exactly what the medicine [sic] is." SH1 at 22.

 Dr. DeBellis would have advised trial counsel to have Dr. Lenane finish testifying and

then "cross-examine her in a way which would show that the injuries that were recorded – were

reported don't necessarily result from penetration alone." *Id.*[11] She would not have advised him

to proceed to the conclusion of trial with the medical records being admitted without being

accompanied by interpretive testimony from a doctor or other medical expert. *Id.* at 23, 33.

On cross-examination, Dr. DeBellis agreed that a thorough review of the medical records

left many questions unanswered, which an attorney could argue to the a jury. *Id.* at 32. She also

agreed that a lack of DNA evidence would not necessarily indicate that a rape or sodomy did not

occur. *Id.* at 33. Finally, Dr. DeBellis concurred that a DNA expert "would be able to testify that

the lack of DNA is explainable." *Id.*

On the second day of the *Sparman* hearing, Jackson's trial counsel, Joseph Damelio, Esq.,

testified. Trial counsel testified that he was assigned by the trial court to represent Jackson on

---

[10]     The prosecutor at Jackson's trial did *not* argue that the finding of "old blood in the vault" was the result of Petitioner's alleged penetration of CJ.

[11]     First, it is important to note that Dr. Lenane affirmatively stated that the abrasion seen during the examination of CJ did not necessarily result from penetration. Second, the trial court ruled that Dr. Lenane could not continue to testify as if she were a treating physician, and so trial counsel could not have cross-examined her in the way that Dr. DeBellis is suggesting trial counsel should have done.

April 16, 2001, after it was discovered that the Jackson's then-counsel, the Monroe County Public Defender's Office, had a potential conflict of interest. Upon learning from the assistant public defender who had been handling Jackson's case that the prosecution would *not* be calling an expert witness, trial counsel determined that he only needed one month to prepare for trial. *See Sparman* Hearing Transcript dated September 15, 2009 ("SH2") at 7-8. Trial counsel testified at the hearing that if the prosecution had proffered expert testimony as to the various medical or physiological indicia of sexual abuse, he may or may not have called an expert for the defense. SH2 at 8. Later in the hearing, however, trial counsel stated, during questioning by respondent's attorney, that if the prosecution had indicated that they were going to call such a medical expert witness, he would have called an expert with similar qualifications. SH2 at 48. Furthermore, trial counsel admitted under questioning by respondent's attorney that he did not know if his cross-examination of an expert witness would have been sufficient, stating–non-responsively–that it was "difficult to say because we didn't get far enough into [Dr. Lenane's] testimony." SH2 at 49.

Trial counsel then explained what he did do in connection with the medical records in Jackson's case. *See generally* SH2 at 8-14. Trial counsel had received in discovery the emergency room records for KJ, Jackson's ex-wife, and CJ, Jackson's fourteen-year-old daughter. (There were no medical records for Jackson's wife, RJ, as she did not go to the hospital on the night of the arrest.) Trial counsel then consulted with a registered nurse, whom he had retained in previous cases of sexual abuse, to assist him in interpreting the phrases and procedures described and abbreviated in the medical reports, which were later admitted into evidence by stipulation. SH2 at 9-10, 14. Counsel explained that he was granted a voucher of

$500 for the purposes of consulting with a medical professional. SH2 at 51. According to trial counsel, he told the registered nurse what the allegations were and defined the statutory requirements regarding the elements of the offenses charged. *Id.* (However, trial counsel, throughout trial, labored under the misapprehension that sodomy, unlike rape, does not require *any* penetration at all. *See* SH2 at 41.)

Trial counsel explained that the nurse provided him with an oral, rather than a written, report, interpreting various notations and abbreviations on the records. SH2 at 12. Trial counsel explained that the nurse told him, "Pretty much, there were no findings. One – one of the complainants [i.e., CJ] had what was termed – once an irritation and once an abrasion, twice in the medical reports – maybe twice in the report. Which [complainant] that was, I don't recall." *Id.* The nurse consultant advised him that the records were deficient in their lack of any description or depiction or documentation of the location, depth, size, and healing characteristics of the "abrasion" or "irritation." SH2 at 14.[12] Trial counsel did not recall any other advice or information given to him by the nurse. SH2 at 13. According to trial counsel, he believed that "surely [his] consultation with the RN prepared [him] adequately if the treating physician had been called by the prosecution. SH2 at 53. Trial counsel did not retain or consult with an expert in terms of the physiological or medical indicia of sexual abuse in children. SH2 at 10.

As to the deficiencies in the medical records pointed out by the consulting nurse, trial counsel explained that his strategy was to address them by argument rather than testimony:

---

[12] Comparing Dr. DeBellis' testimony with the opinion given by the nurse consultant, one sees that they are essentially identical. In other words, Dr. DeBellis' testimony confirmed, but added little, if anything to, the nurse consultant's critique of the medical records. This is not meant as a criticism of Dr. DeBellis; rather, it is intended to emphasize the congruency of the two medical professionals' opinions concerning the lack of evidence of injury to the victims, at least as observed by the treating physician.

> I felt I did not want the prosecution to produce a medical expert. My experience has been that when given the opportunity, that the prosecutor's witness would say that no evidence is consistent with sexual assault or no finding or zero finding would be consistent with a sexual assault. So I found it best or I thought it best to address that on my argument based upon no evidence whatsoever produced by the People.

SH2 at 14-15; *see also id.* at 15, 17. Trial counsel explained that the negative findings he focused on were that there were "[n]o physical injuries to the genitalia, no semen or seminal fluid found." *Id.* at 17. Trial counsel stated that based upon his experience with sexual assault cases, he was "apprehensive about" discussing anything about the condition of the victim's hymen, since his experience cross-examining experts was that the "hymen does not need to be perforated or injured for a sexual assault to [have] occur[red]." *Id.* Trial counsel could not say whether he would have argued the absence of tears or fissures to the victims' anuses, "because . . . [t]he slightest penetration is penetration." SH2 at 18.

The theme of trial counsel's opening statement was the lack of physical evidence regarding rape or sodomy; he agreed that he "basically said that there was no physical evidence of rape – none, zero . . . ." SH2 at 13. Trial counsel stated that he would not have made that statement if he thought there would be expert medical testimony offered by the prosecution. *Id.* at 13-14. Trial counsel did not know what he argued on that point in his closing, but he was certain he argued there was "no indicia of physical injury." Trial counsel recalled parts of his summation. For instance, he argued that an "irritation or abrasion could be consistent with rubbing from clothing, [a] sanitary napkin, or toilet paper[.]" SH2 at 25. Trial counsel admitted that this statement was only his legal argument; it was not based upon any testimony in the record. *Id.* Trial counsel would not agree that having a defense expert testify as to the lack of

diagnostic significance of an undifferentiated abrasion would be more persuasive than mere

argument on summation: "I can't say that, because had I produced such an expert, that would

have promulgated [sic] the People to produce a like expert, and it would have negatived each

other out." SH2 at 26. Trial counsel recognized that if he merely consulted with an expert

medical witness and not called that individual to testify, under the Criminal Procedure Law he

would have been required to disclose the identity of the medical professional with whom he

spoke about Jackson's case. SH2 at 63.

Trial counsel recalled that when Dr. Lenane took the stand as a witness for the

prosecution, he was surprised. SH2 at 18, 55 ("What was going through my mind is why is Dr.

Lenane on the stand testifying?"). Trial counsel explained,

> I think I made an objection, or asked for an offer of proof of what she was going
> to testify to because we hadn't been given expert disclosure. And I think that the
> People – I said she is not a treating or I don't believe that she was the treating
> physician in this case, and the People said she is going to talk about what she
> observed. I think the record speaks for itself. And the judge said as long as she
> confines it two what she observed, or words to that effect, she began to testify
> again, and clearly, she was giving opinion testimony that because very evident that
> she was not the treating physician, that she had never met or seen any of the
> victims in this case for purposes of treatment, and that she was giving an opinion
> as to what the records said, not what her physical examination would [sic] be.

SH2 at 19. Trial court allowed Dr. Lenane to proceed over trial counsel's objection. Dr. Lenane

testified to certain physical findings, including the presence of old blood in the vaginal vault of

the fourteen-year-old victim, CJ. Trial counsel did not recall that Dr. Lenane proceeded to testify

that the abrasions on CJ's vagina were consistent with penetration, but stated that if that

happened (it did), "there must have been a motion for a mistrial subsequent thereto" (there was).

SH2 at 19.

Trial counsel recalled that when the trial judge finally realized that Dr. Lenane was *not* a treating physician, he cut off her testimony. Trial counsel at that time moved for a mistrial. However, the trial judge declined to grant a mistrial and stated that the defense instead had two options: a brief continuance from Friday to Monday to consult with an expert witness to counter Dr. Lenane's testimony, or striking Dr. Lenane's testimony from the record. SH2 at 20. Trial counsel explained that he "knew that would be impossible, to have my own expert – to hire an expert on a Friday night and provide that expert with all the supporting depositions, the statements, the police reports, the medical records, and whatever testimony that the prosecution's doctor had given up to that point. SH2 at 20-21. Trial counsel stated that there "was really no decision at all" between the two options because it would have been "impossible" for him to retain an expert in the time proposed by the trial judge. *Id.* at 21-22. He admitted that he would have preferred to call an expert witness of his own to address Dr. Lenane's testimony, notwithstanding the trial judge's offer of a curative instruction, which he believed to be not only legally incorrect as ultimately phrased, but entirely ineffectual to "unring the bell," as counsel put it. SH2 at 22-23, 24. Trial counsel stated that if the record did not indicate that he requested input into the wording of the curative instruction, then he had not done so. SH2 at 72.

Trial counsel testified that he had in the past tried cases with the assistant district attorney assigned to Jackson's case, Cara Briggs, Esq.,[13] and he knew that she was an "aggressive prosecutor" whose summations often "push[ed] the envelope[.]" SH2 at 28. Trial counsel did not recall that the prosecutor had characterized the location of the "abrasion" on CJ's genitalia "as being, 'right where his penis would have been rubbing, rubbing, rubbing and abrading her body

[13]     Ms. Briggs is no longer with the Monroe County District Attorney's Office.

to leave that mark[.]'" SH2 at 28. Trial counsel conceded that there was no expert testimony of any sort indicating that the location of the abrasion is where Petitioner's penis allegedly had been rubbing. *Id.* The prosecutor also referred to the portion of the medical records describing the "abrasion" or "irritation" observed on Petitioner's daughter as the most reliable part of the records. SH2 at 29-30. Trial counsel maintained that even had he known the prosecutor was going to make such comments, it would not have influenced his decision whether to consult with or retain a medical expert. SH2 at 29.

Next, habeas counsel's examination of trial counsel turned to the physical evidence, or the lack thereof, in Jackson's case. *See generally* SH2 at 30-41. Trial counsel agreed that in his opening statement, he argued that there was a lack of physical evidence corroborating the victims' testimony that multiple rapes and acts of sodomy occurred. SH2 at 30. However, trial counsel did not seek to introduce any of the laboratory reports from the Monroe County Public Safety Laboratory ("the Lab Reports") indicating that various serological and forensic tests (including DNA testing) were performed on bed sheets and other items. SH2 at 30-31. Trial counsel recalled that presumptive blood tests on various items of clothing belonging to Petitioner were negative. SH2 at 31. The reports indicated that there was a small amount of semen on one bed sheet and some brownish-red stains, consistent with dried blood, on the floral-print fitted bed sheet. SH2 at 31. The reports did not indicate the location of where the bed sheets were found. Trial counsel agreed that other than the semen detected on one sheet, there was not anything else in the Lab Reports corroborating that sexual assaults had occurred or connecting Petitioner with any of the alleged assaults. SH2 at 32. He also recalled receiving a follow-up report indicating that DNA testing had been performed and that the blood stains on the bed sheets were not from

CJ ("the DNA Report"). Trial counsel argued to the jury at trial that items were collected by the police department, but stated that the jury was not going to see or hear about any results linking Jackson to the alleged crimes. SH2 at 35.

Trial counsel conceded that the DNA Report, in conjunction with the Lab Reports, bolstered the defense argument that there was no evidence that any sexual act occurred, especially with regard to the minor victim, CJ. SH2 at 33. Thus, they were favorable to the defense. *Id.* at 34. His reason for not introducing them was to prevent giving "the prosecution the opportunity to explain away any of the nonfindings . . . ." *Id.* at 34; *see also id.* at 35. Trial counsel agreed that for the jury to consider the lack of blood or even trace amounts of blood on the sheets would have aided the defense in regard to the allegations that he engaged in repeated acts of vaginal intercourse with a menstruating fourteen-year-old girl. SH2 at 36. Trial counsel maintained, however, that "it was not worth the risk of opening the door to neutralizing the tests." *Id.* Trial counsel "thought it was more proper to argue to the jury that you saw none of it and heard none of it, rather than it comes in and you get an explanation by both sides saying their opinion of this test means." *Id.* Trial counsel maintained that there is "no difference" between (1) a jury hearing that evidence was collected and then not hearing of any tests being performed (what happened in Jackson's case) and (2) a jury hearing that various tests were performed on the collected evidence, which yielded negative results. SH2 at 37. Trial counsel reiterated this position under later questioning by respondent's attorney. *See* SH2 at 65-66.

Trial counsel actually subpoenaed two laboratory technicians, but he did not speak with any of the technicians prior to trial. With regard to his belief that they would try to "back away [from] or neutralize the findings of" the Lab Reports and the DNA Report, this opinion was just

based on his prior experience of what they had done in previous trials, and by virtue of the fact that they were employees of the forensics laboratory. SH2 at 40-41. During subsequent questioning of trial counsel by the Court at the hearing, trial counsel explained that "any time there is a negative finding" in connection with testing of physical evidence, the prosecution's expert witnesses typically testify that such a negative finding is "totally consistent with a sexual assault." SH2 at 76. When asked whether the prosecution argued that anyway in Jackson's case, notwithstanding the non-introduction of the reports, trial counsel could not recall. *Id.* Trial counsel could not point to any positive findings in the Lab Reports and Follow-up DNA Report themselves that would have damaged the defense case. SH2 at 76-77.

Finally, the Court addressed trial counsel's decision not to introduce the Laboratory Reports and the DNA Report. *See* SH2 at 75-80. As the Court pointed out, trial counsel agreed that there were three victims who gave very damaging testimony in front of the jury. The Court expressed concern about counsel's decision not to present the negative results from tangible physical findings in the laboratory and DNA reports. If this were a trial on the record with only medical records, the Court said, such a strategy seemed to make sense. SH2 at 75. However, when juxtaposing the negative reports which undermined the witnesses' testimony that sexual assaults actually occurred, the Court stated, in its opinion, "it just doesn't make any sense." *Id.* The Court asked counsel to identify what evidence he feared would be introduced by the prosecution that could damage those forensics findings. Trial counsel adverted to his fear of the prosecution's witnesses using "neutralizing tactics or techniques" on cross-examination or in rebuttal, if he introduced the Lab Reports and DNA Report. SH2 at 77; *see also id.* at 78. However, trial counsel conceded that the two witnesses he had subpoenaed from the forensics

laboratory would only have testified as custodians of the records to authenticate those documents. SH2 at 78. Trial counsel admitted that it was "[a]ll speculative" that there might be rebuttal testimony to counter the negative findings in the Lab Reports and DNA Report. SH2 at 80. According to trial counsel, such a strategy was reasonable "based upon the way that this type of evidence is offered in . . . [Monroe] County." *Id.*

Habeas counsel elicited that Lab Report Number 1 (containing the results of biological and serological analyses) indicated that various items of evidence were going to be sent out for "trace" analysis, meaning that the laboratory would search for traces of pubic hairs, fibers, artifacts, lubricants, and fecal material, for example. SH2 at 37-38. Trial counsel did not recall making any discovery request for the laboratory results of the trace analysis, and did not know whether this evidence was available at the time of trial. *Id.* There was, in fact, a Lab Report Number 2, which was not provided to trial counsel at the time of trial because it had not yet been generated. *Id.* at 38-39.

Trial counsel agreed that since his defense was that no sexual act occurred with regard to the fourteen-year-old victim, "trace" evidence or the lack thereof would have been "critical". *Id.* at 38. Trial counsel then qualified his answer, saying that he would not necessarily have introduced negative "trace" results if he had been in possession of Report No. 2. SH2 at 39. Again, as trial counsel argued with regard to the Serological Report and the DNA Report, he "wanted to have it both ways" and argue that because the prosecution did not bring in any witnesses to tell the jury the results of the testing, "you cannot put any of this on Shawn Jackson," rather than give the prosecution the opportunity to neutralize the impact of the negative findings by eliciting testimony as to why tests could yield false negative results and the

possibility of contamination of evidence. SH2 at 40. Trial counsel maintained that his strategy was preferable to introducing the specific negative findings that the laboratory had made. *Id.*

During respondent's questioning, trial counsel explained that his objection to Dr. Lenane qualifying as an expert witness was sustained. SH2 at 56-57. As trial counsel recalled, the trial judge, whom trial counsel characterized as "confused", permitted Dr. Lenane to continue testifying as a treating or examining physician. SH2 at 57. At some point, but not until after Dr. Lenane had testified that certain findings in the medical records of CJ were "consistent with" a sexual assault involving penetration, trial counsel lodged an objection which was sustained.

The Court subsequently questioned trial counsel as to whether it occurred to him to object the moment Dr. Lenane was called as a witness and to ask for an offer of proof. *See* SH2 at 70-74. Trial counsel admitted that it had not. *Id.* at 70. Trial counsel testified that it would have been reasonable to have done so, "[r]ather than let the jury hear that they had, sure." SH2 at 70-71. After conceding that Dr. Lenane's testimony, although stricken, was damaging, he insisted that it was reasonable for him not to have immediately objected to Dr. Lenane giving testimony. SH2 at 73-74. When the Court pointed out that this a criminal conviction involving a prison sentence of 64 years was at stake, and requested an honest answer to that question, trial counsel modified his earlier answer: "In retrospect, would I have asked for an offer of proof? I think so. And the only thing I can tell you is I don't know where the witness list is. I'm sure there is one. Maybe there wasn't, I don't know. . . ." SH2 at 73. (At the Court's request, a witness list was produced, and it indicated that Dr. Lenane had been disclosed as a witness by the prosecution prior to trial.) When asked if it would have been reasonable to have prepared a motion *in limine* to exclude her testimony, if Dr. Lenane's name had appeared on the witness list, trial counsel somewhat

inexplicably answered, "No[,]" explaining that if that were the case, he "would have thought that she treated or made some observations in some way, I guess." SH2 at 74. Trial counsel agreed that if he had seen her name prior to trial, it would have been reasonable to determine whether Dr. Lenane was the treating physician. *Id.* He also agreed that when Dr. Lenane was called, that should have been his first question. *Id.* at 75.

Although trial counsel had earlier stated that he was asking himself why Dr. Lenane was on the stand at all, he averred during questioning by the Court that "what was going through [his] mind [wa]s that at some point in time, she treated these people." SH2 at 70. When asked if he had received a witness list prior to trial, trial counsel first said that he was "sure" he did but he did not recall whether her name was on the list. SH2 at 71. When asked what he would have done had he seen Dr. Lenane's name on a witness list prior to trial, he said, "I would have approached the prosecutor in the case and said, is she testifying as an expert or a treating physician. If she is an expert, you told us you were not calling an expert." *Id.* When asked why he did not think in those terms at trial, trial counsel retreated from his earlier testimony, stating, "I don't know if we got a witness list." *Id.*

Trial counsel offered conflicting testimony about the import of Dr. Lenane's improperly offered testimony regarding the medical records of victims CJ and KJ. On the one hand, he stated that he moved for a mistrial after Dr. Lenane's testimony was heard by the jury because he "thought the case for [his] client was prejudiced to the point where no curative instruction could salvage him getting a fair trial." SH2 at 57. Minutes later, however, trial counsel gave responses that do not square with his statement that Dr. Lenane had given what he described testimony so devastatingly prejudicial that a mistrial was warranted. Specifically, counsel claimed that he did

not know whether he would have called an expert witness to counter Dr. Lenane's testimony, even assuming that he had retained a medical expert on a "stand-by" basis prior to trial and would not have had to find one over a weekend continuance. SH2 at 60. Basically, trial counsel maintained that strategically speaking, it was not necessary to have an expert witness in Jackson's case, unless the defense had known in advance that the prosecution would be calling an expert. SH2 at 23.

Following the testimony by trial counsel, Petitioner's habeas counsel and counsel for respondent offered brief oral argument. The parties also were permitted to submit closing argument in the form of memoranda of law. Habeas counsel reviewed the four primary claims of ineffective assistance counsel: (1) the failure to adequately investigate the case prior to trial, based upon (a) counsel's failure to hire as a consultant an expert qualified in the area of sexual abuse cases, and (b) counsel's failure to follow up with respect to the forensic findings by the Monroe County Public Safety Laboratory, in particular, the failure to learn that there was no testing of "trace evidence"; (2) the failure to introduce expert opinion testimony as to what the medical examinations of CJ and KJ did or not reveal; (3) counsel's failure to acquaint himself with the elements of the offense of sodomy in this case involving 15 counts of sodomy; and (4) counsel's failure to introduce the laboratory reports and DNA report containing negative findings, or to elicit testimony that tests were performed yielding negative results. SH2 at 82-83. Habeas counsel posited that trial counsel's argument in summation that the jury did not hear corroboration of the evidence was quite different from the jury hearing that multiple tests were performed with negative results. SH2 at 84-86. As counsel pointed out, this was a case involving allegations of multiple sexual encounters with three different victims in the same of several

hours, with Petitioner allegedly going back and forth from victim to victim; this likely would have left some physical evidence behind, counsel argued. SH2 at 88. Habeas counsel explained that trial counsel did not know that there were some items in the medical records that could be interpreted as harmful to the defense–such as a mention of an "abrasion"[14] and "old blood in the vault"[15] because he did not consult with a qualified medical expert. And thus, habeas counsel argued, trial counsel did not know how to deal with some of the arguments that the prosecutor did make, and the jury was allowed to speculate about things such as "old blood in the vault" and "abrasion" meant. SH2 at 86. Habeas counsel asserted that the prosecutor's misconduct in eliciting opinion testimony from Dr. Lenane was misconduct which exacerbated trial counsel's lack of preparedness. SH2 at 89. In sum, habeas counsel emphasized that the cumulative effect of counsel's errors affected the fairness of the entire trial. *Id.*

Respondent's attorney characterized habeas counsel's argument as merely a disagreement with trial strategy and a hindsight critiquing of trial counsel. SH2 at 89. Respondent's attorney argued that trial counsel made a reasoned decision to pursue a reasonable strategy throughout the trial after performing an adequate investigation and becoming acquainted with the evidence adverse to the defense and the prosecution. *Id.* at 89-90. Based upon what counsel believed was a lack of proof, he reasonably decided to forego calling expert witnesses who would have been subject cross-examination and instead decided to hold the prosecution to its burden of proof. *Id.* at 90. Respondent's attorney that it was reasonable for trial counsel to rely on the jury not having

---

[14]    This is incorrect. Trial counsel *was* aware at the time of trial that there was a notation in the medical records of an "abrasion" in CJ's vaginal area. In addition, he recalled this detail at the *Sparman* hearing.

[15]    As noted several times already in this Decision, the prosecutor did *not* bring up the presence of "old blood in the vault" or argue in any way that it was probative of a forcible penetration.

heard any test results at all "to suggest that had anything pointed to the defendant, the People would have brought it in . . . ." SH2 at 90. Respondent's attorney focused on trial counsel's testimony that in his experience, the prosecutor would have been able to cross-examine any expert witness called for the defense and explain that negative findings are not uncommon in sexual assault cases. *Id.* Respondent's attorney said that it was an "absolutely" reasonable trial strategy for trial counsel to "take the opportunity to suggest to them that, where is the proof[,]" instead of the jury hearing neutralizing testimony elicited by the prosecutor on cross-examination. *Id.* at 89-90.

With regard to Dr. Lenane, respondent's attorney asserted that trial counsel was faced with a "difficult circumstance" and had to make a "split-second decision" on what to do. SH2 at 91. Although conceding trial counsel's insight in admitting he wished he had asked for an offer of proof, respondent's attorney argued that did not change the fact that he acted appropriately under the circumstances because he was faced with a "split second decision." Respondent's attorney argued that his failure to ask for an offer of proof at that point "ultimately just completely denie[d] [Petitioner] a fair trial goes to the extreme . . . ." SH2 at 91.

Both parties subsequently submitted further argument in brief form. In addition, respondent was permitted to submit the rebuttal affidavit of Dr. Lenane. *See* Docket No. 42.

With regard to the Court's request at the *Sparman* hearing for a witness list, Petitioner's habeas counsel, after the hearing, directed the Court's attention to pages 9 and 17 of the jury selection portion of the trial transcript. The transcript indicates that during jury selection, the prosecutor handed up a witness list to the trial judge. Transcript of Jury Selection at 9 (hereinafter "JS." followed by the page number). A short while later the trial court then read

aloud the list of witnesses in order to see if the jurors knew any of them. JS.17. Among the witnesses names' which the trial court read to the prospective jurors was Dr. Ann Lenane. *Id.* Other medical witnesses noted were Dr. Sharon Thompson, Dr. Neil Herendeen, and Pamela Herendeen, R.N. *Id.* Neither Dr. Thompson, nor Dr. Herendeen, nor Nurse Herendeen were called at Jackson's trial.

Based upon this Court's review of the medical records, the Court discerns that Dr. Thompson's signature appears on the "Suspected Sexual Assault Form" completed with regard to CJ The notes of the Physical Examination on that Form appear to be in Dr. Thompson's handwriting. The anatomical drawing portion of that Form lists "Dr. S. Thompson" as the "Health Care Practitioner" and again, the notes thereon appear to be in her handwriting. Dr. Thompson's name appears on other pages of CJ's medical records, as well.

The first page of CJ's medical records from Rochester General Hospital is a form containing a narrative obtained from C.J. and the medical professional's observations of her. The attending emergency department physician is noted as a Dr. "Everett" and the case was apparently signed off to a Dr. "Britton". The Court was unable to discern the names of Dr. Herendeen or Nurse Herendeen in any of C.J.'s medical records.

As noted above, the Court questioned trial counsel at the *Sparman* hearing regarding his belated objection to Dr. Lenane's improper testimony, and asked why he did not make an immediate demand for an offer of proof. Trial counsel at first indicated that when Dr. Lenane took the stand, he did not know why she was testifying; at another point, he testified that she assumed that she was the treating physician. Had he more carefully reviewed the medical records, he would have been able to discern that her name was not indicated thereon. Trial counsel

ultimately agreed. On the other hand, trial counsel was entitled to rely upon the prosecutor's representation that she would not be calling an expert medical witness at trial.

The prosecutor, however, would not have been required to give prior notice of her intent to call the victim's treating physician. For his part, trial counsel testified that he believed his consultation with the registered nurse prior to trial adequately prepared him to cross-examine the treating physician, had the prosecution called him or her.

The Court has reviewed the record carefully and has attempted to ascertain how, if at all, the outcome of Jackson's trial would have been different had trial counsel immediately objected to Dr. Lenane's testimony. As discussed below in this Decision and Order, the Court believes that it was professionally unreasonable for trial counsel to have not familiarized himself with the witness list prior to trial, or to at least have requested an offer of proof at the commencement of Dr. Lenane's testimony. After reviewing the entire trial transcript exhibits and the *Sparman* transcript and related submissions, the Court is compelled to conclude that Jackson was prejudiced by this deficiency in preparation.

## IV.     Applicable Legal Principles

### A.     Antiterrorism and Effective Death Penalty Act

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

-85-

presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also*, *e.g.*, *Gueits v. Kirkpatrick*, __ F.3d __, ___, 2010 WL 2757313, at *2 (2d Cir. July 14, 2010) (citing *Knowles v. Mizrayance*, __ U.S. __, ___, 129 S. Ct. 1411, 1418, 173 L. Ed.2d 251 (2009)).  An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim.  *E.g.*, *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted).

"Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'" *Gueits*, ___ F.3d at ___, 2010 WL 2757313, at *2 (quoting *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003) (internal quotation marks omitted in *Gueits*).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *accord*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *Bell*, 535 U.S. at 694. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. In order to grant

the writ there must be "[s]ome increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted); *accord, e.g., Matter of Richard S. v. Carpinello*, 589 F.3d 75, 80 (2d Cir. 2009; *Gersten*, 426 F.3d at 607.[16] Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B.    The Exhaustion Requirement

In addition, a petitioner must have exhausted all state remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b)(1); *Daye v. Attorney Gen'l of N.Y.*, 696 F.2d 186, 190 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In order for a claim to be considered exhausted, it must have been presented fully and fairly in federal constitutional terms to the State courts. *See, e.g., Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye*, 696 F.2d at 191.A claim is exhausted if it has been "fairly presented" to the state court. *Daye*, 696 F.2d at 191. To fairly present his claim, the petitioner must have set

---

[16]    "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, 341 F.3d 104, 111 (2d Cir 2003) (district court's habeas decision remanded for reconsideration in light of "the more general teachings" of applicable Supreme Court decision). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir. 2003). However, in light of the Supreme Court's decision in *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 654, 166 L.Ed.2d 482 (2006), the Second Circuit has retreated from that position, *e.g., Rodriguez v. Miller*, 537 F.3d 102, 107(2d Cir. 2008) ("No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the *dicta* of the Supreme Court can provide the basis for habeas relief.") (citing *Musladin*, 127 S. Ct. at 654).

forth for the state court all the essential factual allegations and legal premises he now asserts in federal court. *Id.* "[I]f material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Id.*

### C. Adequate and Independent State Ground Doctrine and Procedural Default

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)(citations and internal quotations omitted). Even where the state court also considers a petitioner's arguments on the merits, that is of no moment because "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n. 10; *accord Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). To show a "fundamental miscarriage of justice" requires a demonstration of "actual innocence." *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).

**D.      Ineffective Assistance of Trial Counsel**

In order to prevail on a Sixth Amendment ineffectiveness claim, a defendant must prove (1) that trial counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. In *Strickland*, the Supreme Court said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Thus, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *accord, e.g.*, *Bell v. Cone*, 535 U.S. at 698.

A divided Second Circuit panel recently reiterated that court's previous holding that application of the New York state standard, *e.g.*, *People v. Baldi*,  54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), is not "contrary to," 28 U.S.C. § 2254(d)(1), the principles set forth in *Strickland*, which has been deemed to be the "clearly established" Supreme Court law for evaluating claims of ineffective assistance of trial counsel. *Rosario v. Ercole*, 601 F.3d 118, 126 (2d Cir. 2010) ("*Rosario I*") ("We emphasize again that the New York state standard for ineffective assistance of counsel is not contrary to *Strickland*.") (citing *Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d Cir. 2003); *contrasting with Henry v. Poole*, 409 F.3d 48, 70 (2d Cir. 2005) (recognizing that "in the absence of a contrary decision by this Court *en banc*,

or an intervening Supreme Court decision, we are bound to follow the precedents . . . that the N[ew]Y[ork] Court of Appeals standard is not 'contrary to' *Strickland*")). Senior Circuit Judge Straub, dissenting in *Rosario I*, cogently explained that "[i]t is axiomatic that, even if defense counsel had performed superbly throughout the bulk of the proceedings, they would still be found ineffective under the Sixth Amendment if deficient in a material way, albeit only for a moment and not deliberately, and that deficiency prejudiced the defendant." 601 F.3d at 128 (Straub, C.J., dissenting and concurring) (citing *Henry v. Poole*, 409 F.3d at 72 (2d Cir. 2005) ("[R]eliance on counsel's competency in all other respects[ ] . . . fail[s] to apply the *Strickland* standard at all.") (internal citation and quotation marks omitted)).

In a vote of six to five, the Second Circuit declined to rehear *en banc* the *Rosario I* decision and revisit the question of whether the New York State standard for the ineffective assistance of counsel, although arguably "more lenient to defendants generally, lacking as it does a 'but for' prejudice requirement, is nevertheless contrary to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Rosario v. Ercole*,__ F.3d ___, 2010 WL 3123267, at *3 (2d Cir. Aug. 10, 2010) ("*Rosario II*") (Jacobs, C.J., dissenting from denial of *en banc* rehearing) (citations omitted).

With relief under the "contrary to" clause not available to Jackson under these circumstances, given the Second Circuit's most recent pronouncement in the *Rosario* cases, the remaining issue, then, is whether Petitioner can obtain relief on the ground that the state court's adjudication of his claim involved an "unreasonable application" of *Strickland*. The Second Circuit has stated that the level of "unreasonableness" that must be shown under 28 U.S.C. § 2254(d)(1) "falls somewhere between merely erroneous and unreasonable to all reasonable

jurists." *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008) 8 (quoting *Overton v. Newton*, 295

F.3d 270, 277 (2d Cir.2002)). As the Circuit further explained in *Eze v. Senkowski*, 321 F.3d at

121, an unreasonable application of Supreme Court precedent means more than that the state

court incorrectly applied the precedent; it had to apply the facts in an "objectively unreasonable

manner." *Id.* There must be "some increment beyond error is required," although it "need not be

great; otherwise habeas relief would be limited to state court decisions so far off the mark as to

suggest judicial incompetence." *Id.* (internal citations omitted).

## V.     Analysis of Petitioner's Claims

### A.     Claim One of the Petition: Prosecutorial Misconduct

#### 1.     Overview of the Claim

In his petition, Jackson raises a number of grounds in support of his contention that

prosecutorial misconduct denied him of right to a fundamentally fair trial. He first contends that

due to the lack of physical evidence to support the original five counts on which he was indicted,

that is, the charges involving his daughter, the prosecutor "mounted a bait and switch Shock and

Awe Campaign by bootstrapping the original five charges, adding Two more alleged victims"

and then "burying these 26 Charges behind 22 more charges of Multiplicitous, Duplicitous and

Identical Counts all covered in an egregious shroud of non-specificity as to be indefensible."

Jackson characterizes this claim as an "Abuse of the Charging Function" (Petition, ¶22(A), and

Addendum to Petition, pp. 2-3.

Next, Jackson contends that the prosecutor engaged in "Pre-Trial Misconduct" (Petition,

¶22(A), and Addendum to Petition, pp. 3-5, "[b]y waiting from December, 2000[,] until mid-

April, 2001[,] to announce that she intended to call Tony Arnold, a jailhouse informant . . . who

-91-

was represented by the Public Defender . . . ." Jackson argues that the prosecutor thereby "effectively hamstrung the petitioner's defense" since this information resulted in the assistant public defender being disqualified due to a conflict of interest, and new counsel had to be substituted. Addendum to Petition, p.4.

Jackson also cites examples of misconduct during jury selection–specifically, that the prosecutor improperly used hypothetical questions. Petition, ¶22(A), and Addendum to Petition, pp. 5-6. Jackson contends that the jury was prejudiced against him by the prosecutor's improper use of hypothetical questions during *voir dire* of prospective jurors.

Jackson further contends that the prosecutor committed misconduct during her opening statement when she told the jurors, over defense objection, that they would "have an entirely different picture of defendant than the superficial presentation of him that [they] have of him now." T.221-22. Next, Jackson points to the prosecutor's comment, made over defense objection, that he would be "exposed as a twisted, sadistic man who delighted in controlling his own family members to the point that he abused them constantly." T.222. The trial judge overruled defense counsel's motion for a mistrial based upon the prosecutor's comments.

Jackson points to several statements by the prosecutor during her summation by which he claims that the prosecutor improperly interjected her personal belief about his guilt and attempted to arouse the jury's emotions. The prosecutor opined that Jackson in fact was guilty of the "heinous, horrific acts," T.625, which he was charged. The prosecutor stated that Jackson was not innocent because innocent men "do not admit there is a possibility they did something wrong, when what we are talking about is sex with [petitioner's] own daughter." T.639. The prosecutor told the jury, "That man, sitting there, looking like he is pondering every word that is being said,

is guilty." T.643. The only explanation, the prosecutor stated, was that petitioner was guilty of

the crimes. T.643. The prosecutor stated to the jury that Jackson was "guilty of everything" and

had "consistently abused his family for years, basically beat them into submission." T.649.

Jackson also contends that the prosecutor improperly attempted to bolster the victims' credibility

and elicit sympathy for the victims by commenting that "even the best actor or actress could not

tremble with fear as continuously as some of these witnesses did," T.627, and that it was obvious

that all of the victims were afraid of Jackson, T.628. Notably, trial counsel did not object to any

of the prosecutor's statements during her closing argument.

## 2.    The State Court's Ruling and Exhaustion of State Remedies

The Fourth Department found that the prosecutor's comments in her opening and closing

but "'were not "so egregious as to deprive defendant of [his right to] a fair trial[.]"'" *People v.*

*Jackson*, 4 A.D.3d at 849 (quotation and citations omitted).  Respondent has argued that

Jackson's prosecutorial misconduct claim is unexhausted because it was not "fairly presented" to

the New York Court of Appeals in appellate counsel's seeking leave to appeal. Respondent's

Memorandum of Law in Opposition to the Petition ("Resp't Opp. Mem.") at 13 (citing

Respondent's Appendix "S" at 223 ("the Leave Letter")) (Docket No. 8). Respondent notes that

petitioner enclosed the briefs submitted to the Fourth Department, and that court's Order, and

then identified several issues that he intended to raise in the New York Court of Appeals.

However, respondent points out, appellate counsel did not mention prosecutorial misconduct in

the Leave Letter. The following is the relevant excerpt from the Leave Letter:

> The Fourth Department did not consider the arguments and cases submitted in the
> brief, to the effect that the Appellant's conviction was against the weight of the
> evidence, that the Appellant's statements to a Child Protective [sic] caseworker

should not have been admissible at trial, that he was denied effective assistance of
counsel and other arguments to [sic] set forth in more detail.

. . .

Resp't Appendix "S" at 223. Appellate counsel did not submit any follow-up letters to the New

York Court of Appeals setting out the "other arguments" in "more detail." *Id.*

Respondent's exhaustion argument is based upon several cases from the Second Circuit

interpreting the "fair presentation" requirement, which is "satisfie[d] . . . by presenting the

essential factual and legal premises of his federal constitutional claim to the highest state court

capable of reviewing it." *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005). In New York, to

invoke one complete round of the State's established appellate process, a criminal defendant

must first appeal his or her conviction to the Appellate Division and then seek further review by

applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d

Cir. 2005). Claims are "fairly presented" to the New York Court of Appeals when the application

for leave to appeal either clearly states that all claims in the attached brief are being pressed, or,

alternatively, makes no arguments in detail but simply requests review of all issues outlined in

the brief. *Jordan v. Lefevre*, 206 F.3d 196, 199 (2d Cir.2000); *see also Morgan v. Bennett*, 204

F.3d 360, 369-70 (2d Cir.2000). Where, however, the application for leave to appeal refers to

specific claims raised before the Appellate Division but omits mention of other claims, the

Second Circuit has deemed the unmentioned claims to have been abandoned and not "fairly

presented" to the highest appellate court. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991). The

Second Circuit has held that if the application for leave to appeal argues one or more specific

claims but only makes a passing reference to possible other claims found in the attached briefs,

the claims mentioned in passing have not been fairly presented to the highest appellate court.

*Jordan*, 206 F.3d at 198.

Here, Petitioner's appellate counsel referred to specific claims raised before the Appellate Division (i.e., the verdict was against weight of the evidence, Petitioner's statement to the caseworker was inadmissible, and that trial counsel did not render effective assistance), but omitted mention of others (prosecutorial misconduct, the trial court improperly allowed Dr. Lenane to testify, the trial court erroneously allowed testimony of prior bad acts and uncharged crimes, the indictment was inflammatory and prejudicial, the sentence was illegal and unduly harsh, and the defense case was prejudiced by being presented before three different judges at critical states of the proceeding). Based upon the Second Circuit's teachings in *Grey v. Hoke*, 933 F.2d and 120, and its progeny, this Court must conclude that the prosecutorial misconduct claim was not fairly presented to the New York Court of Appeals. *See Grey*, 933 F.2d at 120 ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned. The only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims."); *see also Jordan*, 206 F.3d at 198 (" In this case, Jordan forcefully argued his *Batson* claim in the first three paragraphs of his application for leave, but made no reference to his other claims. In the fourth paragraph of his counsel's letter to the New York Court of Appeals he asked that he be given permission to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs.' Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims.").

.A federal claim that is procedurally defaulted by state law "meets the technical requirements for exhaustion" because "there are no state remedies any longer 'available' to [the habeas petitioner]." *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *accord*, *e.g.*, *Grey v. Hoke*, 933 F.2d at 120. Under former New York Court of Appeals Rule 500.10(a), New York "permit[ted] only one application for direct review[.]" *Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (quoting N.Y. Ct. App. R. 500.10(a) (1999)). The rule has since been amended, and criminal leave applications are now addressed in N.Y. Court of Appeals Rule 500.20. *Colon v. Connell*, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009). While this section does not specifically state that there may be only one application for appeal, *see* N.Y. Ct. App. R. § 500.20, "such a restriction may be inferred." *Colon,* 2009 WL 2002036, at *6 n.4. First, N.Y. Court of Appeals Rule 500.20(d) and C.P.L. § 460.10(5) provide a 30-day window for any such application to be filed, and "this time limit would be meaningless were multiple applications permitted." *Colon*, 2009 WL 2002036, at *6 n.4. Second, N.Y. Court of Appeals Rule 500.20(d) provides that a request for reargument or reconsideration of an appeal may not raise any new points, implying that a wholly new request for leave to appeal would be impermissible. *Colon*, 2009 WL 2002036, at *6 n.4 (citing *Roa v. Portuondo*, No. 02 Civ. 6116, 2007 U.S. Dist. LEXIS 74387, at *32-33 (S.D.N.Y. Oct. 5, 2007) (declining to review issue that petitioner had failed to raise on direct appeal); *Murray v. Williams*, No. 05 Civ. 9438, 2007 WL 430419, at *8 (S.D.N.Y. Feb.8, 2007) (same); *Oquendo v. Senkowski*, 452 F. Supp.2d 359, 368 (S.D.N.Y.2006) (same)); *see also Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL 783538, at *14 & n.12 (S.D.N.Y. Mar. 26, 2008) (same), *report and recommendation adopted*,

*Harden v. LaClaire*, 07CIV4592LTSJCF, 2008 WL 4735231 (S.D.N.Y. Oct. 27, 2008).

Were Jackson to seek collateral review in state court of the prosecutorial misconduct claim by means of another C.P.L. § 440.10 motion to vacate the judgment, the motion court would be mandated to deny the claim pursuant to C.P.L. § 440.10(2)(c) (mandating dismissal of claim if it could have been raised on direct review but was not). *See Reyes v. Keane*, 118 F.3d at 139 ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record."). When the alleged evidentiary error is "particularly well-established in the trial record," *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003), the error is subject to mandatory dismissal under C.P.L. § 440.10(2)(c).

"For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey*, 933 F.2d at 120 (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989); other citations omitted); *see also Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000); *Bossett v. Walker*, 41 F.3d at 828-29.

Such is the case here–Jackson's prosecutorial misconduct claim should be deemed exhausted. However, the same procedural bar that results in the "constructive exhaustion" of the claims also creates a procedural default and will prevent this Court from reaching the merits of the claims, *e.g.*, *Grey v. Hoke*, 933 F.2d at 120-21, unless Jackson can "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,'" *i.e.*, a showing of "actual

innocence." *Harris v. Reed*, 489 U.S. at 262, 109 S.Ct. at 1043 (citations omitted); *accord*, *Schlup v. Delo*, 513 U.S. 298, 324-27, 115 S.Ct. 851, 865-67 (1995); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116 (1997).

Although attorney ineffectiveness can amount to "cause", it must be true ineffectiveness–that is, ineffectiveness of a constitutional magnitude–not mere error. The ineffectiveness claim, in order to serve as cause, must also be fully exhausted. Here, Jackson could assert that his appellate counsel was ineffective for not including these claims in the Leave Letter, and argue that the omission of those arguments should constitute "cause".[17] However, Jackson has never raised an ineffective assistance of appellate counsel claim in state court, so he has no exhausted claim to use as "cause." Because the cause and prejudice test is conjunctive, the failure to make a showing on either prong is fatal to the defendant. In other words, a reviewing court need not determine whether there is both cause and prejudice if the defendant's proof as to one element is lacking. Finally, Jackson has proffered no new, reliable evidence that was not presented to the jury that would demonstrate his factual innocence, and so he cannot avail himself of the miscarriage-of-justice exception.

Although the Court is precluded from reaching the merits of the prosecutorial misconduct claim due to the procedural default, the Court must note that it is deeply troubled by the unfair tactic the prosecutor employed in deliberately masking the status of her medical expert. She did this by failing to disclose to the trial court that the expert she called to testify was not the victim's treating physician. Nevertheless, knowing that she had not called a treating physician, she led the

---

[17]     Petitioner's habeas counsel did not address the exhaustion defense raised by respondent to the prosecutorial misconduct.

court to believe that she had done so by obdurately arguing that she had no obligation to disclose the witness's status as a non-treating expert, contrary to her legal and ethical obligations under New York law.

### B. Claim Two of the Petition: Ineffective Assistance of Trial Counsel

Jackson has raised four "points" concerning trial counsel's ineffectiveness in his Petition and Addendum to the Petition, which refers to the Petition for a listing of the allegations. In the Petition, Jackson asserts under "Point One" that trial counsel's ineffective representation was "painfully exposed with his decision to NOT put on a Defense and go right for a Dismissal Due to the Fact that he was under the Incorrect Assumption that the prosecution was required to prove the element of penetration in order to sustain a conviction of Sodomy in the 1st." Petition at 6 (emphases omitted) (Docket No. 1). Under "Point Two," Jackson asserts that trial counsel failed to correctly investigate the "plethora of exculpatory evidence, (Physical, Medical, Forensic, Visual, Tactile, ALS [sic] Examinations, NYS Sexual Assault Kits and DNA Results all of which were collected following an alleged 90 Minute Attack)." *Id.* at 7 (emphases omitted) (Docket No. 1). Under "Point Three," Jackson faults trial counsel for not "consult[ing] a Doctor or Medical Expert . . . ." *Id.* (Docket No. 1). Finally, under "Point Four," Jackson asserts that all of the errors described in Points One through Three cumulatively prejudiced his "Right to Confront [His] Accusers through Effective Cross-Examination." *Id.* at 8 (Docket No. 1).

The legal claims underlying Point One's argument and Point Two's argument are unexhausted because they were never raised in the state courts. They should now be deemed exhausted, because Petitioner has no further remedies available in the state courts as he has already used the one direct appeal to which he is entitled, and a motion to vacate would be denied

pursuant to C.P.L. § 440.10(2)(c). Jackson's appellate counsel was in the position, on direct appeal, to raise these record-based claims of ineffective assistance of trial counsel; however, he did not do so, and dismissal under C.P.L. § 440.10(2)(c) would be warranted. Although the claims in Points One and Two are deemed exhausted, the procedural rule that allows for constructive exhaustion of the claims also creates procedural bars to this Court hearing the claims. This default can only be overcome by a showing of cause and prejudice, or by a showing that Jackson is "actually innocent" of the crimes for which he was convicted. Although attorney ineffectiveness can amount to "cause", it must be true, constitutional ineffectiveness–not mere error. And, the ineffectiveness claim, in order to serve as cause, must also be fully exhausted. Here, Jackson could assert that his appellate counsel was ineffective and that should constitute "cause". However, Jackson has never raised an ineffective assistance of appellate counsel claim in state court, so he has no exhausted claim to use as "cause." As noted above, the Supreme Court has clearly articulated the cause and prejudice test in the conjunctive, and thus the failure to make a showing on either prong is fatal to the defendant. In other words, a reviewing court need not determine whether there is both cause and prejudice if, as here, the defendant's proof as to one element is lacking.

Finally, Jackson has proffered no new, reliable evidence that was not presented to the jury that would demonstrate his factual innocence, and so he cannot avail himself of the miscarriage-of-justice exception. The prosecutorial misconduct claims are, therefore, subject to an unexcused procedural default and are denied on that basis.

### 1.     The State Courts' Rulings on the Ineffective Assistance Claims

Citing "generally" to *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981), the Fourth

Department on direct appeal rejected Jackson's contention that he received ineffective assistance of counsel, stating, "A defendant is not entitled to error-free representation, and here defendant 'failed to demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failures[.]'" *People v. Jackson*, 4 A.D.3d at 849 (citing *People v. Quinones*, 238 A.D.2d 921, 922, 661 N.Y.S.2d 122, *lv. denied*, 90 N.Y.2d 862, 661 N.Y.S.2d 189, 683 N.E.2d 1063). That was the extent of the Fourth Department's discussion of the "ineffective assistance" issue.

Notwithstanding the lack of analysis in the Fourth Department's opinion, the Supreme Court and Second Circuit have held that in order to adjudicate a federal claim on the merits, the state court need only dispose of it "on substantive grounds and reduce that disposition to judgment;" hence, "[no] further articulation of its rationale or elucidation of its reasoning process is required." *Eze*, 321 F.3d at 121 (internal citation omitted). An issue thus "may be considered to be adjudicated on its merits even when the state court does not specifically mention the claim but uses general language referable to the merits." *Id*. (internal quotation omitted). Such is the case here. This Court's role as a habeas court is to focus its review simply on "whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent." *Id.* at 125 (internal quotation omitted). The Supreme Court explained in *Bell v. Cone*, 535 U.S. 685 (2002), that for a habeas petitioner alleging ineffective assistance of counsel to succeed, he "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Id.* at 699 (citation omitted). Rather, petitioner "must show that the [state] [c]ourt of [a]ppeals applied *Strickland* to the facts of his case in an objectively

unreasonable manner." *Id.* The dual layers of deference posed by *Strickland* and AEDPA present

a daunting obstacle for habeas petitioners. For the reasons that follow, the Court concludes that

Petitioner cannot hurdle it.

        **2.**        **Analysis of Trial Counsel's Alleged Errors**

                **a.**        **Failure to adequately challenge the indirect physical evidence of sexual assault by consulting with, and calling as a witness, a medical expert specializing in sexual abuse cases.**

        The *Strickland* test with regard to counsel's performance is an objective one, which must

take into account all of the circumstances of the individual case, facing trial counsel at the time

of his or her representation.  Just because a defense attorney employed an identifiable strategy is

not sufficient to preclude careful scrutiny of that decision under *Strickland*, which demands more

than deliberate action–it requires attorneys to behave 'reasonab[ly] considering all the

circumstances.'" *Rompilla v. Beard*, 545 U.S. 374, 394 (2005); *accord, e.g., Wood v. Allen*, ___

U.S. ___, 130 S.Ct. 841, 851, ___ L.Ed.2d ___ (2010) (counsel's decision must be a "reasonable

exercise of professional judgment" to comply with *Strickland*)).   "[S]trategic choices made by

counsel after thorough investigation . . . are virtually unchallengeable," *Strickland*, 466 U.S. at

690, and although there is a strong presumption that counsel's performance falls "within the wide

range of reasonable professional assistance," *id.* at 689-90, counsel nevertheless "has a duty to

make reasonable investigations, and a decision not to investigate will be reasonable only 'to the

extent that reasonable professional judgments support the limitations on investigation.'" *Gersten

v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690-91); *see also

Bell v. Cone*, 535 U.S. 685, 698 (2002).

The Second Circuit has acknowledged that here is no *per se* rule that requires trial attorneys to seek out an expert; expert consultation is not always necessary in order to provide effective assistance of counsel in sexual abuse cases. However, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten*, 426 F.3d at 607 (citing *Eze v. Senkowski*, 321 F.3d 110, 127-28 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (emphasis supplied)). "This is particularly so," the *Gersten* panel explained, "where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." *Gersten*, 426 F.3d at 607 (citing *Eze*, 321 F.3d at 128; *Pavel*, 261 F.3d at 224). This was a complex sexual assault case where, if petitioner were to have any chance at all concerning the alleged rape of his daughter CJ, expertise concerning sexual assault was exceptionally important. There was no direct physical evidence of the rapes and sodomies. Although there was testimony that the wife and ex-wife heard, over the baby monitor, parts of the conversation between Jackson and his daughter that occurred during the sexual assaults, it was not tantamount to uninterested eyewitness testimony.

Here, unlike the situation in *Gersten*, where trial counsel conceded the medical evidence without investigation, Jackson's attorney did consult with a medical professional, albeit not a physician. Trial counsel explained that his consultation consisted of a registered nurse providing him an oral report, interpreting the various notations and abbreviations on the medical records of victims KJ and CJ. SH2 at 12. Trial counsel believed that "surely [his] consultation with the RN prepared [him]" adequately if the treating physician had been called by the prosecution. SH2 at

53.

Certain factors undermine the conclusion that trial counsel was sufficiently prepared by his consultation with the registered nurse. Most telling is his unfamiliarity with any of the medical personnel on the witness list. The Court questions how he could have been prepared to cross-examine the treating physician, let alone an expert medical witness, if he did not know the identity of that person.

At the *Sparman* hearing, trial counsel recalled that the registered nurse with whom he consulted told him, and who was not called as a witness at trial, "Pretty much, there were no findings. One – one of the complainants had what was termed – once an irritation and once an abrasion, twice in the medical reports – maybe twice in the report. Which [complainant] that was, I don't recall." *Id.* Notably, the nurse did advise trial counsel that the records were deficient since they lacked description or depiction or documentation of the location, depth, size, and healing characteristics of the so-called "abrasion", which also was referred to as an "irritation," on CJ.

The information he had received from the registered nurse suggested that the medical records could be used to the defense advantage because they contained a dearth of physical findings. The Court does not understand why, in a case with so many inflammatory allegations, trial counsel would not have pressed that advantage by calling a medical expert to point out the deficiencies in the records. Furthermore, defense counsel needed a medical expert's testimony to explain the difference between an "abrasion" and an "irritation" to effectively make his arguments; without such evidence, his theory was simply that of another layperson, no different from the jurors or the prosecutor.

Petitioner's *Sparman* hearing medical expert, Dr. DeBellis, confirmed the nurse consultant's opinion that the medical report regarding CJ contained deficiencies and inconsistencies. As to the deficiencies in the medical records pointed out by the nurse consultant, trial counsel explained that his strategy was to address them by argument rather than testimony from an expert defense witness:

> I felt I did not want the prosecution to produce a medical expert. My experience has been that when given the opportunity, that the prosecutor's witness would say that no evidence is consistent with sexual assault or no finding or zero finding would be consistent with a sexual assault. So I found it best or I thought it best to address that on my argument based upon no evidence whatsoever produced by the People.

SH2 at 14-15; *see also id.* at 15, 17. Trial counsel was operating on the prosecutor's representation that she was not going to call a medical expert witness. The Court is not suggesting that an attorney should "plan ahead" for another attorney's misconduct. However, his tactical decision not to prepare for and call his own expert out of fear that the prosecution would call her own expert witness was a dubious strategy which left him totally unprepared to address the situation presented by Dr. Lenane's surprise testimony.

Dr. Lenane, who provided a rebuttal affidavit for respondent in connection with the *Sparman* hearing, explained that the documentation of the sexual assault examination contained in CJ's medical records was "typical of the standard" in the Rochester community in 2000, when a child under the age of sixteen years was the patient. Affidavit of Dr. Ann M. Lenane ("Lenane Aff.") at 2, ¶¶8, 10 (Docket No. 41). It was not common practice, according to Dr. Lenane, to document a sexual assault examination of a child under age sixteen by way of a photographs or videotape. *Id.* Dr. DeBellis testified that CJ should have been examined with a colposcope; however, Dr. Lenane stated that such a device was only used in the evaluation of patients aged

sixteen years and older; a colposcope would not have been available for CJ, who was fourteen-years-old in 2000. *Id.*, ¶9 (Docket No. 41).

Dr. DeBellis was emphatic in her testimony that using a colposcope was medically appropriate in children even younger that CJ. Colposcopic examinations, at least at the hospitals where she practiced, were part of standard operating procedure in examining sexual assault victims. Dr. DeBellis testified that if a hospital had a specialized sexual assault program, it should have a colposcope. SH2 at 14. Colposcopes can magnify the area being examined and document the area for digital or other photographic imaging. SH2 at 13. Notably, a colposcope was used in examining Karen, CJ's mother, at the same hospital. Indeed, it is surprising to this Court that a colposcope would not be used in examining all victims of sexual assault given the importance of the medical evidence in criminal prosecutions of this kind.

Dr. DeBellis also explained that photographs of the victim's injuries are typically part of an examination report, SH2 at 12; however, there were no photographs taken of CJ and the alleged injury. Again, the Court finds this deeply disturbing. Dr. DeBellis also noted that there was no documentation describing the examination positions in which CJ was placed, which could have been important since one expects to see changes in the genital or hymenal tissues in different positions. SH2 at 14. The only pictorial representation of the alleged injury merely showed the general area: on a diagram of a female body, the genital area was circled. The area of the "abrasion" was purportedly at the "vaginal introitus" which Dr. DeBellis characterized as a "large area." SH2 at 12. However, the prosecutor argued that the "abrasion" was located at a specific place—"at the point of entry to her vagina". T.634. The prosecutor argued,

> There is a diagram. Look at it. That's right where his penis would have been rubbing, rubbing, rubbing, and abraiding [sic] her body to leave that mark.

T.634. There was no expert testimony to support that argument–just the prosecutor's own unsworn testimony. Even if the jurors might have ultimately drawn that conclusion themselves, it is conceivable that they might not have done so, if a defense expert witness had emphasized the incompleteness of the physical examination and lack of clarity in the medical records. It is not unreasonable to conclude that guided by an expert such as Dr. DeBellis, the jury might have rejected the prosecutor's argument about the "abrasion" since there was no photographic documentation and merely a general description of an undifferentiated injury. In this Court's opinion, an expert such as Dr. DeBellis could not have hurt the defense and could have greatly helped to further undermine the already scanty medical evidence in CJ's case.

Another topic on which a defense expert could have provided assistance was the discrepancy between the notation of the area of trauma, noted both as "irritation" and an "abrasion" in CJ's medical records. Defense counsel argued to the jury that "[t]wo doctors can't agree on the same thing." T.615. He told the jury that the difference was that "[a]n irritation can be a pimple" or "anything that can be manifested [sic] by the body." T.615. However, there was no expert testimony to support that; just counsel's argument, which was not evidence.

Defense counsel stated that an abrasion, which he characterized as a "better term for the prosecution, suggest[ed] some scraping or something." T.615. The Court is baffled as to why defense counsel would have conceded that an abrasion "suggested scraping" when there was no evidence to support such a conclusion, and that characterization helped the prosecution's argument. Trial counsel did properly point out to the jury that "no one came on the stand to tell you what it was, if it was caused by clothes, if it was caused by a sanitary napkin or pad" and "no one can tell you that it was caused by Shawn Jackson, that it was caused by someone else. Could be caused by toilet paper, for that matter. We don't know. Because you didn't hear it. So, that's

consistent with absolutely nothing." T.615-16. In this Court's opinion, however, if these arguments had been supported by testimony from an expert medical witness, there is a reasonable probability that the jury could have found them persuasive.

The prosecutor argued that the part of the record containing the notation of "abrasion" was the most important part of the record, and that the "irritation" description was not significant. A medical expert for the defense would have been able to counter the prosecution's explaining-away of the term "irritation," which the defense wanted the jury to accept as the description of the injury.

The Court recognizes that in her rebuttal affidavit to the testimony offered by Dr. DeBellis offered during the *Sparman* hearing, Dr. Lenane explained that the physician who actually performed the sexual assault examination of CJ noted an "abrasion" at the vaginal introitus. *Id.* at 3, ¶11 (Docket No. 41). This finding of an "abrasion" was noted in both the written description of the pelvic examination as well as on the accompanying anatomical diagram. *Id.* Based upon her review of CJ's medical records, the physician who performed the sexual assault examination "consistently described" the injury to the introitus as an "abrasion", while the reference to that injury as an "irritation" was not made by an individual who examined CJ. *Id.* at 3, ¶12 (Docket No. 41). Dr. Lenane observed that the notation of "irritation" was entered by an individual who was recording what another person had stated, as "is evident from the statement which begins the paragraph: 'Gyn exam reportedly . . . .'" *Id.*, ¶12. Dr. Lenane opined that the notation of "abrasion" in one place and "irritation" at another place in the records "cannot be considered inconsistent interpretations of [CJ's] injuries since this person [who noted an "irritation"] did not perform [CJ's] genital examination." *Id.*, ¶12 (Docket No. 41).

However, as Dr. DeBellis testified, there was no description of the quality or appearance

of the abrasion. SH2 at 12. Dr. Lenane stated that in 2000, an "abrasion in that particular area would have been 'concerning or suspicious' for sexual abuse on the Adams scale, a scale used to evaluate the likelihood of sexual assault in children." *Id.*, ¶11 (Docket No. 41). As Dr. Lenane did not submit any documentation to support her statements concerning the importance of the so-called "Adams scale", the Court accords this post-trial assertion little to no significance.

After scrutinizing the trial transcript, the *Sparman* hearing testimony by Dr. DeBellis, and Dr. Lenane's affidavit, I cannot conclude that trial counsel was correct in surmising that if he had presented medical expert witness testimony, it would have been "neutralized" by any expert witness testimony the prosecution would have introduced. Trial counsel's failure to plan for his own medical expert was compounded by his lack of preparation which led to his belated challenge to the seating of Dr. Lenane as a witness, either by asking for an offer of proof or by simply objecting to her being seated based on lack of notice. By failing to effectively deal with the surprise witness that the prosecutor presented in Dr. Lenane, the jury heard testimony that trial counsel considered to be so damaging that he moved for a mistrial. Indeed, the trial judge's first instinct was to offer a mistrial ruling as one of several options to remedy the consequences of the prosecutor's conduct before he changed his mind.

When assessing the amount of prejudice that accrued to the petitioner, courts "look to the cumulative effect of all of counsel's unprofessional errors." *Gersten*, 426 F.3d at 611 (citing *Lindstadt v. Keane*, 239 F.3d at 204; *accord*, *e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005); *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir.2004); *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir.2003). The Court notes that although trial counsel performed competently in a number of respects, there were several blunders which had disastrous consequences for Jackson's

defense. His unfamiliarity with the witness list compounded his questionable strategy and provides dramatic insight into his lack of preparation. Notwithstanding the complexities of the case, he agreed to take the case one month before trial and failed to request additional time for preparation. He failed to move for a severance of the rape and sodomy charges involving his wife and ex-wife from the rape and sodomy charges involving his daughter. His cross-examination of Karen, petitioner's former wife, was inept and extracted more damaging information than was elicited on direct examination by the prosecutor.

Trial counsel's response to the prosecutor's disturbingly unethical misconduct in violating New York statutory law requiring notice that an expert would testify was ineffective, in that he allowed the expert witness Dr. Lenane to testify without initial objection; he failed to request an offer of proof as to her testimony; he did not know that she was not a treating physician; he did not seek a writ from the appellate division to either review the trial court's refusal to grant a mistrial or to delay the trial to give adequate time to procure an expert of his own; and he failed to initially object to the deficient curative instruction striking the expert's testimony. His tactic of refraining from retaining his own expert so that the prosecution would not be prompted to call a rebuttal witness was highly questionable. Ultimately, it prevented him from effectively dealing with the situation presented by Dr. Lenane's improper testimony.

A verdict "only weakly supported by the record is more likely to have been affected by [counsel's] errors[,]" *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052, while, "[c]onversely, where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus[,]" *Gersten*, 426 F.3d at 611 (citing *Lindstadt*, 239 F.3d at 204); see also Strickland, 466 U.S. at 695, 104 S.Ct. 2052 (courts "must consider the totality of the evidence

before the judge or jury"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 17 (6th Cir.2005) ("[T]he prejudice determination is necessarily affected by the quantity and quality of the other evidence against the defendant.").

Although this case is distinguishable from *Gersten*, *Lindstadt*, *Pavel*, and *Eze*, in certain respects, I nevertheless conclude that the failure to retain an expert medical witness was prejudicial, at least insofar as trial counsel's decision affected the convictions involving CJ, the daughter. In *Gersten*, the Second Circuit observed,

> We have explained that medical expert consultation or testimony is particularly critical to an effective defense in sexual abuse cases where direct evidence is limited to the victim's testimony. The situation may be different in a case where objective evidence exists implicating petitioner in a crime, such as bodily fluids identified as the petitioner's, or where the prosecution offered third party eyewitness testimony. But in a case where the only direct evidence that any crime occurred or that, if it did, the petitioner committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it could be challenged was performance that the state court could not reasonably find to be objectively reasonable.

426 F.3d at 608 (citations omitted). Like the situation in *Gersten*, the prosecution's case was built centrally on the victim's testimony. In *Gersten*, the corroboration was by indirect physical evidence as interpreted by the medical expert; here, the interpretation was offered by the prosecutor, acting as a medical expert. Granted, there was some circumstantial corroborating testimony by two third-party witnesses–the victim's mother and step-mother both testified that they heard the abuse occurring on a baby monitor located in the bedroom where the victim stated that the assaults took place. That is, they were able to hear the bed creaking and the daughter stating at various times that "it hurt" and Petitioner telling the daughter to "relax." The women's testimony concerning what they overheard during Petitioner's repeated assaults on his daughter

lacked eyewitness observations. If this had been a case where Petitioner's incriminating statement had been *Mirandized* and properly admitted, and Dr. Lenane had not offered improper testimony that CJ's injuries were "consistent with penetration", this Court might well have concluded that this case is sufficiently distinguishable from the scenario described in *Gersten*. However, this criminal trial presented a "perfect storm" of legal errors in that the jury heard crucial pieces of evidence it should not have heard: Not only was there the Dr. Lenane debacle, the jury heard testimony from Jackson's own mouth, through Caseworker Bonisteel, strongly incriminating him. A medical expert witness was necessary to capitalize on any benefits the medical records provided to the defense and to effectively counter any medical witness called by the prosecution–either the treating physician or an expert witness. Accordingly, the Court is compelled to conclude that Jackson's defense with regard to the charges involving CJ was prejudiced by trial counsel's failure to retain and plan for a medical expert witness.

The Court turns next to the failure to call an expert medical witness with respect to Rebecca's medical records. With respect to the convictions involving Rebecca Jackson, the consultation with a medical expert was unnecessary, since Rebecca did not go to the hospital on the night of petitioner's arrest and never sought any medical treatment in connection with the alleged sexual assaults.

As to the charges involving petitioner's wife, Karen Jackson, the primary issue was not whether the alleged sexual conduct actually occurred, as in, *e.g.*, *Pavel*, *Eze* and *Gersten*, but whether it was consensual. Therefore, the medical evidence corroborating the sexual assault was less central to the jury's determination of guilt since it does not appear to be possible to distinguish with certainty between consensual and non-consensual intercourse based only on a review of the victim's medical records. *See Andrickson v. Brown*, No. 05 CV 4506(ARR), 2007

WL 1704133, at *4 (E.D.N.Y. June 12, 2007) (finding that petitioner was not prejudiced by trial counsel's failure to call a medical expert witness in a rape case because he failed to demonstrate that there was a reasonable probability of a different result even had an expert testified that the medical findings were "consistent with" consensual intercourse). Furthermore, there was third-party eyewitness testimony from Rebecca, corroborating Karen's version of events.

> **b.**      **Trial Counsel Failed to Adequately Investigate the Lack of Physical and DNA Evidence Corroborating the Victims' Testimony and Present the Reports from the Forensics Laboratory**

There were three laboratory reports produced as a result of the forensic and DNA testing conducted on the items of physical and biological evidence collected by the police at Jackson's house and from emergency room medical personnel from Karen and CJ. Trial counsel's argument at trial, as he recounted at the *Sparman* hearing, was that there was no physical or medical evidence to corroborate the victims' testimonial accounts of repeated sexual assaults by anyone, let alone petitioner, since none of the reports returned positive results. Trial counsel emphasized this in his opening statement to the jury:

> The proof is going to show that there is no physical evidence of rape, none, zero. The proof is going to show that there is no physical evidence of sodomy, zero. There is going to be no physical evidence of incest. You are going to hear about no semen, no blood. You are going to hear about how the police took clothes off of each of these women. You are going to hear about how they took a sheet, preserved a sheet where some sexual act took place on. You are not even going to hear about a pubic hair which was found, my clients, the women, none of them. Everyone has heard about this DNA, how it solves all kinds of crime and how people get let free and everything. You are not going to hear about DNA in this case. You are going to hear how it was submitted, tested, but you are not going to hear about any results tying my client to any of it.
> . . .

T.230-31.

When assessing counsel performance, a reviewing court must presume that "under the

-113-

circumstances, the challenged action might be considered sound trial strategy," *Bell v. Cone*, 535 U.S. at 698, and afford counsel a "strong presumption" of competence, *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) . The decision about whether to introduce a particular piece of evidence "is a question of trial strategy which courts will practically never second-guess," *Ozuru v. United States*, 95 CV 2241, 1997 WL 124212, at *4 (E.D.N.Y. Mar 11, 1997) (citing *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir. 1983) (" We have repeatedly noted our reluctance to second-guess matters of trial strategy simply because the chosen strategy was not successful.") (citations omitted), *aff'd*, 152 F.3d 920 (2d Cir.1998), *cert. denied*, 525 U.S. 1083, 119 S.Ct. 828 (1999)); *see also Skinner v. Duncan*, Nos. 02-CV-3430, 03-MISC-0066, 2003 WL 21386032, at *40 (S.D.N.Y. Jun. 17, 2003) (citing *Ryan v. Rivera*, No. 00-2153, 21 Fed. Appx. 33, 34, 2001 WL 1203391 at *1 (2d Cir. Oct. 9, 2001) ("[W]hen a party challenges matters of trial strategy, such as the decision not to call a witness, even greater deference is generally warranted: "'[A]n appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." ') (quoting *United States v. Luciano*, 158 F.3d at 660)).

At the time of the *Sparman* hearing, I entertained considerable doubts about trial counsel's strategic decision not to introduce the reports indicating that the forensic and DNA testing yielded negative results. It did not seem that there was a downside to introducing the reports, since there were no positive results that trial counsel did not want the jury to hear. Trial counsel explained that he did not introduce the laboratory reports because he wanted to forestall the prosecutor from calling an expert witness to "explain away" the negative results.

Nevertheless, the question on habeas review is not whether I or a different attorney would have employed a different strategy in trying the same case; rather, it is whether Jackson's trial

-114-

counsel's choice was an objectively unreasonable one. *See Wood v. Allen*, ___ U.S. ___, 130 S. Ct. at 851 ("Reviewing all of the evidence, we agree with the State that even if it is debatable, it is not unreasonable to conclude that, after reviewing the [expert's] report, counsel made a strategic decision not to inquire further into the information contained in the report about [petitioner]'s mental deficiencies and not to present to the jury such information as counsel already possessed about these deficiencies.") (citation omitted). After carefully reviewing the record, trial counsel's explanations for his decisions, and the parties' arguments in this case, I conclude that it was not an objectively unreasonable strategy under *Strickland*, since trial counsel was able to argue to the jury that the if there had been any positive physical or DNA evidence linking Jackson to the crimes, the prosecutor certainly would have told them about it. Thus, trial counsel was able to take advantage of the negative reports even though he did not introduce the reports themselves.

Under the particular circumstances of this case, the laboratory reports, although helpful, did not have exceptional value to the defense. The lack of any semen or sperm was not surprising given that neither Karen or Rebecca testified that Jackson ejaculated at any point. The daughter, CJ, testified that she did not know if Petitioner had ejaculated. Notably, both Jackson's ex-wife and wife testified that despite his efforts, he consistently was unable to maintain an erection that night, so it makes sense that there were no traces of ejaculate found.

With regard to the lack of blood, trial counsel did argue that one would have expected to see blood stains on the sheets that were on the bed in which CJ was alleged to have been raped and sodomized, because she was having her menstrual period at the time. As counsel argued, if there had been bloodstains corresponding to CJ's characteristics on the bed sheets, the prosecution certainly would have produced that evidence. The prosecutor plausibly argued that it

was not unusual for CJ's blood not to have gotten the bed sheet, because her menstrual flow was light at the time, which was further corroborated by the finding of "old blood" in the vaginal vault at the time of the hospital examination.

Finally, as to the DNA report, Petitioner's own medical expert, Dr. DeBellas, conceded at the *Sparman* hearing that a lack of DNA evidence would not necessarily indicate that a rape or sodomy did not occur. SH1 at 33. Furthermore, Dr. DeBellis concurred that a DNA expert "would be able to testify that the lack of DNA is explainable." *Id.*

Given Dr. DeBellis' concessions regarding the laboratory and DNA reports, the Court does not find that introducing them would have sufficiently strengthened the defense's case, or undermined the prosecution's proof, such that there is a reasonable probability of a different outcome. Therefore, I do not find that trial counsel's handling of the laboratory and DNA reports prejudiced Jackson's defense.

    **B.**    **Claim Two of the Petition: Petitioner's unwarned statements to the Child Protective Services Caseworker made while Petitioner was in custody, and after Petitioner terminated his interview with police by invoking his Fifth Amendment right to remain silent, were improperly admitted at trial.**

        **1.**    **The Suppression Hearing**

Sgt. Bittner testified that at 6:46 a.m. on November 30, 2000, Jackson asked if he was under arrest. H.12. Sgt. Bittner replied that he was not, and Jackson got up and tried to leave. H.12. At that point, Sgt. Bittner stopped him and told him he was under arrest. *Id.* Sgt. Bittner then read Jackson the *Miranda* warnings from a pre-printed card. H.8. He then asked Jackson each of the waiver questions verbatim from the card. *Id.* Jackson responded that he understood the warnings, but when asked if he agreed to give up his rights and talk to the police "he stated, no, I do not." *Id.* Jackson at no time asked for an attorney. H.9. Jackson was then brought

downstairs to the processing area.

At about 3:30 p.m. that afternoon, just after Karen Jackson had completed giving her statement to the police, Sgt. Bittner was approached by Caseworker Bonisteel from Child Protective Services. H.10-11. Sgt. Bittner could not recall who called whom, but stated that "obviously some member of the police department had called Child Protective [Services] at some point . . . ." H.15. Caseworker Bonisteel requested to speak with Jackson, and Sgt. Bittner assented. *Id.*, H.12.

Sgt. Bittner explained that he did have contact with Caseworker Bonisteel earlier that day. He spoke with her on the phone, and she asked to interview the victims if and when they were released from the hospital. H.15. When Karen and CJ left the hospital, they were brought to the police station, where Casework Bittner participated in the police interviews of both victims and asked questions of them. H.15, 16, 35-36. Caseworker Bonisteel was aware of the nature of the Greece Police Department's investigation. H.17. Sgt. Bittner knew that Caseworker Bonisteel was investigating the same incident that he was investigating. H.20. Sgt. Bittner assumed that Caseworker Bonisteel would ask Jackson questions about the incidents involving Karen, Rebecca, and CJ. H.21.

When asked if he told Caseworker Bonisteel that Jackson had refused to talk to the police, Sgt. Bittner replied, "I believe so." H.17. Caseworker Bonisteel confirmed that Sgt. Bittner had told her that Jackson was not speaking to the police. H.38.

Sgt. Bittner testified that the door to the "holding facility" (i.e., cell) in which Jackson had been placed, H.18, was open. Until the holding facility door was unlocked, Jackson was not able to leave of his own accord. H.19. Jackson was escorted, un-handcuffed, out of the holding facility to a table where Caseworker Bonisteel was sitting. H.11, 22. Sgt. Bittner and the other

officer present both went down a hallway around the corner, so they were out of sight of Jackson, but within earshot of the conversation. H.11-12, 22. Neither officer participated in the interview. H.11-12. However, Sgt. Bittner testified, "I heard everything" said between Jackson and Caseworker Bonisteel. H.21.

Caseworker Bonisteel testified that she asked Sgt. Bittner if he could make Jackson available to her to interview, and he agreed. H.25. This was about 3:30 p.m. Caseworker Bonisteel said that she interviewed Jackson outside of his holding cell at the police department. H.26. She first introduced herself and explained her position with Child Protective Services and that as part of her investigation on behalf of Child Protective Services, she needed to address the allegations made by the victims with him. H.26. She asked if she could speak with him. Jackson agreed. H.27. Caseworker Bonisteel testified that at no point did Jackson say that he did not wish to speak with her. H.27.

Caseworker Bonisteel related that she asked Jackson what had happened the previous night that led to him being in custody. H.29. (What Jackson told Caseworker Bonisteel has been set forth in the section, *supra*, summarizing her trial testimony.) After Jackson expressed "disbelief" that his family had called the police, Caseworker Bonisteel asked him again why he thought he was there. H.32. Jackson said that he overheard one of the deputies saying that not only was he "fucking his wife and ex-wife, he was molesting his fourteen-year-old daughter." Caseworker Bonisteel asked him why he thought the deputy would say that. H.32. Jackson replied that he would never hurt his daughter. Caseworker Bonisteel asked him he had done anything to his daughter; Jackson again replied that he would not hurt her. H.33. Caseworker Bonisteel told him that CJ was saying that Jackson had raped her and represented to him there was "some evidence" of it. H.33, 36. Jackson "kept repeating" that he would not hurt CJ.

Caseworker Bonisteel "asked him how would she get that evidence and why would she say that he was raping her, if he didn't hurt her." H.33. Jackson repeated that he would not hurt his daughter, and stated that no one in his family would have done it. H.33. Caseworker Bonisteel "asked him if it were possible that he was so drunk that he wouldn't have remembered if he raped [CJ]. He said it was a possibility, and I said to him, if it wasn't Karen or Becky or Greg, then that leaves you and could you have been the one to rape [CJ], and he said he could have been the one to rape [CJ]." H.33-34.

The interview lasted about 45 minutes. When asked how it concluded, Caseworker Bonisteel stated that she thanked Jackson for talking with her and "explained that the child protective [services] referral that named him as a subject of the report, was going to be indicated [sic] for sexual abuse against him." H.41. Caseworker Bonisteel could not remember if Jackson went back into the holding cell before she left the room. H.41.

### 2. The State Courts' Rulings on the Suppression of Petitioner's Statement to the Child Protective Services Caseworker

At the conclusion of the hearing, following oral argument, the trial court ruled from the bench on the suppression motion. The trial court found that "no police officer participated in the interview [with Caseworker Bonisteel] and it was not instigated at the request of police officers[,]" and during the interview the police officers "overheard part of the conversation out of concern for the safety of the protective worker." H.47. The trial court found that "the constitutional rights of the defendant were not violated at any time" and "that the statements to the child protective [services] worker were voluntarily, knowingly and intelligently made, and were not made under the influence of any fear produced by any threats, coercion or force or by any promises by the child protective worker, and that the defendant never requested a lawyer."

H.48.

The trial court further found that the C.P.L. § 710.30 notice given to the defense was "pretty much . . . gratuitous in nature because the child protective [services] worker was not a public servant and, in this case, did not act as a law enforcement officer or an agent of a law enforcement officer, but as a child protective [services] worker." H.48. Therefore, there was no requirement for her to give Jackson *Miranda* warnings. H.48-49. The trial court found "additionally, that the child protective [services] worker was being–had the obligation to interview the defendant as part of a completely separate civil proceeding and was not interviewing him as part of any criminal proceeding, although, discussion, of course, necessarily, involved discussion perhaps of criminal activity, it was taken in the course of actually a civil proceeding and the motion to suppress is denied." H.49.

The Fourth Department concluded that Jackson's *Miranda* claim "lack[ed] merit" because "[t]he filing of a child abuse petition does not trigger the right to counsel, and thus the caseworker was not required to advise defendant of his *Miranda* rights before speaking with him[.]" *People v. Jackson*, 4 A.D.3d 848, 772 N.Y.S.2d 149 (N.Y. App. Div. 2004) (citation omitted). The Fourth Department further found that, in any event, "the record establishe[d] that the caseworker was not engaged in law enforcement activity[.]" *Id.* (citation omitted). Jackson sought leave to appeal this issue, which was summarily denied by the New York Court of Appeals. *People v. Jackson*, 2 N.Y.3d 801 (N.Y. 2004). The Fourth Department's ruling constitutes an adjudication on the merits, for purposes of 28 U.S.C. § 2254(d), regarding Jackson's claim that his statements to a child abuse caseworker were inadmissible because the caseworker was acting as an agent of the police and did not advise him of his *Miranda* rights.

### 3. *Miranda v. Arizona* in the Context of 28 U.S.C. § 2254

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." *Id.* at 444. Absent other fully effective procedures, an individual in custody must receive certain warnings before *any official interrogation*, including warnings that he has a "right to remain silent" and that "anything said can and will be used against the individual in court." *Id.* at 467-69 (emphases supplied); *see also Estelle v. Smith*, 451 U.S. 454, 466-67 (1981).

"'Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.'" *Michigan v. Mosley*, 423 U.S. 96, 101 (1975) (quoting *Miranda*, 384 U.S., at 473-474) (footnote in *Mosely* omitted)). However, the Supreme Court has held that *Miranda*, in "decree[ing] that the interrogation must cease upon invocation of the right of silence, . . . did not create a Per se Proscription of indefinite duration upon any further questioning." *Wilson v. Henderson*, 584 F.2d 1185, 1187 (2d Cir. 1978) (citing *Mosley*, 423 U.S. at 103). In *Mosley*, the Supreme Court narrowed the scope of *Miranda* by approving the resumption of custodial interrogation following renewed warnings, instructing that the admissibility of a statement made after a suspect has exercised his right to remain silent depends on whether his "right to cut off questioning" has been "scrupulously

honored." *Mosley*, 423 U.S. at 103 (quoted in *Wilson*, 584 F.2d at 1187).

*Miranda* acknowledged that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." 384 U.S. at 467. The *Miranda* decision "was concerned with 'the "interrogation environment" created by the interplay of interrogation and custody [that] would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination.'" *Saranchak v. Beard*, __ F.3d ___, 2010 WL 3001668, at *6 (3d Cir. Aug. 3, 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 457))."A suspect is entitled to *Miranda* warnings only if he or she is *interrogated while 'in custody.'" Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (emphases supplied)).

"Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624 (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought, *Garner v. United States*, 424 U.S. 648, 657, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976) (the investigative intent requirement)." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir.1987); *accord, e.g.*, *United States v. Fnu Lnu*, No. 09 CR 1207(RPP), 2010 WL 1686199, *6 (S.D.N.Y. Apr. 22, 2010).

Under the prophylactic rules announced in *Miranda*, a statement made by a suspect in response to custodial interrogation after he has elected to remain silent is inadmissible at trial. *Id.*

at 478-79. Thus, in order for the Fifth Amendment right to remain silent to be invoked, however, petitioner must establish that he was subjected to "interrogation." *See Miranda*, 384 U.S. at 444. As the Supreme Court explained in *Rhode Island v. Innis*, 446 U.S. 291 (1980), "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its *functional equivalent*[,]" *id.* at 301, which "is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or action on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an *incriminating response* from the suspect[,]" *id.* footnotes omitted) (emphases supplied). Significantly, the Supreme Court explained, "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Because the "*Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices," *id.*, the reviewing court must focus upon what the accused subjectively believed concerning his situation when considering whether the type of questioning was "reasonably likely" to elicit an incriminating response. This inquiry is made "without regard to objective proof of the underlying intent of the police." *Id.* However, the Supreme Court cautioned, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302. An "incriminating response" is "any response–whether inculpatory or exculpatory–that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5 (emphasis in original).

### 2. The State Courts' Rulings

Here, it is apparently uncontested that Jackson was "in custody" at the time he was questioned by the Child Protective Services Caseworker. I note that on direct appeal, Jackson's appellate counsel asserted that Jackson was undoubtedly in custody, and the prosecution, in its opposition brief, notably, did not contest the issue. *See* People's Appellate Brief at 8, Respondent's Appendix "O" at 201 ("[W]hile in custody at the Greece police station, the defendant agreed to speak to Kathy Bonisteel . . . ."). Rather, the parties disputed was whether Caseworker Bonisteel was acting as a law enforcement officer or an agent of the police. *Id.* at 8-9, Respondent's Appendix "O" at 201-02; Defendant's Appellate Brief at 23-26, Respondent's Appendix "E" at 32-35.  In other words, the critical issue in the state court proceedings was whether Caseworker Bonisteel's questioning of Jackson could be considered "official interrogation" for purposes of Jackson's right to receive *Miranda* warnings, although it was not articulated as such..

The Appellate Division's analysis approached the issue from a different standpoint, in that it held that Jackson's Sixth Amendment right to counsel was not triggered by the filing of a child abuse petition, and therefore, the Child Protective Services Caseworker was not required to advise him of his *Miranda* rights. For this proposition, the Appellate Division relied upon a First Department case, *People v. Brooks*, 184 A.D.2d 274, 276 (App. Div. 1992) ("The caseworker was not required to advise the defendant of his *Miranda* rights before speaking with him, since the filing of a child abuse petition did not trigger the defendant's right to counsel and, in any event, the caseworker was not engaged in law enforcement activity[.]") (citing *People v. Smith*, 62 N.Y.2d 306).  *People v. Smith* dealt with the question of when a defendant's Sixth Amendment right to counsel attaches; the *Miranda* issue was not present in *Smith* because the defendant had been given *Miranda* warnings. Furthermore, there was no issue in Jackson's case

regarding his right to counsel; there is no contention that he requested, but was denied, access to an attorney. Thus, it does not appear to this Court that either *People v. Brooks* or *People v. Smith* are apposite to deciding the *Miranda* claim presented by Jackson. Furthermore, the Fourth Department apparently ignored the fact that Jackson had been arrested on criminal charges and was in police custody; in this Court's opinion, whether or not there was a civil petition alleging child abuse filed against Jackson was immaterial to the *Miranda* analysis.

The portion of the Fourth Department's holding regarding the caseworker not being engaged in law enforcement activity, to the extent that it can be interpreted as concluding that Caseworker Bonisteel did not engage in "official interrogation" of Jackson, is the only relevant part of the decision. Ultimately, however, neither the suppression court nor the Fourth Department apprehended the correct legal standard for evaluating Jackson's claim. In other words, it cannot be said that they "applied" Federal law in deciding the issue. Under AEDPA, when a habeas court is faced with an unexplained state court adjudication or one that does not apply Federal law, it nevertheless must apply a deferential standard of review and evaluate the result reached by the state courts. For the reasons discussed below, the suppression court's ruling and the Fourth Department's holding were both contrary to, and an unreasonable application of, clearly established Supreme Court precedent.

### 2. Applicability of *Miranda* to the Interview with the Caseworker

The Court's initial inquiry must be whether the Fifth Amendment privilege is applicable in the circumstances present in Jackson's case. As noted above, the parties do not contest that Jackson was "in custody" for *Miranda* purposes at the time he was questioned by the Child Protective Services Caseworker. The issue for this Court to determine is whether Caseworker

Bonisteel was "aware of the potentially incriminatory nature of the disclosures sought," *United States v. Morales*, 834 F.2d at 38, that is, whether she possessed the requisite "investigative intent[,]" *id.* As the Third Circuit recently explained, "[t]he interrogation necessary to trigger the need for *Miranda* warnings is not limited to the quintessential station-house police interrogation[,]" *Saranchak v. Beard*, __ F.3d ___, 2010 WL 3001668, at *6 (citing *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (citing *Miranda*, 384 U.S. at 457).

In *Mathis v. United States*, 391 U.S. 1 (1968), the defendant was incarcerated pursuant to a state criminal conviction. An IRS agent met with Mathis and questioned him regarding discrepancies in two of his federal tax returns. During the course of the interview, Mathis made incriminating statements that were later introduced at his criminal trial on charges of tax fraud. The Government argued in *Mathis* that the defendant had been questioned by the IRA agent "as part of a routine tax investigation[,]" that was, at the time, entirely civil in nature, and pointed out that Mathis "had not been put in jail by the officers questioning him, but was there for an entirely separate offense." *Id.* at 2. After determining that Mathis was "in custody," the Supreme Court dismissed the Government's argument that the questioning was done in the context of a civil tax investigation, in which criminal proceedings might not have been brought. The Supreme Court rejected this fact as dispositive, noting that "tax investigations frequently lead to criminal prosecutions, just as the one here did," and that any tax investigation could lead to a criminal prosecution. *Mathis*, 391 U.S. at 4. "Because the defendant was in custody at the time of questioning, and because of the ever-present possibility that tax investigations could wind up as criminal prosecutions, the Fifth Amendment was implicated." *Saranchak*, ___ F.3d. ___, 2010 WL 3001668, at *6 (citing *Mathis*, 391 U.S. at 4). The availability of the Fifth Amendment's privilege against self-incrimination "'does not turn upon the type of proceedings n which its

protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.'" *Saranchak*, ___ F.3d. ___, 2010 WL 3001668, at *6 (quoting *In re Gault*, 387 U.S. 1, 49 (1967)).

In *Estelle v. Smith*, 451 U.S. 454 (1981), the Supreme Court analyzed the scope of the Fifth Amendment's protections when a criminal accused is questioned by someone other than a law enforcement officer. In *Smith*, the trial judge *sua sponte* ordered a psychiatric evaluation of the defendant to determine his competency to stand trial. The accused was in jail, awaiting trial, and was represented by counsel. Without administering *Miranda* warnings, the court-appointed the psychiatrist interviewed him for 90 minutes, concluded he was competent, and filed a short report to that effect. *Id.* at 456-57. At the capital sentencing phase, the psychiatrist was the State's only witness, testifying on the question of Smith's future dangerousness; the State bore the burden of proving, beyond a reasonable doubt, this key element in determining whether to impose the death sentence. Certain inculpatory answers given by the defendant during the interview with the court psychiatrist were used to formulate very specific and adverse opinions on Smith's future dangerousness. *Id.* at 459-60. Based upon the jury's answers to special interrogatories, the death penalty was mandatory. *Id.* at 460. The lower federal courts vacated the death sentence based upon the erroneous and prejudicial admission of the psychiatrist's statements, and the Supreme Court affirmed. The *Smith* court rejected the government's argument that the defendant's statements to the psychiatrist, because they were made during a pre-trial competency evaluation, were similar to handwriting or voice samples and therefore not protected by the Fifth Amendment. The Supreme Court observed that it was the substance of the defendant's discussions with the psychiatrist, in which the defendant described the details of the crime, that provided the basis for the doctor's opinion of the defendant's future dangerousness.

The defendant was never warned that this "compulsory examination would be used to gather evidence to decide whether, if convicted, he should be sentenced to death." 451 U.S. at 467. Because the defendant in *Smith* "did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements," his Fifth Amendment right against self-incrimination was violated. *Id.* at 468. The Supreme Court in *Smith* "went out of its way to reiterate that what had taken place was 'a court-ordered psychiatric inquiry' while the defendant was in custody." *Saranchak*, ___ F.3d ___, 2010 WL 3001668, at *7 (quoting *Smith*, 451 U.S. at 469). The Supreme Court found it "immaterial" that defendant was interrogated by a court-appointed psychiatrist "rather than by a police officer, government informant, or prosecuting attorney," *Smith*, 451 U.S. at 467, for "[w]hen [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting[,]" *id.*

*Miranda* clearly stated that "[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda*, 384 U.S. at 478. Thus, "[a] criminal defendant always runs the risk of having his statements used against him if he makes them voluntarily." *Saranchak*,___ F.3d ___, 2010 WL 3001668, at *7.  Based upon the Supreme Court's decisions in, for example, *Mathis* and *Smith*, the Third Circuit explained that "[i]t is clear, then, that assuming the defendant is in custody, interrogation *vel non* is the focal point of *Miranda*'s protection against the evidentiary use of self-inculpatory statements." *Saranchak*,___ F.3d ___, 2010 WL 3001668, at *7 (citing *Innis*, 446 U.S. at 300). "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*,

446 U.S. at 300 (footnote omitted) (quoted in *Saranchak*, 2010 WL 3001668, at *7). The Supreme Court's analysis in *Innis* implies that determining whether a person has been subjected to "functional equivalent of interrogation," for purposes of *Miranda*, is more than simply finding of historical fact; the court must evaluate facts to determine whether police or their agents should have known their conduct was reasonably likely to elicit incriminating response.

Accordingly, whether the functional equivalent of interrogation has taken place is a mixed question of law and fact. Thus, this ultimate issue is not entitled to the § 2254(d) presumption of correctness; rather as a question of law, the issue merits independent consideration in a federal habeas corpus proceeding. *Endress v. Dugger*, 880 F.2d 1244, 1249 & n.3 (11th Cir. 1989), *cert. denied*, 495 U.S. 904 (1990) (citing *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (holding that the issue of the voluntariness of a confession is not an issue of fact entitled to the former § 2254(d) (now § 2254(e)(1)) presumption , but is a legal question meriting independent review); *see also United States v. Moreno-Flores*, 33 F.3d 1164, 1168 (9th Cir.1994) ("[W]hether [a] defendant was subjected to interrogation is a mixed question of law and fact reviewed de novo.").

The underlying facts concerning Caseworker Bonisteel's status are, however, "subsidiary factual findings bearing on the ultimate issue of whether the functional equivalent of interrogation occurred." *Endress*, 880 F.2d at 1249 (citing, *inter alia*, *Miller v. Fenton*, 474 U.S. at 112). However, as discussed more fully in the ensuing paragraphs, I conclude that the state court's factual determination was "objectively unreasonable in light of the evidence presented during the state proceedings," 28 U.S.C. § 2254(d)(2). Briefly, the investigating officers in Jackson's case arranged and facilitated the meeting between Jackson and Caseworker Bonisteel, which took place in the jail where Jackson was being detained in custody. The inference is

inescapable that the purpose was to elicit an incriminating response from the suspect who had just hours before, specifically invoked his Fifth Amendment privilege against self-incrimination and refused to talk about the alleged crime. Caseworker Bonisteel–not Jackson–mentioned the crime and specifically questioned Jackson about it with the clear intent of eliciting information from him. Both Caseworker Bonisteel, and the Greece Police Department officers who were eavesdropping on the conversation, knew that Caseworker Bonisteel's visit was reasonably likely to elicit an incriminating response from Jackson–indeed, that is why they were eavesdropping on the interview, and their eavesdropping demonstrated planning. Furthermore, I find that clear and convincing evidence, 28 U.S.C. § 2254(e)(1), rebuts the presumption typically accorded to the state courts' factual determinations. I also find that the state court unreasonably applied clearly established federal law, namely, *Mathis v. United States* and *Estelle v. Smith*, and *Rhode Island v. Innis*, insofar as the state courts concluded that Jackson was not subjected to the functional equivalent of interrogation by an agent of law enforcement. Indeed, the state courts' conclusions were "contrary to" the clearly established Supreme Court precedent of *Mathis v. United States*, a case which is squarely on point with the instant matter.

I begin with a discussion of the Third Circuit's recent decision in *Saranchak v. Beard*, a 28 U.S.C. § 2254 petition involving a *Miranda* claim quite similar to the one pressed by Jackson here. In *Saranchak*, the petitioner asserted that trial counsel had been ineffective in failing to litigate the admissibility of his statements made to a Child Youth Services caseworker while he was incarcerated for a double homicide. Petitioner Sarachak argued that the Children and Youth Services caseworker subjected him to a custodial interrogation without providing him procedural safeguards, such as advising him of his *Miranda* rights or providing notice to his attorney. The Pennsylvania Supreme Court concluded that the caseworker did not interrogate petitioner

Saranchak, noting that she was visiting him to discuss matters related to proceedings involving his children, who were in foster care as the result of his incarceration; that she "was a stranger to any aspect of the criminal case"; and that her question regarding the murders "was purely conversational and was not made with the purpose of soliciting information from [petitioner] about the crimes." *Saranchak*, __ F.3d __, 2010 WL 3001668, at *8 (citation to state court opinion omitted). The Third Circuit found that characterization accurate, noting that the caseworker had testified that she and petitioner were discussing visitation with his children when she expressed her inability to understand how the murders happened. *Id.*; *see also Saranchak v. Beard*, 538 F. Supp.2d 847, 884-85 (M.D. Pa. 2008) ("I asked [sic] him that I couldn't understand nor could the worker previous to me how any of this had happened. . . . He then went on to tell me about the murders, why he had done it, etc.") (quoting caseworker's testimony at degree-of-guilt hearing), *reversed and remanded*, __ F.3d __, 2010 WL 3001668. After petitioner Saranchak readily provided details about the murders, the caseworker asked a follow-up question–why, then, he had earlier pled not guilty. Saranchak explained that he also had been accused of stealing from the murder victims, but that it was only his accomplice who had stolen from them. *Id.* Because he had not stolen anything, he refused to plead guilt to those offenses, but would serve time for the murders since he had committed them. *Id.* The Third Circuit readily distinguished the caseworker in *Saranchak* from the tax agent-turned-informant in *Mathis*, because the caseworker's "interview with [petitioner] was not of the kind, like a tax investigation, that has a high probability of leading to informant testimony at a criminal trial." *Saranchak*, __ F.3d ___, 2010 WL 3001668, at *8 (citing *Mathis*, 391 U.S. at 4-5). The Third Circuit observed that "[t]he same could be said for a [Child Youth Services] interview of a person charged *with offenses involving children*," *id.* (emphases in original)–in other words, there

is a high probability of that type of interview resulting in a criminal inquiry. *Id.* (citing *Commonwealth v. Ramos*, 367 Pa. Super. 84, 532 A.2d 465 (Pa. Super. Ct. 1987) (holding that statements made to a child youth services caseworker without *Miranda* warnings were inadmissible where caseworker was investigating charges relating to the sexual abuse of a child for which the defendant was incarcerated pending trial). It was "quite a different matter," the Third Circuit opined, to say that a youth services caseworker "answering questions about visitation and letters to children and explaining the [children and youth services] court system should know that the person she is interviewing would freely admit to committing two murders." *Saranchak*, ___ F.3d ___, 2010 WL 3001668, at *8. In sum, the Third Circuit found that children and youth services caseworker's testimony "fail[ed] to reveal interrogation compelling him to [discuss the murders]" and Saranchak's statements about how he committed the murders were "not elicited by any 'express questioning or its functional equivalent'" by the caseworker. *Id.* (quoting *Innis*, 446 U.S. at 300-01).

The circumstances in Jackson's case are directly on point with those in *Commonwealth v. Ramos*, 367 Pa. Super. at 89-91, which the Third Circuit in *Saranchak* analogized to the Supreme Court's decision in *Mathis v. United States*, 391 U.S. at 3-4. Like Jackson, the defendant in *Ramos* had been arrested on child sexual abuse charges and was incarcerated at the time of his conversation with the children and youth services caseworker, which was conducted in a locked interview room. There being no question that Ramos was in custody for *Miranda* purposes, the court turned to whether the questioning amounted to interrogation within the meaning of *Miranda* and whether the caseworker was a government actor. The state in *Ramos* argued, as respondent does here, that the caseworker was not working at the direction or behest of the police and that the statements were obtained in the course of a "good faith" civil investigation. This

argument, however, ignores the previous decisions of the Supreme Court, such as *Mathis v. United States*, rejecting such distinctions. *Accord Commonwealth v. Ramos*, 367 Pa. Super. at 91 (citing *Mathis*, 391 U.S. at 3-4). In dismissing the Government's argument that *Miranda* did not apply because the questions asked of Mathis were part of a routine civil tax investigation, the Supreme Court noted that "[t]hese differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Mathis*, 391 U.S. at 4.

Similarly, in *Battie v. Estelle*, 655 F.2d 692, 699 (5th Cir. 1981), the Fifth Circuit explained that *Miranda*'s relevance was not obviated simply because the questioner–here, Caseworker Bonisteel–is not directly affiliated with law enforcement: "[T]he particular office that the official who performs the custodial interrogation represents is inconsequential because *Miranda* was concerned with official custodial interrogations of an accused and the use of statements obtained from an accused without an attorney in such circumstances to prove the State's case against the accused." *Battie*, 655 F.2d at 699. Here, the primary purpose of the applicable title of the Social Services Law is to "encourage more complete reporting of suspected child abuse and maltreatment and to establish in each county of the state a child protective service capable of investigating such reports swiftly and competently and capable of providing protection for the child or children from further abuse or maltreatment and rehabilitative services for the child or children and parents involved." N.Y. Social Services Law § 411. The Social Services Law also mandates certain reporting procedures; among the persons required to report suspected child abuse to Child Protective Services are law enforcement officers. *Id.*, §

413(1)(a).[18] Upon receiving such a report, it is incumbent upon the Child Protective Services agency to immediately commence an appropriate investigation. *Id.*, § 424(6)(a).[19] All reports made by the Child Protective Services agency pursuant to the Social Services Law are to be made available to law enforcement officers. *Id.*, § 424(5-a).[20] Clearly, Caseworker Bonisteel was *required by law* to forward her reports of the interviews with the victims and alleged perpetrator, to the police. Furthermore, the Social Service Law requires investigations such as the one undertaken by Caseworker Bonisteel to "be conducted by an approved multidisciplinary investigative team, established pursuant to subdivision six of section four hundred twenty-three of this title provided that in counties without a multidisciplinary investigative team investigations shall be conducted jointly by local child protective services and local law enforcement[.]" *Id.*

### 3. Harmless Error Analysis

---

[18] Section 413. Persons and officials required to report cases of suspected child abuse or maltreatment . 1.(a) The following persons and officials are required to report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child: . . . police officer; district attorney or assistant district attorney; investigator employed in the office of a district attorney; or other law enforcement official.

[19] Each child protective service shall: 6. (a) upon receipt of such report, commence or cause the appropriate society for the prevention of cruelty to children to commence, within twenty-four hours, an appropriate investigation which shall include an evaluation of the environment of the child named in the report and any other children in the same home and a determination of the risk to such children if they continue to remain in the existing home environment, as well as a determination of the nature, extent and cause of any condition enumerated in such report and the name, age and condition of other children in the home, and, after seeing to the safety of the child or children, forthwith notify the subjects of the report and other persons named in the report in writing of the existence of the report and their respective rights pursuant to this title in regard to amendment.

[20] Each child protective service shall: give telephone notice and forward immediately a copy of reports made pursuant to this title which involve suspected physical injury as described in paragraph (i) of subdivision (e) of section ten hundred twelve of the family court act or sexual abuse of a child or the death of a child to the appropriate local law enforcement.

Since the Appellate Division did not address the harmless error issue, there is no state court holding regarding harmlessness to which AEDPA deference applies. *Smiley v. Thurmer*, 542 F.3d 574, 583-84 (7th Cir. 2008). Under these circumstances, this Court sitting, in habeas review, must apply the "*Brecht* standard of actual prejudice." *Fry v. Pliler*, 551 U.S. 112, 122 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705."). Thus, I must determine whether the *Miranda* violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (adopting a standard first announced in *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946)). *Brecht* instructs that if "in grave doubt about whether or not that error is harmless," then the habeas court "should treat the error . . . as if it had a 'substantial and injurious effect or influence'" on the jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436-37(1995) (quoting *Brecht*, 507 U.S. at 627); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 7 (2004). In discussing the harmless error analysis in a case involving application of *Chapman*, the Supreme Court noted that the inquiry asks

> not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks . . . to the basis on which the jury actually rested its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered–no matter how inescapable the findings to support that

verdict might be–would violate the jury-trial guarantee.

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (citations omitted). Likewise, the Supreme Court explained in *Brecht*, "[t]he standard for determining whether habeas relief must be granted is whether . . . the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (emphasis added)); *accord Wilson v. Mitchell*, 498 F.3d 491, 504 (6th Cir. 2007) ("The Supreme Court has indicated that of these two meanings [for harmless error] the proper one is the first (i.e., whether the error had an actual impact on the outcome).") (citing *Sullivan*, 508 U.S. at 279; *Brecht*, 507 U.S. at 623).

The constitutional error occasioned by the admission of a defendant's confession in violation of his *Miranda* rights is subject to review for harmlessness. *Zappulla v. People of the State of New York*, 391 F.3d 462, 466 (2d Cir.2004) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004)). In *Brecht*, the prosecution erroneously referred to the defendant's post-*Miranda* silence; the Supreme Court, in reviewing the harmfulness of that Fifth Amendment error, relied on several factors including the prominence of the constitutional error, whether the improperly admitted testimony was "cumulative," and the strength of the prosecution's other evidence. 507 U.S. at 639, 113 S.Ct. 1710. Similarly, the Second Circuit has instructed that the following factors, distilled from the Supreme Court's precedents on *Miranda* violations, are relevant in determining whether the erroneous admission of a confession was harmless error: (1) the overall strength of the government's case; (2) the government's conduct (e.g., the prosecutor's degree of reliance) with regard to the confession; (3) the importance of the improperly admitted confession; and (4)

whether the confession was cumulative of other, properly admitted evidence. *Zappulla*, 391 F.3d at 466 (citations omitted).

I first consider the effect of the improperly admitted statement on the jury verdicts involving Jackson's daughter, CJ. Both the defense and the prosecutor mentioned the statement in their summations. Defense counsel focused on Jackson's assertion to the caseworker that he would never hurt his daughter. As noted above, when asked by Caseworker Bonisteel why his daughter would be alleging that he raped her, Jackson repeatedly asserted that he would never do anything to hurt CJ. Defense counsel utilized this part of the statement: "[Jackson] told her that he didn't hurt [CJ]. She pressed him, pressed him. He told her again and again, I didn't hurt [CJ}, I wouldn't do anything to hurt [CJ], I would never hurt [CJ]. Why? She puts those things in quotes. And as a caseworker she tells you any time someone says something significant to me, I put it in quotes exactly what they had to say." T.618. Trial counsel attempted to minimize the importance of Jackson's admission that it was "possible" that he had raped CJ,[21] suggesting that the caseworker's report was not an accurate representation. T.619. He argued that the caseworker did not record Jackson's exact words when he allegedly admitted that the rape was a possibility. He emphasized that the report was based on her memory, rather than her notes, which she destroyed after the interview.

The prosecutor relied heavily on the statement to Caseworker Bonisteel, arguing that it demonstrated Jackson's guilty conscience; she argued that an innocent person, accused of raping his daughter, would never have allowed the "possibility" of such a thing happening. There is no

---

[21] Jackson did concede that there was no one else in the household that would have raped CJ. And, when asked several leading questions by Caseworker Bonisteel to the effect of whether he could have been so drunk that he could have been the one to do it, Jackson reportedly said that it was "possible."

question that his admission was extremely damaging. The prosecutor compounded the damage by proceeding to mischaracterize Jackson's alleged statement:

> Now, I ask you, ladies and gentlemen, if you were a person who stood accused of having sex with your own child, and you hadn't done it, if somebody asked you if that was possible, would you say "maybe[?]"

T.635.  However, the caseworker did *not* testify that Jackson had said, "Maybe." The prosecutor continued in this vein, opining that

> [t]here would be an adamant denial, there would be something of a much stronger reaction than, "Yeah, maybe, I could have."

T.635. Again, that misquotes the caseworker's testimony because Jackson never said, "Yeah, maybe, I could have.".  The prosecutor finished by vouching for the caseworker's credibility and proclaiming Jackson's guilt: "And the reason he says, 'Yeah, maybe, I could have' is because he did. It's that simple. Innocent people don't admit that there is a possibility that they did something wrong, particularly when what we are talking about is sex with his own daughter." T.635.

Evaluating the *Miranda* error against the *Zappulla* factors, I am compelled to conclude that the error did have a substantial and injurious effect on the jury's verdicts as to the charges involving CJ. First, considering the properly admitted evidence, the prosecutor's case against Jackson with regard to CJ was not overwhelming. There was no physical or DNA evidence, and the medical injuries were not overly strong and the medical records themselves were lacking in numerous respects. The prosecutor relied heavily on the confession and, in fact, mischaracterized Petitioner's statements so as to make them more unequivocal. Third, the improperly admitted confession was a centerpiece of the prosecutor's closing argument. Fourth, the confession was *not* cumulative of other, properly admitted evidence. Under the particular circumstances of this

case, I have a "grave doubt[,]" *Brecht*, 507 U.S. at 623, in my mind about the harmlessness of the *Miranda* error vis-à-vis the CJ verdicts, and that precludes me from dismissing the constitutional error as harmless.

I turn next to the effect of the improperly admitted statement on the jury verdicts involving Jackson's wife (Rebecca), ex-wife (Karen), and son (Gregory). As noted above, Petitioner did not admit to any acts of abuse against Rebecca or Karen when he talked to Caseworker Bonisteel; indeed, he denied having had sexual relations with them at all on the night of his arrest, claiming he tried but was unable to do so. The son, Gregory, was not even mentioned by Jackson when discussing the case with Caseworker Bonisteel. Thus, the improperly admitted statement was hardly a critical piece of evidence as to the charges involving Karen, Rebecca, or Gregory. *See Zappulla v. State of New York*, 391 F.3d 462, 472 (2d Cir. 2004) (discussing the "importance of the improperly admitted evidence" in assessing the harmlessness of a *Miranda* violation) (citing *Satterwhite v. Texas*, 486 U.S. 249, 260, 108 S.Ct. 1792 (1988) (noting that the erroneously admitted evidence was the only evidence that established the crucial issue at sentencing regarding future rehabilitation); *Arizona v. Fulminante*, 499 U.S. 279, 299, 111 S.Ct. 1246 (1991) (noting that the erroneously admitted "confession was not merely cumulative" of the other evidence at trial)). Although the prosecutor argued Jackson's comment to the effect that Karen and Rebecca "knew the routine" implied their lack of consent to the sexual acts committed by Jackson, there was a mountain of other evidence, in the form of these witnesses' internally and externally consistent testimony, establishing that their participation was based on forcible compulsion, and was not voluntary in any sense of the word. After carefully reviewing the trial transcript, I am firmly convinced the improper admission of the statement to Caseworker Bonisteel did not have a "substantial and injurious effect in

determining the jury's verdict[s,]" *Brecht*, 507 U.S. at 623 (quotation omitted), on the charges

involving Karen, Rebecca, and Gregory. Stated another way, I am confident that the jury verdicts

reached with regard to these three family members "were surely unattributable to the error[,]"

*Sullivan v. Louisiana*, 508 U.S. at 279.


### C.    Claim Three of the Petition: Defective Indictment

#### 1.    Overview of Claim and the State Court's Ruling

 Petitioner here argues, as he did on direct appeal, that the indictment contained

inflammatory language, and contained duplicitous, multiplicitous, and identical counts, in

violation of his rights under the Sixth and Fourteenth Amendments. *See* Petitioner's Addendum

to the Petition, pp. 9-14. The Appellate Division held the claims regarding the indictment to be

unpreserved and declined to exercise its discretionary power to review them claim in the interest

of justice. *People v. Jackson*, 4 A.D.3d at 848 (citing N.Y. CRIM. PROC. LAW §§ 470.05(2),

470.15(6)).

#### 2.    Procedural Default

Respondent argues that the claims concerning the indictment are procedurally defaulted

due to the state court's reliance upon an adequate and independent state ground, i.e., C.P.L. §

470.05(2), to dismiss them. *See* Respondent's Memorandum of Law in Opposition to the

Petition, pp. 8-9 (Docket No. 7). A federal court reviewing a habeas corpus petition may not

review a federal issue related to that petition when the latest state court's ruling on the claim

rested upon "a state law ground that is independent of the federal question and adequate to

support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d

640 (1991). However, only a "firmly established and regularly followed state practice" may be interposed by a state to prevent subsequent review of a federal constitutional claim. *James v. Kentucky*, 466 U.S. 341, 348 (1984); *accord, e.g.*, *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir.2003). Criminal Procedure Law § 470.05(2) provides that that parties must preserve an issue for appellate review by lodging a contemporaneous objection. This procedural rule, upon which the Appellate Division explicitly relied in Jackson's case, has been recognized by courts in this Circuit as such a firmly established and regularly followed rule. *E.g.*, *Garcia v. Lewis*, 188 F.3d 71, 7982 (2d Cir.1999). The Second Circuit explained in *Garcia* that New York's requirement regarding preservation of issues for appellate review serves a legitimate state interest because it requires that a party give the trial court the opportunity to remedy a problem and thereby avert reversible error before the issue arrives at the appellate court. *Garcia*, 188 F.3d at 78; *accord, e.g.*, *Simpson v. Portuondo*, No. 01-CV-8744, 2002 U.S. Dist. LEXIS 10536, at *12, 2002 WL 31045862 (S.D.N.Y. June 4, 2002) ("New York's contemporaneous objection rule is firmly established and regularly followed by state courts, as the Second Circuit has long recognized."). Habeas courts in this Circuit have found C.P.L. § 470.05(2) to be an adequate and independent state ground under circumstances similar to those present in Jackson's case. *E.g.*, *Roldan v. Ercole*, No. 08 CV 6548(LBS), 2009 WL 2191176, *3 (S.D.N.Y. July 20, 2009) ("Because the Appellate Division invoked this adequate and independent state ground in denying Petitioner's claims that the indictment contained duplicitous counts and that the People failed to prove count five of the indictment consistent with the court's jury instructions, this Court is barred from considering the merits of Petitioner's claims.") (citing *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990) (when a state court explicitly invokes a state procedural bar rule, federal habeas review is precluded)).

To overcome the adequate and independent finding of procedural default and obtain federal review of his claims, a petitioner must either show cause for the default and prejudice resulting from the alleged constitutional error, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice. *E.g.*, *Coleman v. Thompson*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Petitioner has not attempted to establish either cause for the default or prejudice attributable thereto. Nor has he established a fundamental miscarriage of justice. As the Supreme Court has stated, a miscarriage of justice occurs in the "extraordinary" case where a constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 322-24 (1995); *see also id.* at 324-27 (explaining that fundamental miscarriage of justice may be demonstrated by showing through "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence"); *accord Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.") (citation omitted). The Supreme Court summarized its jurisprudence in this area as follows:

> [T]he miscarriage of justice exception is concerned with actual as compared to legal innocence. We have often emphasized "the narrow scope" of the exception. "To be credible," a claim of actual innocence must be based on reliable evidence not presented at trial. Given the rarity of such evidence, "in virtually every case, the allegation of actual innocence has been summarily rejected."

*Calderon*, 523 U.S. at 559 (internal quotations and citations omitted).

Apart from his own protestations that he has been wrongly accused and convicted, petitioner has not presented any evidence pertinent to an actual innocence claim. Petitioner likely

would argue that the Laboratory Report No. 2, the report concerning the results of the trace analysis ("the Trace Analysis Report"), which he contends was not provided to defense counsel at trial, constitutes new, reliable evidence of innocence. As noted above, the Trace Analysis Report was negative; in other words, the items of physical evidence sent for testing, such as the sheets taken from the Jackson household, did not yield any "trace" evidence or physical artifacts from a sexual assault such as pubic hairs, sexual lubricants, or fecal material, for example. Neither the Trace Analysis, nor the DNA Report or the Biological/Serological Report, constitute new, reliable evidence of actual innocence under the *Schlup* standard. *See Moreno v. Kelly*, 1997 WL 109526, *4 (S.D.N.Y. Mar. 11, 1997) ("The absence of Moreno's semen on Lopez's clothing and inside her vagina does not indicate that no rape occurred. Supporting medical evidence is not required for a rape conviction. Further, the absence of Moreno's semen is understandable in light of Lopez's testimony that Moreno may not have ejaculated during the rape. Ejaculation is not necessary for the crime of rape. *See People v. Counts*, 220 A.D.2d 218, 219, 632 N.Y.S.2d 4, 5 (1st Dep't 1995). Thus, there was more than sufficient evidence, based on the trial testimony, to find that Moreno was guilty of rape in the first degree.") (footnote omitted); *Kendrick v. Greiner*, 296 F. Supp.2d 348, 353 (E.D.N.Y. 2003) ("There was no physical evidence directly linking petitioner to the stabbing. Although officers seized clothing from petitioner's home, no traces of the victim's blood were found. No forensic evidence at the crime scene linked petitioner to the killing. No fingerprint evidence was introduced. There was, however, other evidence introduced at trial that a reasonable juror could find tended to prove petitioner's guilt."); ("During a search of Petitioner's home and vehicle, police officers did not find any traces of semen or blood. Ms. Diane Alia, a forensic scientist at the Suffolk County Crime Laboratory who analyzed the evidence collected during Ms. Newell's rape kit

examination, testified that she did not find any traces of semen or blood on Ms. Newell's clothing or from anal, vaginal, and oral swabs. Mr. Clyde Wells, also a forensic scientist at the same laboratory, testified he found a red carpet fiber in a tape lift of Ms. Newell's underpants that was consistent with the carpet in Petitioner's home. Several black dog hairs were recovered from Ms. Newell's clothing and similar hairs were found in a tape lift of Petitioner's bed sheets.").

Nor are the laboratory reports and DNA report "new" in that trial counsel used the lack of positive findings in those disputed laboratory to argue to the jury that the prosecution's case was weak. For instance, he pointed out that on the sheet confiscated from the bed in which petitioner allegedly had sex with his daughter, who was menstruating at that time, there was no blood on that sheet from the victim, and argued that if there had been, the jury would have heard about it. T.612. Counsel argued that the prosecution was not adducing any evidence that there was pubic hair, semen, or DNA, or any other physical traces of sexual intercourse. T.612-13. Furthermore, counsel emphasized, there was no physical evidence collected from the victims' clothing or from the sanitary napkin that the daughter was wearing, or from any of the swab samples or pubic combings taken by the medical personnel from the victims. T.613-14. Nor was there any physical evidence on petitioner's clothing or underwear. T.614. In sum, trial counsel argued, there was "no evidence right now to show that a crime was committed." T.614. Even if the reports could be deemed "reliable" evidence of "actual, factual innocence," the jury already heard about the lack of physical and DNA evidence documented in those reports, through trial counsel's argument. Therefore, I do not believe that the reports can be considered "new" for purposes of establishing actual innocence.

Jackson's claims regarding the alleged defects in the indictment are subject to an unexcused procedural default and accordingly are dismissed. *Accord*, *e.g.*, *Roldan v. Ercole*,

2009 WL 2191176, at *3 (citing *Jones v. Duncan*, 162 F. Supp.2d 204, 212-14 (S.D.N.Y. 2001)).

**VI.  Conclusion**

For the foregoing reasons, Shawn Jackson's petition for a writ of habeas corpus is granted in part, to the extent that relief is (1) **granted** on the claim of ineffective assistance of trial counsel with regard to the failure to retain a medical expert witness in connection with the convictions involving CJ; and (2) **granted** on the claim that the *Miranda* error was not harmless as to the convictions involving CJ.

A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2);  *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000); *United States v. Lozada*, 107 F.3d 1011, 1013 (2d Cir.1997). To show entitlement to a certificate of appealability, the petitioner need not show that he should prevail on the merits; instead, he need only demonstrate: (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues in a different manner; or (3) that the questions are adequate as to deserve encouragement to proceed further. *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983); *Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (stating that the present standard under the current version of 28 U.S.C. § 2253 is a codification of the certificate of probable cause standard announced in *Barefoot v. Estelle*); *see also Lucidore*, 209 F.3d at 112 (citing *Barefoot*, 463 U.S. at 893 n. 4). The Court finds that the claim that trial counsel's failure to introduce the laboratory and DNA reports was ineffective and prejudiced the defense fulfills the above-cited standard. Therefore, a certificate of appealability is **granted** as to this claim.

The remaining claims in the petition are **denied** for the reasons stated above in this

Decision and Order.

Respondent is hereby ordered to vacate Petitioner's convictions involving CJ unless within 90 days unless the Monroe County District Attorney's Offices commences re-prosecution of Petitioner as to the charges involving CJ. This judgment is stayed pending completion of any appellate proceedings.

The appointment of Petitioner's habeas counsel under the CJA is hereby continued for purposes of further proceedings in this matter.

**IT IS SO ORDERED**.

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:      January 11, 2011
            Buffalo, New York.